UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 14-10363-RGS

UNITED STATES OF AMERICA

v.

BARRY J. CADDEN, et al.

MEMORANDUM AND ORDER ON DEFENDANT
BARRY CADDEN'S MOTION FOR A JUDGMENT OF ACQUITTAL
OR, IN THE ALTERNATIVE, A NEW TRIAL [DKT # 1004]

June 22, 2017

STEARNS, D.J.

Following a ten-week trial and four days of deliberations, the jury returned a verdict finding defendant Barry J. Cadden guilty of racketeering, racketeering conspiracy, mail fraud, and violations of the federal Food, Drug, and Cosmetic Act (FDCA). Having preserved his rights, Cadden now moves for a judgment of acquittal, or in the alternative, a new trial.

Judgments of acquittal are granted sparingly. In deciding such a motion, "we scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt." *United States v. Olbres*, 61 F.3d 967, 970 (1st Cir. 1995) (quoting *United States v. Taylor*, 54 F.3d 967, 974 (1st Cir. 1995)). "Under the viewpoint principle, a jury charged with determining an accused's guilt

or innocence is entitled to consider the evidence as a seamless whole. . . . 'The sum of an evidentiary presentation may well be greater than its constituent parts.'" *Id.* at 974 (quoting *United States v. Ortiz*, 966 F.2d 707, 711 (1st Cir. 1992)).

A district court's power to order a new trial is greater than its power to grant a motion for acquittal. *United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986). The court may consider both the weight of the evidence and the credibility of the witnesses in deciding a motion for a new trial. *Id.* However, "[t]he remedy of a new trial is rarely used; it is warranted 'only where there would be a miscarriage of justice' or 'where the evidence preponderates heavily against the verdict.'" *United States v. Andrade*, 94 F.3d 9, 14 (1st Cir. 1996) (quoting *United States v. Indelicato*, 611 F.2d 376, 386 (1st Cir. 1979)).[1]

The grounds for Cadden's motion can be divided into three separate groups. The first ground is purely one of law: that the First Circuit's post-trial opinion in *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017), made fundamental changes in the interpretation of the mail fraud statue (which

---

[1] While the standards differ in some respects, for present purposes the disparities do not affect the outcome. Consequently, I will refer to the Motion for a Judgment of Acquittal, or in the Alternative, for a New Trial, as simply "Cadden's motion."

formed the basis of the majority of Cadden's convictions) by imposing a "new and more rigorous" causal requirement linking a defendant's scheme to defraud to his obtaining another's money or property.

The second ground rests on a claim that the evidence at trial was insufficient in six respects. First, that the evidence did not support a finding that Cadden knew that the three lots of methylprednisolone acetate (MPA) shipped in May, June, and August of 2012, were contaminated or that New England Compounding Center (NECC) technicians were not strictly following USP-797[2] standards (as NECC's customers were assured).[3] Second, that the evidence regarding deficient testing of NECC's product did not refute Cadden's contention that he reasonably relied on Analytical Research Laboratories (ARL), an independent third-party laboratory, to verify the sterility and potency of NECC's drugs. Under this heading, Cadden maintains that the government failed to disprove his contention that USP-797 does not forbid the shipment of drugs prior to a pharmacy's receipt of the sterility results. Cadden also asserts that certain subpotent lots cannot

---

[2] USP is a reference to the United States Pharmacopeia, the significance of which is explained later in this opinion.

[3] These three lots of MPA form the basis for mail fraud Counts 4-30 (and the analogue predicate acts 1-27).

be a basis for liability because USP-797 does not require potency testing.[4] Third, that there was no evidence that the status of an unregistered pharmacy technician (Scott Connolly), who Cadden employed to compound cardioplegia drugs, was material to customers' purchasing decisions or that he (Cadden) ever affirmatively represented Connolly as being licensed.[5] Fourth, that there was no evidence of an agreement justifying the jury's finding of a conspiracy, or at least one involving Cadden (Count 2). Fifth, that there was insufficient evidence that the active ingredient contained in the methotrexate shipped by NECC had expired, as the government alleged.[6] Finally, Cadden argues that there is no case law supporting the government's claim that issuing a prescription under a false patient name (Counts 95, 99, and 100) can constitute misbranding for purposes of the FDCA.[7,8]

---

[4] The allegations regarding sub-potent and nonsterile drugs form the basis for mail fraud Counts 31-39 and 41 (and the analogue predicate acts 53-61 and 63).

[5] The allegations involving Connolly form the basis for mail fraud Counts 69-78 (and the analogue racketeering acts 69-78).

[6] These shipments formed the basis of mail fraud Counts 42-46. The jury did not find any of these instances to constitute a racketeering act.

[7] Although presented as a factual sufficiency claim, the objection is more properly treated as one of lack of legal sufficiency.

[8] Cadden also renews his constitutional challenge on grounds of vagueness to the racketeering and racketeering conspiracy counts (Counts 1

The third ground raises four claims of prosecutorial misconduct. First, that Cadden was unfairly prejudiced by the government's decision to fold into the indictment twenty-five racketeering acts of second-degree murder that it knew were "unsupported, unreasonable, and would ultimately not be proved." Second, that the government presented and then refused to withdraw (despite refuting evidence) the testimony of South Bend (Indiana) Clinic director Wendy Huffman, who stated that Cadden had called her on Friday, September 21, 2012, to warn of the contaminated MPA, suggesting that he then knew of the potentially fatal drugs but failed to alert other customers until five days later.[9] Third, that the government compiled a distorted collection of exhibits involving test results (the "binder") that, without the court's permission or Cadden's consent, was given to the clerk to be delivered to the jury. Finally, Cadden objects to the PowerPoint used by the government in its closing as overly prejudicial, distorted, and misleading.

I will address each ground in the order presented.

*United States v. Berroa*

---

and 2). The court has previously considered these arguments and rejected them (*see* Dkt # 405), and sees no need to revisit them now.

[9] Cadden also claims that the government presented false testimony that Cadden failed to notify one clinic, Michigan Pain Specialists, of the contaminated MPA.

5

Unlike Cadden, I find nothing groundbreaking about the First Circuit's decision in *Berroa*. Without belaboring the context, *Berroa* involved doctors who bribed an employee of the Puerto Rico Board of Medical Examiners to alter the results of two of their qualifying examinations to change failing grades to passes (the manner and means). 856 F.3d at 147-148. After completing some additional requirements, the would-be doctors received notice (the mailing) that their licenses had been issued. *Id.* at 152. Each of them eventually established his or her own medical practice (the scheme to defraud), recruited patients, and in the ensuing years billed for their services (the obtaining of money and property). *Id.*

In overturning the mail fraud convictions, the Court first noted that what the government had attempted was an end-run around the holding of *Cleveland v. United States*, 531 U.S. 12, 20 (2000), that a state-issued license does not constitute "property" for purposes of the mail fraud statute. *Berroa*, 856 F.3d at 149. In *Berroa,* what was missing (except in a "but-for" sense) was any connection between the "means" and the "end" that amounted to "something more than oblique, indirect, and incidental." *Id.* (quoting *Loughrin v. United States*, 134 S. Ct. 2384, 2393 (2014)). What mail fraud requires is that the fraud be the mechanism that induces a victim to part with

money in the sense evoked by "the familiar concept [in tort law] of proximate causation." *Id.* at 149 n.4.[10]

What differentiates this case is the direct link between the false statements regarding the integrity of NECC's compounding process and the safety and purity of its drugs (the manner and means) and the decision of customers (hospitals and clinics) to purchase them (the obtaining of money and property). Unlike in *Berroa*, there are no intervening circumstances attenuating the connection between the fraud and the injury. In other words, *Berroa*, even if it does put a gloss in some respects on First Circuit precedent interpreting the mail fraud statute, has no relevance here.

*Sufficiency of the Evidence*

Much of Cadden's argument is based on an alleged lack of proof that he knew that NECC's drugs, such as the three nonsterile lots of MPA shipped between May and August of 2012, fell well short of the USP-797-plus safety standards touted to customers. In the first instance, there was ample evidence that Cadden was not merely an outside investor in NECC, or a non-presence in the Clean Rooms of NECC's facility, or someone unschooled in the compounding business. Rather, Cadden was a licensed pharmacist with

---

[10] Another way of looking at *Berroa* is that the holding in the case does nothing more than restate, in a mail fraud context, the holding in the celebrated case of *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339 (1928).

years of practitioner's experience who had founded NECC (his "baby") and nurtured its growth from a small mom-and-pop operation into a national presence in the compounding market. There was also abundant evidence that Cadden was intimately involved in the day-to-day operations of NECC, including oversight of the Clean Rooms and the staff, including the on-site lead pharmacist, Glenn Chin.

    The argument that Cadden advances with respect to his alleged lack of personal knowledge that specific drugs shipped by NECC were fatally contaminated is more appropriately directed to the second-degree murder racketeering allegations, which the jury rejected. Second-degree murder requires a high degree of subjective awareness by a defendant that his acts are almost certain to result in the death of another. Mail fraud, on the other hand, requires proof of something entirely different: knowledge on Cadden's part that the representations that he and the salespeople working under his direction made to customers regarding compliance with USP-797 safety standards were materially false. On this point, there was considerable evidence from which the jury could reasonably find that Cadden knew, *inter alia*, that Chin was autoclaving drugs for less than the 20 minutes prescribed by USP-797, that the autoclave sterilization process was not being verified as the USP requires, that sterility testing was being conducted improperly, and

that drugs were being shipped despite environmental counter-indications that USP-797 deems urgently actionable.

Unlike in the case of second-degree murder, the jury also had the option (with evidence to support it) to find that Cadden had turned a blind eye to the deteriorating safety practices being followed in the Clean Room as NECC technicians struggled to cope with the ever-increasing volume of sales.[11]

---

[11] As to the state of knowledge required for a mail fraud conviction, the jury was instructed a follows.

> A defendant acts "knowingly" if he is aware of his actions, realizes what he is doing, and does not act out of ignorance, mistake, or accident. Intent or knowledge cannot usually be proved by direct evidence because there is no way to directly scrutinize the workings of the human mind. In determining what Mr. Cadden knew or intended at a particular time, you may consider any statements he made or acts that he did or failed to do in the context of all other facts and circumstances in evidence.

> In deciding whether Mr. Cadden acted "knowingly," you may infer that he had knowledge of a fact if you find that he deliberately closed his eyes to a fact that otherwise should have been obvious to him. In order to infer knowledge, you must find that two things have been established. First, that Mr. Cadden was aware of a high probability of the fact in question. Second, that he willfully made himself blind to that fact. It is important, however, to bear in mind that mere negligence or mistake in failing to learn a fact is not sufficient. There must be a deliberate effort to remain ignorant of the fact.

Cadden's argument that he could not be held liable for the sale of subpotent drugs because USP-797 does not require potency testing is infected by a similar misdirection of focus.[12] Cadden's position from the beginning, one with which the court agreed, *see* Dkt # 573, was that USP-797 was not a federal statute subjecting a defendant to the potential of criminal liability. As the court explained to the jury in its instructions:

> It is important to remember that the standards contained in the USP are not drafted by the United States government. However, when Congress drafted the Food, Drug and Cosmetic Act, it referenced the USP as a source for defining best practices for the compounding and drug manufacturing industries. While the USP standards may be considered by you in determining the standard of care that Mr. Cadden may or may not have followed, a deviation from a provision of the USP, by itself, is not a criminal violation. Congress did not, in other words, enact the Pharmacopeia as a criminal statute.

What is lost in the argument is that Cadden was not convicted of violating the USP-797, but of mail fraud. In this context, the representations that NECC adhered to internal testing standards that supplemented and exceeded USP-797 requirements were contradicted by abundant evidence to the contrary.[13]

---

[12] Cadden's defense that he in good faith relied on the reports from ARL to verify the potency and sterility of NECC's drugs was clearly rejected by the jury.

[13] As the government points out, NECC's marketing materials (approved by Cadden) boasted that it conducted potency testing on every

The next sufficiency argument – that there was no evidence that customers of NECC would have been materially influenced by the fact that Connolly, the technician assigned to compound cardioplegia drugs in Clean Room 2, had lost his license – is based on a misapprehension of the mail fraud statute. In explaining to the jury the concept of materiality as it relates to a scheme to defraud, the court instructed as follows:

> The term "false or fraudulent pretenses" means any false statement or assertion that concerns a material aspect of the matter in question, that was either known to be untrue when made or made with reckless indifference to its truth and made with the intent to defraud. The definition includes actual, direct false statements as well as half-truths and the knowing concealment of facts. To satisfy its burden of proof that a fact is "material," the government is not required to show that it succeeded in influencing or deceiving the decision maker to whom it was addressed. Rather, a fact or matter is "material" if it has a natural tendency to influence or is capable of influencing the decision maker involved.

Put more succinctly, the mail fraud statute does not require proof of actual reliance. *Neder v. United States*, 527 U.S. 1, 24-25 (1999); *United States v. Prieto*, 812 F.3d 6, 13 (1st Cir. 2016). The jury need only have been persuaded that a reasonable purchaser of NECC's drugs, if told that the drugs they were

---

drug as part of its "comprehensive end-product testing program." Robert Ronzio, NECC's director of sales, testified that Cadden instructed him to assure customers in his sales presentations that NECC "tested everything for 14 days; sterility, endotoxin, and potency."

11

being offered had been compounded by an unlicensed technician, would have given weight to that fact in his or her purchasing decision.[14]

Cadden's next two sufficiency arguments require little discussion. The existence of a conspiratorial agreement is uniquely a question of fact committed to the jury. The jury was not required to find the existence of an express or written agreement among conspirators, but was entitled to use common sense in assessing whether Cadden and other of the named defendants were involved in a conspiracy. The record is replete with evidence of communications among the alleged conspirators discussing the improper use of labels, the shipping of untested drugs and drugs with expired ingredients, as well as unremediated insanitary conditions, from which the jury was well entitled to find the existence of an agreed course of unlawful conduct. The same deference to the jury's role as factfinder is also conclusive on the subject of the allegedly stale methotrexate shipped by NECC. The December 2011 email exchange between Cadden and Chin discussing what

---

[14] The jury was entitled to rely on the testimony of Samuel Penta, the chief investigator for the Massachusetts Board of Pharmacy, that a technician who had surrendered his license could not work legally as a pharmacy assistant. The government also points to evidence that Cadden himself thought that Connolly's lack of a license was a matter to be concealed from customers and regulators (to the point that he had instructed Annette Robinson to use his name rather than Connolly's in the quality control records as the cardioplegia drug compounding pharmacist).

to do about the expired bottle of methotrexate powder that NECC was then using by itself is sufficient justification for the jury's finding.[15]

Cadden's final contention that case law does not support the proposition that issuing a prescription under a false patient name (Counts 95, 99, and 100) constitutes misbranding for purposes of the FDCA is simply erroneous. *See, e.g., United States v. Munoz*, 430 F.3d 1357, 1366 n.7 (11th Cir. 2005). While this court has held with respect to other pharmacist-defendants in this case that merely sticking an address label on a package of drugs for shipment does not constitute "dispensing" for purposes of the FDCA, *see* Dkt # 675, Cadden's role went far beyond that of a mere shipping clerk. According to the evidence, Cadden signed the Pharmacist's Prescription Order Verification Sheet for each of the three shipments at issue, bearing patient names that are so patently fictitious that Cadden does not attempt to argue otherwise.

*Prosecutorial Misconduct*

The easiest issue to dispose of is the allegation that the PowerPoint used by the government in support of its closing argument was a distorted,

---

[15] As Chin wrote to Cadden in describing the bottle: "I mean OLD, it expired in 2007 according to the sticker."

prejudicial, misleading, and incomplete Rule 1006 summary chart. It was not. As the court previously noted, the PowerPoint presentation was

> a perfectly acceptable Rule 611(a) pedagogical aid supporting the government's closing argument. As the court observed in . . . ruling on the pertinent motion in limine:
>
>> While a Rule 1006 chart is typically admitted in evidence, a Rule 611(a) pedagogical device distilling and simplifying complex data to aid counsel's argument to the jury is not. *See United States v. Milkiewicz,* 470 F.3d [390,] 397 [(1st Cir. 2006)]. The difference, as explained in [*United States v. Bray*, 139 F.3d 1104 (6th Cir. 1998)]*,* is that charts admitted under Rule 1006 are explicitly intended to reflect the contents of the documents they summarize, and typically are substitutes in evidence for the voluminous originals, while Rule 611(a) pedagogical aids are intended to illustrate or clarify a party's position and may by way of captions or method of organization permissibly promote the inferences and conclusions the proponent seeks to draw from the evidence. 139 F.3d at 1111; *cf. United States v. Johnson*, 54 F.3d 1150, 1157-1161 (4th Cir. 1995) (summary testimony and charts allowed in a complex drug trial as a permissible "pedagogical device" under Fed. R. Evid. 611(a)).

Dkt # 1036. The court, of course, sat through the argument and the original presentation of the PowerPoint and has reviewed it again. While it makes a forceful (and coherent) brief for the government's view of the case, it does nothing that strays out of the bounds of permissible (if vigorous) advocacy. Consistent with Rule 611(a), the PowerPoint was not admitted into evidence

14

or given to the jurors as a chalk for use in their deliberations. There is no reason given for the court to alter its original ruling.[16]

The second issue is troubling, but ultimately not a matter of material prejudice to Cadden. The issue arose as follows. In support of its theory of second-degree murder, the government presented the testimony of Wendy Huffman (née Tribett), the Director of the South Bend Clinic, that she had received a telephone call on Friday, September 21, 2012, from Cadden warning her that the MPA shipment the Clinic had received was contaminated and should be immediately quarantined. As NECC did not undertake a recall of the defective MPA until five days later, the testimony was damning in that it implied that Cadden had callously attempted to sweep the contamination issue under the rug.

As the evidence developed it became clear that, however sincere Huffman's testimony, she had confused a call from a patient advocate inquiring about an appointment, coincidentally originating from NECC's 508 (central Massachusetts) area code, with the warning call she did receive from Cadden the following week. The defense produced as a witness the actual September 21 caller (Janet Mahoney), and evidence that Huffman had

---

[16] This might not have been an issue at all but for the government's incomprehensible refusal to make a copy available for inspection by Cadden without a court order.

15

recorded the date she had allegedly received Cadden's call sometime after the fungal meningitis outbreak had erupted, and not contemporaneously as she had testified to the Grand Jury. The court thought the refutation convincing enough to recommend to the government that it retract Huffman's testimony, which it declined to do.

In its response, the government insists that it is not for the court to substitute itself for the jury in determining matters of fact and that, even if Huffman was mistaken, there is other plausible evidence that Cadden was less than forthcoming with other customers of NECC as well as with investigators from the Centers for Disease Control. This is true as far as it goes, but the government's persistence in defending the Huffman testimony is perplexing at best, and at worst, inconsistent with the obligation of the government to serve the higher interests of justice. Nonetheless, one must assume that the jury, in rejecting the second-degree murder allegations, was unswayed by Huffman's testimony. As no prejudice resulted, there is nothing for the court to rectify by way of a judgment of acquittal.

Finally, there is the issue of the binder of government exhibits that made its way to the jury room. In its closing argument, the government alluded to the fact that it had compiled a binder of the exhibits showing test results related to mail fraud Counts 4-39, and 41. The comment went

unremarked at the time by the court and Cadden's lawyers. On the third day of deliberations, Monday, March 20, 2012, the jury asked in writing for the identification of exhibits related to racketeering acts 53-63 (the analog of Counts 31-41; act 62 and Count 40 are both omitted) involving allegations of fraudulent shipment of untested drugs. In response, the court had the parties each identify the exhibits (by number) that they believed responsive to the question. The court then merged the exhibit references in numerical order and sent the result to the jury.

During a discussion that began on the morning of the third day of deliberations concerning an unrelated question submitted by the jury, Mr. Singal objected to the fact that a binder consisting of a compilation of testing results, mentioned by Ms. Strachan in her closing argument, had been sent to the jury. As he pointed out, that specific binder had never been admitted as an exhibit or summary chart. In reply Mr. Varghese professed to have no idea where the binder was, but that in any event, it included only exhibits that had been properly admitted over the course of the trial.[17] Relying on this incomplete response and the fact that the jurors were seeking exhibits

---

[17] The government concedes in its responsive brief that it did give the binder to the clerk during the review of the exhibits prior to their transmittal to the jury room, but faults the defense for not making note of the inclusion and lodging a contemporaneous objection.

17

already included in the binder, I mistakenly assured Mr. Singal that while "[w]e do not live in a perfect world," I was confident that the binder was not in the jury room.

There is plenty of fault to share for the mistake: the court for not *sua sponte* undertaking a confirmatory investigation, the government for not being more forthright about having submitted the binder to the clerk, defense counsel for not having then noted the submission, and the clerk for not speaking up about the fact that she had indeed been given the binder by the government. However, at the end of the day, the mistake was not so prejudicial as to merit the harsh result of upsetting even a portion of a verdict returned by one of the hardest working and most conscientious juries I have had the privilege to work with. The finding of the absence of any prejudice (or, put another way, harmless error) is based on the following considerations. First, I have reviewed the binder itself and I have confirmed the government's contention that it contains only exhibits that were properly admitted during the trial. Second, there is plausibility to the government's argument that the jurors never reviewed the contents of the binder (as the court had also assumed based on their request for exhibits already allegedly included in the binder). Even assuming that they did, the compilation of testing results clearly had no influence on the verdict. As the verdict form

reflects, when given the undifferentiated government and defendant exhibits on racketeering acts 53-61 and 63 (the equivalent of Counts 31-39 and 40), the jurors found liability on each of these acts (and the corresponding mail fraud counts) as they did with all of the other failure-to-test allegations set out in the indictment. Third, had the government offered the compilation as a formal exhibit in binder form, I would have admitted it. The law has no prohibition against such compilations, *see United States v. Best*, 939 F.2d 425, 430 (7th Cir. 1991) (*en banc*), and at the pretrial conference the court had urged both sides to assemble the key exhibits for the jurors in binders to avoid the confusion that the erratic numbering of government and defense exhibits caused during the trial. Finally, for the reasons stated by the Seventh Circuit in *Best*, I do not see prejudice in the fact that the binder may have made it easier for the jury to retrace the government's evidence, particularly where the jurors had access to all of the exhibits admitted during the trial.[18]

---

[18] The suggestion that prejudice might have inured from the fact that the binder bears on its cover the seal of the Department of Justice (assuming that the jurors at some point inspected the binder) is counterintuitive. If anything, it would have made it clear to the jury that the exhibits had been assembled by the government, and not by the parties working at the court's direction.

## ORDER

For the foregoing reasons, the motion for a judgment of acquittal, or in the alternative, a new trial, is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE