UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No.:  14-10363-RGS |
| v. | ) | |
| | ) | |
| BARRY J. CADDEN, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>DEFENDANT BARRY CADDEN'S SENTENCING MEMORANDUM</u>**

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| INTRODUCTION |  | 1 |
| ARGUMENT |  | 2 |
| I. | The nature and circumstances of the offense and the history and characteristics of Mr. Cadden warrant the requested sentence. | 3 |
|  | A.   Mr. Cadden's background. | 4 |
|  | B.   The creation of NECC. | 4 |
|  | C.   The growth of NECC and compounding generally. | 6 |
|  | D.   Changes at NECC due to its growth. | 10 |
|  | E.   Under Mr. Chin's management, the clean room's staff and adherence to SOPs foundered. | 16 |
|  | F.   Mr. Cadden's misdeeds alleged at trial are far less central to the outbreak and to the core of this prosecution. | 21 |
|  | *1.   Having Scott Connolly assist with the cardioplegia was not dangerous.* | 22 |
|  | *2.   NECC prescription practices were no different than other large compounders at the time, and the "fake names" were an aberration.* | 22 |
| II. | A sentence more than that which Mr. Cadden proposes would create an unfair and disfavored disparity among compounding pharmacists who have been convicted based on remarkably similar facts. | 25 |
| III. | Neither NECC, nor Mr. Cadden, was the outlier depicted at trial; NECC's practices were in line with those of other compounders and he should not be sentenced as an "outlier." | 28 |
|  | A.   Cadden and NECC exceeded USP 797 in numerous ways. | 28 |
|  | B.   NECC's historical product testing results were more favorable than those achieved by other comparable compounders. | 30 |

**Page**

C.   NECC's compounding practices were comparable to those of
other compounders at the time.                                      31

   1.   *Many experts in the field—including the government's
trial expert, Eric Kastango—agree that NECC was not
an outlier.*                                                        32

   2.   *Inspections of other compounders, even after the outbreak,
revealed that most had similar practices to those at NECC.*        33

   3.   *Even where violations were found, compounders were rarely
if ever shut down, even temporarily.*                              36

   4.   *The government's distortion of NECC as an outlier is
illustrated by its incorrect presentation of NECC's
environmental monitoring program.*                                 37

   5.   *Most compounders deviated from USP 797 because there
was no clear and consistent guidance about compounding
or USP 797 itself, and because no pharmacy could be in
perfect compliance with the myriad aspirational best
practices of USP-797 at all times.*                                39

IV.   The statutory goals of deterrence, protecting the public, and restitution
are not served by a lengthy sentence.                                  41

V.   The Presentence Report Offense Level Computation is inaccurate
and does not reflect the appropriate sentence to reflect Mr. Cadden's
culpability.                                                            42

A.   Acquitted conduct should play no role in the advisory Sentencing
Guideline calculation                                              42

B.   There is no legal or factual support for the other offense characteristic
or role adjustment advocated by probation.                         48

   1.   *Mr. Cadden should not be punished for conscious disregard
of death or bodily injury where the jury rejected that finding.*   48

   2.   *The government has not proven that the vulnerable victim
adjustment applies.*                                               48

|  |  |  | **Page** |
|---|---|---|---|
| | C. | Role Adjustments | 51 |
| | | *1.   Organizer* | 51 |
| | | *2.   Abuse of Trust* | 54 |
| VI. | The government's loss calculation—or any figure in the same range—does not accurately reflect Mr. Cadden's culpability based on an advisory Guideline sentence. | | 57 |
| VII. | Advisory Guideline Calculation | | 58 |

## INTRODUCTION

When the Court completes its comparison of the government's sentencing analysis with that of Mr. Cadden, it will appear that they are talking about two entirely different cases. And in fact, they are. For the government's analysis is heavily dependent on emphasizing the national fungal meningitis outbreak, the 64 people who died from it (including 25 for which Mr. Cadden was charged with second-degree murder), and the hundreds of others who were sickened with fungal meningitis. In its submission to Probation, the government aggregates these factors to arrive at a Guideline calculation at the life imprisonment level.

But that is not the case on which Mr. Cadden was convicted. He stands acquitted of all 25 second-degree murder charges, and those acquittals belie the government's effort to transform the jury's verdict into a murder case. Rather, this is a mail fraud case, and our sentencing analysis is faithful to his conviction on the particular mail fraud counts comprising the four sub-schemes to defraud that the government alleged and presented. Notably, Mr. Cadden was not convicted of knowing drugs were contaminated—he was convicted misrepresenting the *process* by which the drugs were made, *not* the quality of the drugs themselves. The evidence in the case—i.e., NECC's history of safely compounding sterile injectables—was that Mr. Cadden had every reason to believe that the products were sterile.

When properly viewed as a mail fraud case rather than the acquitted murder case, the correct advisory Guideline level is 19, with a criminal history in Category I, resulting in an advisory guideline sentence range of 30-37 months. *See* § VII, *infra*. It is this case—not the government's hypothetical murder case—on which Mr. Cadden should be sentenced.

Beyond the government's efforts to transform this into the murder case it is not, it also presented at trial, and continues to present, a demonized picture of Mr. Cadden and NECC that is not compatible with the true nature of the evidence presented.

None of this is to say that Mr. Cadden is guilt-less. He did things, and particularly failed to do things, that in hindsight he deeply regrets. There is little doubt that Mr. Cadden failed as a supervisor. The most reasonable interpretation of the bulk of the jury's verdicts is that they found him to have been willfully blind to what was happening in the clean room; he failed to adequately supervise Glenn Chin and the other pharmacists in the clean room, especially during the relatively short period that was largely at issue at trial—the Spring and Summer of 2012 when production increased due to market shortages.

As the jury found, Mr. Cadden is not a murderer. Nor is he the person the government portrayed him as at trial. When the distortions are put to the side, it becomes apparent that Mr. Cadden's *own actions*—as opposed to those of others at NECC, and particularly to those working in the clean room—are far more limited than the government claims, and far more peripheral to the tragic deaths and illnesses on which the government places such undue emphasis in order to exact an excessive penalty.

Mr. Cadden's sentence should and must reflect this critical distinction.

## **ARGUMENT**

The overarching goal under Section 3553(a) is for sentencing courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2," namely (under Section 3553(a)(2)):

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most
effective manner.

In determining the minimally sufficient sentence, § 3553(a) further directs sentencing

courts to consider the following factors: (1) "the nature and circumstances of the offense and the

history and characteristics of the defendant," § 3553(a)(1); (2) "the kinds of sentences available,"

§ 3553(a)(3); (3) "the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct," § 3553(a)(6); and, (4) "the need

to provide restitution to any victims of the offense," § 3553(a)(7).

These factors squarely support Mr. Cadden's requested sentence of 3 years, as spelled out

below. In fact, our research reveals that Mr. Cadden would be the first compounding pharmacist

ever to serve prison time for his or her compounding practices, despite a long list of tragedies

over the years and similar convictions that resulted only in probationary sentences.

## I.     The nature and circumstances of the offense and the history and characteristics of Mr. Cadden warrant the requested sentence.

The Court will not find a long list of letters attached to this memorandum as is often the

case at sentencing. Although it would have benefitted Mr. Cadden to tap friends and family for

these letters, he has refused to involve his family or friends in this experience—he has done so

from the start and to his own detriment. Mr. Cadden even forbade his wife and children from

attending the trial and the upcoming sentencing.[1]

The lack of such letters, and the lack of a family presence at trial and otherwise, sheds

more light into Mr. Cadden's character than letters themselves ever could. He is not willing to

---

[1] One person ignored Mr. Cadden's preference that his close friends and family stay as far from this public
proceeding as possible; that letter is from his brother-in-law and is attached at Tab 1.

subject his immediate family or others to the harsh scrutiny and taint of this infamous case, even though doing so could help him and he could certainly use that support.

A.    Mr. Cadden's background.

Mr. Cadden, fifty years old, is married and has three children, ages 17, 19, and 21. They were 12, 14, and 16 at the time of the outbreak. Mr. Cadden grew up in Cranston, Rhode Island in a middle-class family. PSR, at ¶ 145. His childhood was comfortable, but was in no way privileged; he took out loans for school, worked, and lived at home.

His calling to be a pharmacist no doubt stemmed from the fact that his father was a pharmacist. PSR, at ¶ 145. Mr. Cadden helped his father in the pharmacy and enjoyed being close to his father and helping patients. Patients were the draw for him to enter pharmacy school and he become a pharmacist himself.  Notably, people do not become pharmacists out of greed— as the Court is no doubt aware, pharmacists make a comfortable living, but are not highly compensated.

Mr. Cadden met his wife, Lisa Conigliaro Cadden, in pharmacy school, and they married in 1993. *Id.*, at ¶ 152. His first jobs after pharmacy school were traditional, retail pharmacy positions. He worked at various Walgreens pharmacies in Massachusetts and Rhode Island.  He was content in these roles and would likely have continued on this traditional pharmacist path like his father had he not become intertwined with his wife's brothers, who were far more ambitious.

B.    The creation of NECC.

It was Lisa's brother, Doug, who presented the idea of starting a compounding pharmacy. In 1997, NECC was incorporated and operated at all times in a building owned by Greg and Doug Conigliaro; Lisa and Barry Cadden were the sole pharmacists and employees. Doug

4

Conigliaro's wife became the majority (55%) owner, and she and Doug profited the most from NECC. By 2012, Mr. Cadden was a 17.5% owner, as was his wife Lisa.

For many years, NECC barely broke even and Barry and Lisa compounded primarily non-sterile products, such as creams and ointments. The Caddens initially made far less than they had earned as retail pharmacists. In 1998, Mr. Cadden earned $20,054. *See* Trial Exhibit 1924. In 1999 he earned $54,146.[2] *Id.* NECC was a true "mom and pop" business, as shown in the newspaper excerpt attached at Tab 2, and they were happy with it that way. NECC hired its first employee, Sharon Carter, in 2000. Then and even in 2012, NECC continued to have patients who picked up prescriptions on site in Framingham, just like a retail pharmacy.

Until 2008 when he left the clean room, Mr. Cadden was intimately involved in the day-to-day compounding operations. He compounded all high-risk drugs himself and he hired the other pharmacists and technicians that he worked alongside, including Cory Fletcher, Edward Fallon, and Glenn Chin. But upon removing himself from the clean room, Mr. Cadden began focusing on running the overall NECC business operation, and he delegated responsibility for the compounding operations to Mr. Chin and others. Mr. Cadden never worked inside Clean Room 1, which went into operation in May or June 2011 (three years after he left the clean room and stopped compounding). *See* 1/11/17 Trial Trans., at pp. 157:24-158:4 (Lombardo), and was not inside any cleanroom after 2008.

Mr. Fletcher was the only testifying witness who had been at NECC long enough to have worked in the clean room with Mr. Cadden and who experienced, first hand, how Mr. Cadden ran NECC's compounding operations. Mr. Fletcher, who himself had trained to be a pharmacist, was complimentary of the working environment and attention to SOPs under Mr. Cadden. Mr. Fletcher testified that Cadden trained him to perform compounding tasks "properly" and

---

[2] Both figures include all distributions from NECC and Mr. Cadden's salary. *See* 2/22/17 Trial Trans., at p. 8:19-22.

"safely." *See* 2/7/17 Trial Trans., at p. 48:15-19. Mr. Cadden was always helpful to Mr. Fletcher

if he needed something, even after Mr. Cadden left the clean room. *Id.,* at p. 48:20-23. And Mr.

Fletcher testified that Mr. Cadden was always open to suggestions to make the compounding

process better, including purchasing new machines and equipment. *Id.,* at p. 48:24-49:4.

     Mr. Fletcher's testimony likewise made it clear that the alleged unsafe compounding

practices, on which the government built its case, arose only toward the end under Mr. Chin's

leadership, when NECC got busier, and they did not exist when Mr. Cadden was in charge of the

clean room. *See, e.g., id.,* at pp. 83:15-85:12 (mixing of lots started toward the end when NECC

got larger); 2/6/17 Trial Trans., at pp. 149:17-150:2 (as the clean room got busier Chin told them

to prioritize production over cleaning).

     C.    The growth of NECC and compounding generally.

     NECC's growth from its humble beginning stemmed not from Mr. Cadden's greed or

ambition, as the government has suggested throughout this case. Rather, dramatic changes in the

health care landscape, and compounding specifically, fueled a national need for compounders to

make not only the more traditional compounded medications (e.g. custom medications for

patients with allergies), but also to compound an increasing number of widely-used drugs that

were unavailable in the commercial market. NECC and other compounders filled this important

need. *See* E. Kastango[3], "Lessons Learned from Compounding Tragedies," The Canadian

Journal of Hospital Pharmacy, 2013 May-June; 66(3): 152-52, attached at Tab 3. NECC and its

customers—clinics and hospitals that otherwise would have to go without life-saving

---

[3] Mr. Kastango served as the government's expert witness on the USP at trial.

medications—appreciated NECC prior to the outbreak which led to repeat business from most.[4] *See, e.g.,* Trial Exhibit 3024 (email from Winchester Hospital praising NECC); *see also* 1/17/17 Trial Trans., at p. 46:6-14 (Giamei).

There were two primary drivers of NECC's growth, both of which were outside of Mr. Cadden's control. First, USP 797, addressing sterile compounding, was adopted in 2004. *See* 2/28/17 Trial Trans., at p. 38:18-20 (Kastango).  Many health care providers—primarily hospitals—that had previously compounded their own drugs began outsourcing this function because they could not comply with the practices recommended by USP 797. *See* 1/18/17 Trial Trans., at p. 70:5-10 (Boneau).

Second, a new phenomenon of "backordered" medications emerged. Widely-used commercially manufactured drugs were more frequently unavailable, creating a crisis for clinics and hospitals that relied upon those medications. *See* 1/17/17 Trial Trans., at pp. 43:18-44:13 (Giamei). Those medical providers went to compounders like NECC and relied on them to fill this void. And, as discussed below, and as acknowledged by the government's own USP 797 expert, Eric Kastango, a new sector of larger compounders like NECC outgrew existing compounding standards due to these changes in the market. *See* E. Kastango and K. Douglass, *Quality Standards for Large Scale Sterile Compounding Facilities*, Clinical IQ, at p.3, attached at Tab 4. Despite these changes, no other standards or guidance was provided to compounders until after the outbreak. This above-cited piece by Mr. Kastango, written well after the outbreak, provides a concise summary of the history of compounding and speaks openly about the fact that NECC's failings were emblematic of the industry.

---

[4] Mr. Kastango observed that this change in the market may have unwittingly pushed some compounders like NECC beyond their expertise: "Pharmacy practitioners [were] increasingly challenged to prepare compounded sterile dosage forms that [were] not commercially available, at times using nonsterile active pharmaceutical ingredients…[this] may require greater experience and expertise than a particular pharmacy possesses" *Id.*

These marketplace forces did generate large profits for NECC and its several owners. Notably, Doug Conigliaro, whose wife Carla was the majority (55%) owner of NECC, was the President of MSM and drove the sales force in that role. *See* 3/6/17 Trial Trans., at pp. 54:24-55:6 (Ronzio); *see also* Letter of Mark Ferrar (Tab 1). NECC was certainly willing and eager to fill the marketplace gaps and it profited as a result. But to characterize this growth as pure greed is inaccurate and unfair.[5] The government argues that this greed was the motive for Mr. Cadden's actions or inactions. That is simply not the case and there is no evidence to support this incorrect inference.

Most fundamentally, and not stated at trial, the vast majority of Mr. Cadden's wealth came from his part ownership in Ameridose, not NECC.  Evidence presented by the government at the detention hearing and in support of seizure warrants reflects that Mr. Cadden derived at least $53M in income from Ameridose between 2010 and 2012, while he received approximately $8.2M in profit distributions from NECC during the six-year period between October 23, 2006 and October 1, 2012. *See* 12/18/14 Transcript at 22-23; Affidavit of Special Agent Joseph Ridgley in Support of Seizure Warrants; Motion in Limine to Preclude the Government from Offering Evidence Concerning Wealth (Dkt. #796), at pp. 4-5.[6] As with NECC, Mr. Cadden and his wife each were 17.5% owners of Ameridose, while Carla Conigliaro was the 55% majority owner. Financially speaking, Mr. Cadden could have shut NECC's doors, eliminating the stress,

---

[5] So is the argument, repeated regularly at trial, that Mr. Cadden deliberately kept NECC as a compounder to avoid the more stringent requirements of cGMP that applied to FDA-registered drug manufactures. First, the jury acquitted Mr. Cadden of Count III, thereby flatly rejecting this theory. Second, the core of NECC's business was, in fact, compounding, as witnessed by the vast number of different products it compounded. *See* 2/22/17 Trial Trans., at pp. 3:25-4:1 (Government expert Roger Edwards stating NECC compounded 7,419 different products). That NECC's batches were large does not change that it was making numerous variations of medications, not a small group of medications like a manufacturer.

[6] Mr. Cadden does not believe the government's figures are accurate but accepts them as true for purposes of this Sentencing Memorandum

time, and risk of running NECC, and that would not have materially impacted his income. Plainly, money was not what drove him. Rather, as Robert Ronzio testified, NECC was Mr. Cadden's "baby." *See* 3/3/17 Trial Trans., at p. 87:13-14. Mr. Cadden was motivated by professional pride, certainly, but more so—no doubt ironically, given this horrible tragedy—by the service NECC performed for healthcare providers and patients across the country.

Mr. Cadden's brother-in-law, Mark Ferrara, confirms that Cadden was never motivated by money or greed. *See* Letter of Mark Ferrara (Tab 1). He writes: "Barry has been the same humble guy for as long as I have known him and he never bragged about business success or flaunted money around. Frankly, he seemed uncomfortable having a lot of money. I remember the first time he bought a nice car and when I complimented him he down-played it and simply deferred attention elsewhere." *Id.*

Mr. Cadden was certainly comfortable, and had some possessions reflecting that comfort level—two homes[7] and a Sailfish motor boat. But given his significant wealth in 2012, these comforts were hardly showy or excessive. He did not belong to any country clubs; his children did not go to expensive private schools.[8] He did not own or desire a Ferrari, as the government was eager to suggest salaciously to the jury. *See* 3/3/17 Trial Trans., at p. 102:15-18 (Ronzio). As his brother-in-law explains: "When the subject of money came up [Cadden] would often make a comment like 'it really doesn't mean anything.' Money is not what drove Barry to work hard other than to provide for his family."

---

[7] He and his wife built their primary residence in Wrentham. They purchased a vacation home in Rhode Island for approximately $700,000.

[8] They attended small Catholic schools.

D.   Changes at NECC due to its growth.

As NECC grew, Mr. Cadden's hands-on role changed by necessity. He had far too many responsibilities with the growing company—staffing, facilities, management, procurement, regulatory research for 50 states—to be directly responsible for the day-to-day compounding work and clean room staff. Accordingly, after 2008, Mr. Cadden no longer worked at all in the cleanroom and he took on more of a CEO-oversight role, delegating the day-to-day clean room compounding and related operations not to one, but to *nine pharmacists*—each of whom had the same or even higher levels of education. *See* 1/11/17 Trial Trans., at p. 20:21-23 (Frank Lombardo); 1/19/17 Trial Trans., at pp. 52:23-53:2 (Joseph Connolly). This delegation is permitted under USP 797. *See* Trial Exhibit 3174 (USP 797), at p. 351. Each of the nine pharmacists was responsible for complying with USP 797 as well as with NECC's SOPs and Cadden was entitled to rely upon them to do so. *Id.* Mr. Chin—who was one of those nine pharmacists—was formally promoted to the supervisor of both clean rooms in January 2010, but in practice he had served in that role since Mr. Cadden left the clean room in 2008. *See* 1/11/17 Trial Trans., at p. 20:21-23 (Frank Lombardo); 1/19/17 Trial Trans., at pp. 52:23-53:2 (Joseph Connolly). Certainly, Mr. Cadden provided direction to the cleanroom, but he did not work inside the cleanroom.

Neither before nor after this change in Mr. Cadden's role was there any evidence of Mr. Cadden deliberately cutting corners to save money, nor could there be.[9] There was not a single example—not one—of Mr. Cadden refusing to spend money that was needed for his staff's or his customers' safety. For example, the clean room itself was state-of-the art and costly. *See* 3/10/17 Trial Trans., at p. 27:19-21 (Steve O'Neil, of SAA, stating that NECC was "one of the best [cleanrooms] I've been in."). Mr. Cadden ordered customized glove boxes to further protect

---

[9] There were typical emails one would see in any business in which vendors' prices were discussed and compared.

the critical areas for compounding even though that investment, and that level of protection, was not required by USP 797. *See* Trial Exhibit 3174 (USP 797), at p. 361. There was unrebutted evidence at trial that when NECC staff requested supplies or equipment, Mr. Cadden bought them, no questions asked.[10] *See, e.g.,* 1/20/17 Trial Trans., at p. 124:4-14 (Connolly, purchasing of ingredients); 2/7/17 Trial Trans., at p. 22:17-20 (Fletcher, same); *see also* Trial Exhibit 2251 (purchasing cleaning supplies); Trial Exhibit 2249 (tens of thousands of dollars in invoices for cleaning supplies). This evidence underscores Mr. Cadden's commitment to safety, despite the mistakes the jury attributed to him.

In fact, all of Mr. Cadden's directions to the clean room staff—all of them—focused on quality and doing things the right way.[11] The evidence is striking: Mr. Cadden's directions were always to perform *more* testing, *more* cleaning, and to *increase* quality control standards. Mr. Cadden did not acquiesce to less rigorous controls, or give instructions to save time or money by doing less.[12] To the contrary:

- In Trial Exhibit 1709 Mr. Cadden directs Mr. Chin to perform additional sterility and fungal testing on the epidural steroid products.

---

[10] The government unfairly tried to depict NECC as a filthy mess at all times, including by hinting that there were mice at NECC in the clean room area (there was no such evidence), and by showing a photograph of a supposedly "rusty" wheel, among other "optic" evidence the government hyped. Like that wheel—which was not rusty but damaged by repeated cleanings in the clean room, *see* 1/23/17 Trial Trans., at pp. 38:25-39:8 (Connolly)—virtually all of these optics were debunked. Regardless, there was no evidence that any of these supposed problems were *ever* brought to Mr. Cadden's attention outside the clean room.

[11] Though some of Mr. Cadden's emails were arguably interpreted by the jury to show his knowledge, at some point, that certain processes or SOPs were no longer being followed, there is no question that Mr. Cadden's directions to the clean room were positive, not negative or corner-cutting.

[12] The lone piece of evidence to which the government may point to rebut this is Trial Exhibit 212 in which Mr. Cadden directs Mr. Chin to "re-label" and old lot of a drug called retinoic acid. The government seized on this language because it makes Mr. Cadden look bad. However, the email is not clear on its face. It does not make clear the size of the lot in question, when it was made, whether it was tested—from almost four years before the outbreak—what was on the original, what would be on the new label, or, most importantly, whether any of this was ever even done or whether the drug was ever sent out. The government chose not to call a single witness to explain any this, and without that critical information it is not possible, or fair to Mr. Cadden, to draw any conclusions from this Exhibit. USP 797 *allows* such relabeling as long as it is supported. *See* Trial Exhibit 3174 (USP 797, allowing pharmacists to assign longer BUD/expiration dates when re-dispensing unopened or unused products).

- In Trial Exhibit 245 Mr. Cadden reveals to Mr. Chin and Mr. Svirskiy that he recently learned that his instructions to test certain logs were being ignored, and he directs them to assign someone to ensure that "EVERY log that comes into CR-1 is properly sampled."

- In Trial Exhibit 235 Mr. Cadden criticizes Mr. Chin's productions methods and warns him that he "can't do what [he was] currently doing." Mr. Cadden also unequivocally directed Mr. Chin to ensure that "100% of the KCL that leaves [NECC] MUST be tested [for sterility and potency]. No exceptions."

- In Trial Exhibit 237 Mr. Cadden directs Mr. Chin and Mr. Svirskiy, among other things, to: (1) make sure all batches of more than 25 units are sterility tested; (2) quarantine all stock products until test results are received; and, (3) subject stock products to a second sterility test before the vials are sent out.

- Mr. Connolly testified about a conversation in the Spring of 2012 where Mr. Cadden ordered testing procedures in the clean room to be improved in order to make NECC "bulletproof." *See* 1/19/17 Trial Trans., at pp. 103:25-104:4. However, according to Mr. Connolly, under Mr. Chin's leadership these changes lasted "[f]or a day" only. *Id.,* at p. 126:19-20.

Mr. Cadden's consistent directions to conduct *more* testing, cleaning, and quality control is even apparent in some of the government's oft-cited exhibits. For example, the government relied heavily on Trial Exhibit 231 in arguing that Mr. Cadden instructed Mr. Chin to mislabel or "botch" lots. The email says no such thing. That email warrants brief attention here given the inordinate and misplaced weight the government places on it (as it must, given the dearth of other evidence connecting Mr. Cadden to this practice).

As a starting point, that email proves that Mr. Cadden was *not* intimately familiar with the clean room's testing processes in August 2011—but that he jumped in quickly when he learned something might be amiss. He wrote: "What's the testing process for the large meds currently? I assumed that we have at least sterility testing for 'all' lots of large volume injectable lots that we are dispensing but I am told that the lots for some drugs almost never coincide with the available test data." *See* Trial Exhibit 231. In short, he was concerned to learn that testing may be out of specification and he asked that this be addressed. Likewise, the email also *ends*

with Mr. Cadden insisting on *more* testing. He writes: "I was told that we are only testing rarely and dispensing many untested lots? Please clear this up + tell me what we are doing + what we will do." *Id.* On its face the email directs Mr. Chin, in no uncertain terms, to conduct *more* and correct testing.[13]

At trial, and to Probation, the government ignored this command to test *more* and instead focused on Mr. Cadden's statement in the middle of that email to "[r]un like normal stock meds like beta repos = test every lot and just fill as you go based on the size vial = # needed or make as many lots as you like 'internally' but only label vials with lot# of tested lost to cover our ass=ex..Avastin." *Id.* Despite the facial appeal of the reference to labeling lots, there was no testimony whatsoever explaining what was a complicated process in the cleanroom. The government had numerous opportunities to do so as the many technicians who testified could have explained the process NECC used for Avastin for which Mr. Cadden was advocating, but it instead chose to enter this email without a witness and without that explanation. Had the government asked, it would have learned that Avastin was a repackaged drug—it was not even a high-risk product like the injectable steroids at the heart of this case—and that the end product of each lot was, in fact, tested. The government's interpretation of the cherry-picked quotes is untethered to *any* evidence or testimony concerning the email because the government did not call a single witness to explain it or provide any context. Nor is the jury's verdict conclusive evidence that it adopted the government's incorrect interpretation of this confusing and highly technical email.

---

[13] This insistence by Cadden on more testing, more cleaning, and more quality control extended beyond Chin to other NECC employees and third parties. *See, e.g.,* Trial Exhibit 239 (Cadden directing Sharon Carter to add another layer of sterility testing to NECC's stock products); *see also* Trial Exhibits 334-336, 1912, 2296, 2371, 2374, 2379 (Cadden directing NECC's third-party cleaning company—UniClean—to engage in stricter entry and gowning procedures to prevent microbial contamination of the clean room).

Mr. Cadden's commitment to, and concern about, patients was vividly demonstrated by other evidence at trial. For example, in evidence there are many instances of Mr. Cadden declining to compound or provide certain drugs customers requested—and thereby turning down business—for safety reasons. *See, e.g.,* Trial Exhibits 2132, 2354, 2769. Mr. Cadden also forwent business by putting limits on the amount of backordered products customers could order to avoid—unsuccessfully it now appears—overtaxing the cleanroom. *See* 1/17/17 Trial Trans., at pp. 47:25-48:4 (Giamei). On another occasion, when Mr. Cadden learned that some customers might be engaging in the very dangerous practice of sending compounded medications home with patients, he threatened to terminate any salespeople who were aware of customers doing this but failed to report it. *See* Trial Exhibit 2396.

Mr. Cadden's feelings about patients, though, may be best illustrated by what he did when he learned of the possibility of particulate matter in the August lot from an Indiana clinic on September 25 (the same day as the CDC call discussing the infections in Tennessee). Immediately upon learning about this possibility, Mr. Cadden drove back to NECC at midnight and made calls all throughout the night to NECC's customers across the country to alert them not to use the methylprednisolone ("MPA") the next day. Even at this point, Mr. Cadden was not sure there was a link between the Indiana clinic's email about particulates and the still unwinding reports of infections in Tennessee, but he erred on the side of caution and safety by recalling the MPA immediately. For the government to continue to claim that Mr. Cadden stood by and did nothing "when every second mattered," as it repeated at trial, is simply false.[14]

---

[14] Mr. Cadden acted no differently than the FDA in believing that once the drug was recalled, the urgency of learning the precise cause of the contamination was alleviated. On this subject, the government tries to fill this void of personal culpability by arguing, wrongly, that Mr. Cadden knew of the outbreak sooner than he did, and that he lied at its outset. Neither is true, and the evidence contradicts both assertions.

The government first claims that Mr. Cadden did not disclose the complaint he received from the Indiana clinic about particulate matter. This could not be further from the truth as the very next day following his receipt of the complaint he initiated a voluntary recall of the lot of MPA. This recall process—which was overseen and supervised

Mr. Cadden's true humanity was also revealed through the testimony of cooperating witness, Robert Ronzio, who described how Mr. Cadden broke down in tears upon learning of the first death. *See* 3/6/17 Trial Trans., at p. 38:10-12. Mr. Cadden was plainly "devastated." *Id.*, at p. 38:13-14. Mr. Ronzio knew Mr. Cadden well, and he testified that Mr. Cadden was not one to show his emotion—just as the Court likely observed at trial. *Id.*, at p. 38:17-21. Nonetheless, Mr. Cadden was "in shock" and was "an emotional mess" during the outbreak. *Id.*, at pp. 36:22-37:2. Mr., Cadden's brother-in-law, Mr. Ferrara, also saw this anguish over the illnesses first hand: "Regardless of what people may think, Barry's heart goes out [sic] the victims and their families. He has told me how terrible he felt for the families and his frustration on how he could not speak to them directly. I know he truly sympathizes with them." (Tab 1).

---

by the Massachusetts Board of Pharmacy, *see* 2/15/17 Trial Trans., at pp. 75:3-76:22, 122:8-14, 123:11-17 (Penta)—included NECC faxing recall notices that explained it was "due to the potential for foreign particulate matter within the vial," *see, e.g.,* Trial Exhibit 3035. The government is well aware of this, and for it to still argue that Mr. Cadden concealed this information is ludicrous.

The government next argues that in the early days of the outbreak Mr. Cadden should have done more. However, the government can only make this argument with the benefit of hindsight. The evidence established that, in those early days, everybody—Mr. Cadden and the regulators—feared the cause of the infections in Tennessee could have come from NECC's MPA, but nobody knew for certain. *See* 1/10/17 Trial Trans., at p. 90:16-19 (Park). Yet the government asserts that Mr. Cadden should have responded as though he knew the full scope of the outbreak and that there were no other possible causes. That was not the case. Based on the available information, Mr. Cadden—just as anyone in his position would have—hoped desperately that NECC was not the cause while awaiting additional information.

Although the government is eager to use hindsight to hold Mr. Cadden accountable, with the benefit of hindsight everyone involved in this outbreak should be held accountable. For example, on September 26 representatives from the FDA and the MA BOP were on site at NECC, sitting in a room with hundreds of vials of MPA. But not a single agent from either agency thought to even ask for one of those vials to have it tested immediately for microbial growth. *See* 2/15/17 Trial Trans., at pp. 146:23-147:6 (Penta). With the benefit of hindsight, this is unimaginable.

Similarly, the evidence established that everyone involved in the early stages of the outbreak was careful about disclosing information because nobody knew what was going on. Thus, with the benefit of hindsight, it appears dishonest that St. Thomas lied to its patients that the clinic was closed because of an equipment malfunction when in fact it was closed because of the infections. *See* 1/17/17 Trial Trans., at p. 153:10-14 (Culclasure). It seems wrong that the Tennessee DPH instructed St. Thomas to do precisely that, i.e. lie, until they knew more information. *Id.,* at p. 153:21-22. With the benefit of hindsight, the FDA's refusal to give state boards of health more information about what it knew is difficult to understand. *See* Trial Exhibit 2446. And with the benefit of hindsight, there is little question that Dr. Bhambani of Box Hill Surgery Center regrets that she never told Mr. Cadden during either of the two calls she had with him that several of her patients had developed infections. *See* 2/2/17 Trial Trans., at p. 151:13-21 (Bhambani). While it is easy to criticize each of these individuals/groups now that we know the full scope and cause of the outbreak, at the time, when information was scarce and certainty was scarcer, each acted in a way it felt was reasonable. It is no fairer to criticize Mr. Cadden's actions using the lens of hindsight than it is to criticize each of them.

E.    Under Mr. Chin's management, the clean room's staff and adherence to SOPs foundered.

The undisputed evidence established that Mr. Chin and the clean room staff did not consistently adhere to Mr. Cadden's compounding standards after he left the clean room in 2008. Although Mr. Chin was skilled technically, he was, by all accounts, a terrible manager who punished or ridiculed anyone who criticized him directly or who criticized him to Mr. Cadden. *See, e.g.,* 1/20/17 Trial Trans., at pp. 141:17-142:20 (Connolly). As a result, the safe clean room practices in place under Mr. Cadden, we now know, deteriorated under Mr. Chin's leadership. After Mr. Cadden transitioned out of the clean room, Mr. Chin became responsible for all clean room operations and personnel. This included responsibility for hiring clean room staff; Mr. Cadden learned at trial that Mr. Chin apparently hired based on personality rather than skill. *See, e.g.,* 1/24/17 Trial Trans., at pp. 90:20-91:14 (Finnegan). Further, while Mr. Cadden had sent compounding technicians, such as Corey Fletcher, to compounding training, this practice apparently stopped under Mr. Chin's management. *See* 2/6/17 Trial Trans., at p. 44:14-22 (Fletcher).

The evidence established that Mr. Cadden—who was managing the growing company and not present in the clean rooms—did not engage in the allegedly unsafe compounding practices that formed the basis of the government's case and, indeed, he did not even know about most of them. The clean room employees who testified at trial consistently and uniformly attributed the alleged safety-related deficiencies exclusively to Mr. Chin:

- Mr. Chin instructed them to use old lot numbers and old labels on new bottles of drugs. *See* 1/27/17 Trial Trans., at p. 36:13-37:21 (Booth); 1/25/17 Trial Trans., at p. 130:6-8 (Finnegan).[15]

---

[15] As noted above, the only evidence to which the government has pointed to connect Mr. Cadden to this practice lacks critical information (that the government did not fill in by calling a witness) and, thus, does not support such a connection (*see* footnote 12, *supra*) and/or reflects Mr. Cadden's overall insistence on testing *more*, not less (*see* Section I.D, *supra*).

- Mr. Chin instructed them to fill out cleaning logs for tasks they did not perform. *See* 1/26/17 Trial Trans., at p. 140:5-11 (Booth); 2/7/17 Trial Trans., at p. 14:11-18 (Fletcher).

- Mr. Chin instructed them to "roll" or "botch" lots. *See* 1/23/17 Trial Trans., at p. 70:14-17 (Connolly); 1/25/17 Trial Trans., at p. 120:1-10 (Finnegan).

- Mr. Chin checked the drugs sent out without test results.[16] *See* 1/23/17 Trial Trans., at p. 110:5-9.

- Mr. Chin was the only person who ever put the MPA into the autoclave. *See* 2/6/17 Trial Trans., at pp. 77:25-78:3. The logged formula worksheets for the MPA state a 20-minute autoclave time, *see, e.g.,* LFW for the August Lot, at p. 2, attached at Tab 5, and there was no evidence at trial that Mr. Cadden was informed otherwise.

- Mr. Chin directed the use of expired ingredients. *See Id.,* at pp. 96:21-97:1.

As Mr. Fletcher testified, these practices all began toward the end, i.e. well after Mr. Cadden's time in the clean room. The Court should consider this critical fact when determining Mr. Cadden's sentence for the mail fraud offenses because it goes directly to Mr. Cadden's knowledge concerning the representations about NECC's compounding operations. Mr. Cadden had every reason to rely on Mr. Chin to continue to operate the clean room just as it had been operated under Mr. Cadden's watch. And Mr. Cadden did not know that Mr. Chin had abandoned the safe processes he had put in place and taught him.

Despite Mr. Cadden's instructions to Mr. Chin to do things right—some of which are discussed above in Section D—the evidence showed that Mr. Chin continued to direct the clean room staff to do things improperly and, worse, falsely attributed those instructions to Mr. Cadden:

- Mr. Cadden directed Mr. Chin to ensure that the clean room staff always prioritized "quality" over production. *See* Trial Exhibit 2391. Not only did Mr. Chin never share this directive with the clean room staff, *see* 1/20/17 Trial Trans, at pp. 173:10-176:24

---

[16] Conversely, Cory Fletcher testified that he could not recall Cadden ever authorizing the release of untested drugs. *See* 2/7/17 Trial Trans., at p. 93:8-11.

(Connolly); 2/7/17 Trial Trans., at p. 96:18-21 (Fletcher), but he falsely stated that Mr. Cadden insisted that they produce a certain number of medication doses per day, *see* 1/24/17 Trial Trans., at p. 132:11-13 (Finnegan), and that they prioritize production over cleaning, *see* 2/6/17 Trial Trans., at pp. 149:23-150:2 (Fletcher). This instruction was, quite literally, the exact *opposite* of what Mr. Cadden's email to Mr. Chin stated.

- Mr. Cadden directed Mr. Chin to assign one person to ensure that every log in clean room one was properly sampled and tested according to Mr. Cadden's written instructions. *See* Trial Exhibit 2397. But Mr. Chin never instituted this direction or shared it with anyone in the clean room. *See* 1/26/17 Trial Trans., at pp. 100:15-102:15 (Finnegan).

- Mr. Cadden directed Mr. Chin to ensure that the clean room staff always filled out the cleaning logs accurately and contemporaneously with the cleaning. *See* Trial Exhibit 2095. But Mr. Chin never relayed this message and, instead, he actively encouraged the clean room staff to continue falsely and arbitrarily filling out the logs, and to do so in a manner designed to conceal that practice from Mr. Cadden. *See* 2/7/17 Trial Trans., at p. 19:6-9 (Fletcher); 1/26/17 Trial Trans., at pp. 3:23-4:16 (Finnegan).

Similarly, the evidence also showed that Mr. Chin went to great lengths to *conceal* deficient practices from Mr. Cadden that Mr. Chin had implemented or allowed. Mr. Chin's efforts to conceal were graphically illustrated during the testimony of Owen Finnegan when he discussed the practice of "back-stocking" that Mr. Chin directed. Mr. Finnegan testified that in the Summer of 2012 Mr. Chin kept 15-20 Ziploc bags of unlabeled drugs on the shelves in the clean room from which they would fill orders (sometimes without testing results). *See* 1/25/17 Trial Trans., at p. 132:12-17. When asked why these unlabeled vials were kept in the clean room and not sent out to the packing or stock areas, Mr. Finnegan made clear that Mr. Chin did not want anyone outside of the clean room—including, or perhaps especially, Mr. Cadden—to learn of this practice and prevent him from continuing to employ it. He was asked why those unlabeled vials were not sent out to Sharon Carter (NECC's Operations Manager) or others outside the clean room:

"Glenn was fearful that they would either lose it, mislabel it, or if we got an order later on down the line that we didn't have testing for, we wouldn't be

able to get the order out until we had testing. So he liked to keep it in the room so we could label it as we wished." *Id.,* at p. 136:17-21.

Mr. Chin undertook similar efforts to conceal other deviations from the SOPs from Mr. Cadden. This included Mr. Chin's instructions that the clean room staff fill out the monthly cleaning logs for tasks they did not perform. *See* 1/26/17 Trial Trans., at p. 140:5-11 (Booth); 2/7/17 Trial Trans., at p. 14:11-18 (Fletcher). When Mr. Cadden learned of this practice, he specifically directed Mr. Chin to make sure the clean room staff was accurately and contemporaneously initialing the cleaning logs. *See* Trial Exhibit 2095. Unfortunately, as recounted by several of the government's witnesses, Mr. Chin ignored this directive and, instead, continued to direct the clean room staff to falsely and arbitrarily fill out the logs. Notably, undisputed evidence established that after Mr. Cadden directed him to stop this, Mr. Chin directed the staff to spread their initials more "randomly" throughout the logs *to conceal from Mr. Cadden* that they were violating his direction and continuing to falsify the logs. *See* 2/7/17 Trial Trans., at pp. 18:21-19:9 (Fletcher); 1/26/17 Trial Trans., at pp. 3:23-4:16 (Finnegan).

Given the clear evidence separating Mr. Cadden from the alleged compounding deficiencies in the clean room, the government went to great lengths to conflate Mr. Cadden's knowledge and actions with the knowledge and actions of other NECC employees and of NECC as a whole. The government did this because there was no evidence that Mr. Cadden was aware of the vast majority—and certainly the more concerning—compounding practices Mr. Chin was directing, much less that he approved or participated in them. At best, he was willfully blind. Nowhere was this conflation made more clear than in the government's closing in which AUSA Strachan listed a litany of things generically done by anyone at NECC rather than focusing on things the government had proved *Mr. Cadden* did. Although Mr. Cadden was the sole defendant

on trial, Ms. Strachan went on and on about what *NECC* did, not even mentioning Mr. Cadden's name:

> "*They* didn't sterilize the methylpred for a great amount of time. *They* didn't verify the autoclave sterilization process. *They* didn't use biological indicators. *They* tested from the batch instead of doing end-product testing. *They* didn't test enough samples of the drug. *They* didn't wait for test results to come back before sending out the drug. *They* shipped the drugs without prescriptions. *They* shipped drugs with expired ingredients. *They* sold Methotrexate to hospitals treating cancer patients even though it was expired. *They* ignored environmental monitoring results showing mold and bacteria in that clean room. *They* shut off the air conditioning at night. *They* ignored test results showing out-of-specification and nonsterile results. *They* forged cleaning logs. *They* mixed drug lots. *They* poured drugs down the drain. *They* covered up cracks in the floor with plastic and tape. *They* used expired media. *They* wrestled with each other in the clean room. *They* dealt with bugs in the clean room by spraying them with alcohol. *They* literally threw Matt Crothers out of the pass-thru." *See* 3/16/17 Trial Trans., at pp. 7:6-8:7 (emphasis added).

Mr. Cadden cannot be made culpable by simply adding the word "they." He was not involved or even aware of the key actions, or inactions, that were the focus of the indictment. Rather, Mr. Cadden's compassion, and his consistent insistence on *more* testing, *more* cleaning, and *more* quality control should carry great weight in his sentencing. The government paints Mr. Cadden as a callous and greedy business owner who put profits ahead of safety. But that picture is plainly belied by Mr. Cadden's own words. The jury's verdict suggests that they recognized this. The most reasonable interpretation of the verdict and acquittals is that the jury held Mr. Cadden responsible for not always knowing (or remaining willfully blind to) Mr. Chin's clean room practices, or perhaps not sufficiently following up on his own instructions to Mr. Chin to correct them. But by acquitting Mr. Cadden of all twenty-five murders and of the substantive FDCA charges— after asking the Court a telling question about the need for Cadden to have held

drugs in an insanitary condition to convict on the FDCA counts[17]—the jury appears to have rejected the government's characterization of Mr. Cadden as callous and greedy. The Court should do the same, and Mr. Cadden's sentence should reflect that critical difference.

F.  Mr. Cadden's misdeeds alleged at trial are far less central to the outbreak and to the core of this prosecution.

There is little doubt that certain of Mr. Cadden's actions cast him in a very negative light, and rightly so, and led the jury to convict him. But Mr. Cadden's most "culpable" actions, and counts of conviction, are very much removed from the patient illnesses and deaths, another important factor supporting Mr. Cadden's requested sentence.

As discussed above, the only reasonable interpretation of the jury's verdicts on Counts I and II relating to the clean room operations is that Mr. Cadden was willfully blind to Mr. Chin's deviations from SOPs and USP 797. Regardless, the evidence concerning Mr. Cadden's role vis-a-vis the contaminated MPA plainly does not support a sentence that treats Mr. Cadden as though he directed the clean room activities at issue.

The same is true for the other counts for which he was convicted, which related to: (i) the unregistered clean room technician, Scott Connolly; and, (ii) fake names on three prescriptions from two customers.[18] These counts had minimal, if any, impact on the safety or sterility of NECC's medications, and there was no evidence that *any* of them led to patient harm. Therefore, for the purposes of sentencing, they should be treated differently.

---

[17] The question was posed on March 21, 2017, about the following portion of the Court's instructions concerning the FDCA: "That he knew that the drugs were adulterated, in that he prepared, packed, or held them under insanitary conditions." The jury note continued: "The jury is interpreting this literally as the defendant himself, prepared, packed, or held them under insanitary conditions." Plainly, the jury acknowledged that Mr. Cadden's awareness of the clean room operations was limited and acquitted him of these counts.

[18] By way of reminder, these were customers who themselves placed the fake names on the prescription order forms.

>    *1.      Having Scott Connolly assist with the cardioplegia was not dangerous.*

The allegations concerning the unregistered pharmacy technician (Scott Connolly)

illustrate graphically why the conduct of which Mr. Cadden was convicted was peripheral to the

outbreak, was unrelated to safety, and merits the sentence he proposes.[19] There was not a shred

of evidence that the use of this single, unregistered technician to perform menial compounding

tasks under the supervision of a licensed pharmacist resulted in any patient harm, or ever

threatened the safety of any NECC medication.[20] The sole cardioplegia bag alleged to have been

contaminated was not even overseen by Connolly. This illustrates why these alleged deficiencies

should be treated differently at sentencing.[21]

>    *2.      NECC prescription practices were no different than other large*
>            *compounders at the time, and the "fake names" were an aberration.*

The three counts reflecting fake names on order forms likewise did not implicate safety.

Mr. Cadden signed those particular "verification sheets" (which did not list the patient's name)

and the jury convicted him. But Mr. Cadden asks the Court to recall Mr. Ronzio's testimony that

he knew he would have been fired if he had ever encouraged salespeople to obtain fake names.

*See* 3/6/17 Trial Trans., at p. 118:3-5.

---

[19] Mr. Cadden was shown to have chosen Mr. Connelly's experience over the formality of his registration status; this was wrong.

[20] Further, evidence suggesting that Mr. Cadden faked his own media fills, supposedly to obscure that Mr. Connolly had worked in clean room 2, is highly distasteful. It did not, however, put patients at risk. Mr. Cadden was not "faking" this procedure so he could compound drugs; Mr. Cadden did not compound any drugs in reliance on the false media fills about which Annette Robinson testified.

[21] This is true even though the allegations concerning Mr. Connolly look bad, and they paint Mr. Cadden in a poor light. First, there were never any reports of patient harm from the cardioplegia medications Mr. Connolly participated in making, or that those medications were sub-par in any way. Second, Mr. Connolly—while experienced and skilled as a pharmacy technicians, *see* 1/26/17 Trial Trans., at p. 85:9-16 (Finnegan); 1/30/17 Trial Trans., at p. 52:19-25 (Carvalho)—had an extremely limited role in the compounding process. All he did—under the supervision of a pharmacist—was monitor a pump that automatically filled bags with various ingredients. *See id.*, at pp. 42:17-44:5 (Carvalho). Third, neither the technician registration process itself, nor the reason Connolly lost his registration, was at all connected to patient safety. The registration process came about not to ensure quality, but to track possible drug diversion by technicians. And Mr. Connolly did not surrender his registration due to quality issues but rather because he sent his ex-wife yeast infection medication in an effort to win her back. *See* 2/16/17 Trial Transcript, at pp. 16:9-20:18 (Penta).

The government continues to treat Mr. Cadden as "convicted" by a majority of jurors on

Count III. That approach is wrong and should be rejected out of hand by the Court. Mr. Cadden

was acquitted of Count III.

Regardless, the government's spin on NECC's prescription practices is not accurate.

NECC was not alone in struggling with how to reconcile prescription requirements in the 50

states it serviced with the alarming drug shortages for backordered commercial products. It was

widely understood in the market that larger compounders like NECC dispensed in greater

quantities without traditional prescriptions. *See* Eric Kastango's advice summarized in Pharmacy

Sterile Compounding Summit, Summary of a Stakeholder Meeting held on February 6, 2013, at

p. 6 attached at Tab 6 ("According to Kastango, under current oversight systems, sterile

compounding companies or any pharmacy providing non-patient-specific CSPs should register

with the FDA"). The government's USP 797 expert, Mr. Kastango, explains: "The scope and

magnitude of sterile compounding has changed dramatically over they past three decades and

includes many large scale commercial compounding operations providing compounded sterile

preparations (CSPs) without the traditional benefit of a patient-specific prescription." E.

Kastango and K. Douglass, *Quality Standards for Large Scale Sterile Compounding Facilities*,

Clinical IQ, at p.3, attached at Tab 4.

The FDA likewise knew before the 2012 outbreak that the traditional prescription models

were impractical for larger compounders and were not being followed. By 2012 (prior to the

outbreak), the FDA was in the process of implementing rules to formally codify the fact that

large-scale compounders needed a certain time period (e.g. 7 days) in which to obtain

prescriptions after shipping medications to customers. *See* Trial Exhibit 2243. For the same

reasons, so-called "outsourcing" contracts (such as the MEEI contract in this case, Trial Exhibit

3229) were implemented by compounders across the country to address the reality that hospitals needed medications before they would know the identity of the particular patient. *See* Pharmacy Sterile Compounding Summit, Summary of a Stakeholder Meeting held on February 6, 2013, at p. 6 (Tab 6).

This gap between the state laws on prescriptions and the market was greatly increased by the jump in backordered drugs—commercial drugs that were temporarily or permanently unavailable on the commercial market. This drug shortage became so dire that President Obama issued an Executive Order on October 31, 2011, to help address the problem emergently. (Copy of the October 31, 2011, Executive Order 13588 is attached at Tab 7). Even more than clinics, hospitals could not identify the specific patient prior to ordering a compounded drug. *See* 3/6/17 Trial Trans., at p. 117:20-23 (Ronzio). The proposed change was meant to codify what the FDA and the industry knew was already taking place by necessity. *See* Pharmacy Sterile Compounding Summit, Summary of a Stakeholder Meeting held on February 6, 2013, at p. 12 (Tab 6) (proposing in 2013 new FDA oversight for compounders known to be shipping drugs out of state without a prescription). Indeed, the 503B(b) pharmacy—created after the outbreak— simply codified the rules and registration requirements for these pre-existing pharmacies like NECC, including the authorization of shipping without prescriptions as long as the prescription was received later, within a set period. *Id.*

The same is true for the Massachusetts BOP. The BOP, as the Court heard at trial, was given the prescription form that NECC used and raised no objection to that form until *after* the outbreak. *See* 2/15/17 Trial Trans., at pp. 84:20-86:3 (Penta); Trial Exhibit 358, at p. 6. Indeed, there was evidence at trial that the BOP initially took no issue with this form when it inspected NECC on September 26, 2012. *See* 3/9/17 Trial Trans., at p. 76:10-13 (Frisch). Although the

BOP knew that NECC was shipping drugs without prescriptions at times over the year, NECC was never disciplined.[22] This failure to view the prescription issue as warranting discipline speaks volumes about the state of the industry in 2012.

In sum, there is nothing about the counts of which Mr. Cadden was convicted that implicates patient safety and nothing that comes anywhere close to warranting a life sentence.

[Section I.G Filed Separately Under Seal]

II.     **A sentence more than that which Mr. Cadden proposes would create an unfair and disfavored disparity among compounding pharmacists who have been convicted based on remarkably similar facts.**

Mr. Cadden's request for no more than a 3-year sentence also comports with the statute's direction to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See* §3553(a)(6). The Court should not conduct a results-oriented sentencing that allows the scope of the outbreak—and deaths of which he was not convicted—to drive the sentence; it is Mr. Cadden's conduct itself that is relevant.

Research reveals only two criminal cases, state or federal, ever brought against compounding pharmacists and neither served any jail time. That is the case despite the numerous deaths, illnesses, and FDA 483s arising out of similar compounding pharmacies' practices, as discussed in detail below in Section III.

The first case is startlingly similar—it also stemmed initially from contaminated MPA. In December 2014 a probationary sentence was given to David A. Newbaker, the pharmacist in charge of Main Street Family Pharmacy, LLC in Tennessee. (A copy of the Information and Plea Agreement for Newbaker are attached at Tab 8). This case also involved contaminated MPA,

---

[22] NECC was given a non-disciplinary warning only.

shipped to fourteen states, that sickened multiple patients. *See* May 29, 2013, "History of

Violations for Main Street Family Pharmacy," attached at Tab 9. There, federal prosecutors

permitted Mr. Newbaker to plead guilty to a one-count information for a misdemeanor violation

of the FDCA. *Id.* The violations at Main Street, according to the FDA 483 inspection form,

appear to exceed NECC's.[23] Main Street's violations included:

- Failure to test each batch of drug product (testing done on a random basis only)
- Failure to release product only after testing completed;
- Failure to validate any process in the processing of injectable drug products;
- Failure to use biological indicators;
- Failure to document lot numbers so that distributed drug products could be traced;
- Spiders found in the ISO 6 clean room;
- Caulking on pieces of flooring in ISO 6 clean room worn away causing a crack in the floor of the clean room;
- Buildings used in the manufacture, processing, packing or holding of drug products not free of infestation by rodents, birds, insects, and other vermin;
- Failure to investigate failure of the injectable MPA to meet its potency specification— one of three tested for potency was super-potent; no investigation performed and no corrective action documented;
- Failure to use any type of sporicidal agent inside or outside the ISO 6 clean room;
- Lack of equipment cleaning, maintenance, or use logs for critical pieces of equipment;
- Failure to separate expired ingredients from in-date ingredients;
- Lack of stability testing;
- During observed compounding, components brought from uncontrolled environment and placed on work surface of the ISO 5 hood without being sterilized;
- Non-sterile wipes used to clean workbench surfaces of ISO 5 hoods;
- Protective clothing not worn as necessary (exposed legs, eye make-up, exposed facial areas, non-sterile gown worn over street clothes)
- Gown intended for use in the clean room stored on a coat rack in the hallway outside the clean room beside a door leading outside;
- Failure to handle and store drug product containers at all times in a manner to prevent contamination;
- No documentation of the pressure differentials between and among the clean rooms;
- No records to document cleaning, disinfection, or maintenance of hoods;
- No written complaint process;
- No quality control unit;

---

[23] There was no evidence that Mr. Newbaker, like Mr. Cadden, had a large team of pharmacists to whom he delegated the critical compounding operations, meaning he did it all himself.

- Lack of written procedures assigning responsibility, providing cleaning schedules, and describing in sufficient detail the methods, equipment and materials to be used for sanitation. *Id.*

Mr. Newbaker's probationary sentence cannot be attributed to Main Street being a first-time offender: Main Street Pharmacy had numerous regulatory violations in several prior inspections and merely had its license placed on probation by the state of Tennessee. *See* May 29, 2013, "History of Violations for Main Street Family Pharmacy," attached at Tab 9. Significantly, those infractions that were treated as mere regulatory issues paralleled those at NECC, including: 89 outdated medications, 20 of which had been used in compounding (Dec. 2011 inspection); shipping medication without prescriptions; an employee who worked as a pharmacy technician for more than four years without proper registration as a technician. *Id.*

The second conviction and probationary sentence of which counsel is aware arose out of conduct prior to the 2012 outbreak. Gary Osborn, the owner and operator of a compounding pharmacy, ApotheCure, Inc. in Texas, pleaded guilty to a misdemeanor information in 2012 where his product resulted in three deaths.[24] *See* April 24, 2012, press release from the Department of Justice attached at Tab 10. Mr. Osborn received a sentence including 90 days of home confinement and a one-year probationary term, plus a $100,000 criminal penalty. *See* Docket Case No. 12-cr-00047-M, Northern District of Tx. Attached at Tab 11.

Mr. Cadden's recommended sentence also comports with sentences in analogous cases involving deficient pharmaceuticals or products that sickened or killed people. *See* Chart of Analogous Cases, attached at Tab 12. For example, Eric and Ryan Jensen opened and operated Jensen Farms whose cantaloupes killed 33 people and sickened nearly 150 people. *United States v. Jensen*, D. Colo. Pacer Docket 13-MJ-01138-MEH, Docket Entries 44 & 48. They each received 12 months' probation. *Id.*

---

[24] The underlying facts are not available online.

In addition to these relevant comparisons, the Court should also consider the countless compounding pharmacies and pharmacists over the years that have had similar histories, and similar tragedies, where there has been no criminal action whatsoever. These are discussed in the next section. It would be grossly unfair to impose the type of sentence Probation has wrongly calculated here given the regulatory response to all previous compounding tragedies.

**III.   Neither NECC, nor Mr. Cadden, was the outlier depicted at trial; NECC's practices were in line with those of other compounders and he should not be sentenced as an "outlier."**

If Mr. Cadden had not become the public face of the compounding industry's problems, that unenviable role would have been assumed by some other pharmacist, at some other time. "There but for the grace of God go I" was likely uttered by every compounder across the country when Mr. Cadden was indicted. This reality must be considered in sentencing. Mr. Cadden—at great expense—put procedures, equipment, and practices in place at NECC that exceeded industry standards. (Section 1, below.) Though NECC obviously had failings, NECC was no different than other compounders in 2012 in terms of it compounding practices (Sections 2-4, below). A sentence of 3 years is far more appropriate in light of these facts.

A.      Cadden and NECC exceeded USP 797 in numerous ways.

NECC's processes were not materially different than most compounders in 2012. In fact, the evidence showed that NECC exceeded industry standards, and other compounders' practices. Notably, all of these exemplary aspects of NECC involved areas for which Mr. Cadden, as an owner, was directly responsible, as discussed below and proven at trial. He and NECC attempted to create the safest operation possible, and he believed it was safe. *See, e.g.,* 1/13/17 Trial Trans., at pp. 148:21-149:5 (Giamei). By contrast, as discussed in Section I, *supra*, the deviations from

the standard of care were made not by Mr. Cadden but by Mr. Chin, who was overseeing the clean room operations.

It was uncontested that NECC's SOPs, drafted by Mr. Cadden with assistance from experts, exceeded USP 797 in many respects. For example, even the government's USP expert, Eric Kastango, agreed that NECC conducted environmental monitoring far more frequently, and in areas that exceeded what USP recommended. *See* 3/1/17 Trial Trans, at p. 27:11-13. The USP called for air testing two times per year—NECC tested the air in its clean room *every other week*. *Id.,* at p. 27:8-10. The USP did not suggest frequent environmental testing of floors or other areas unlikely to affect the product, *see* Trial Exhibit 3206 (USP 1116), at pp. 702-703—NECC tested those areas weekly, *see* Trial Exhibit 992 (environmental monitoring results). Had Mr. Cadden "cut corners" as the government argues, he would have tested only the bare minimum. But he chose to test far more frequently and in more inclusive areas.

Moreover, the results of NECC's environmental testing were likewise consistent with, and frequently exceeded, USP standards.[25] *See* Trial Exhibits 3232A, 3232B, 3233-3239. The USP acknowledged that even in the critical areas "airborne and surface contamination recovery rates of 1% or less should be attainable." *See* Trial Exhibit 3206 (USP 1116), at p. 703. NECC's recovery rates in the critical areas, however, was 0%. *See* Trial Exhibit 3233.

NECC also compounded high-risk products in the superior ISO-4 environments (glove boxes and hoods) even though USP required only an ISO-5 (more air particulates) environment for sterile compounding. *See* Trial Exhibit 3174 (USP 797), at p. 361. NECC's compounding

---

[25] The government denounced the comparison of NECC's results to USP 797's action levels as "fake charts" in its closing. *See* 3/16/17 Trial Trans., at p. 45:6. The government also intentionally tried to confuse the jury by claiming incorrectly that the architectural ISO designations of the clean rooms *as designed* somehow impacted the USP standards. They did not. As Steven O'Neil—the only person to speak to this subject—testified, these two concepts are unrelated. USP 797 has only one set of action levels and they are *not* based on the architectural ISO levels but on the functions performed in each area. *See* Trial Exhibit 3174 (USP 797), at p. 361. Those USP action levels are the ones against which Mr. Cadden's chart properly measured NECC's performance.

personnel in the clean room wore expensive, irradiated gowns that exceeded USP's requirements.[26] *Id.,* at p. 366. Mr. Cadden purchased two costly, automated handwashers for the anteroom—which were not required by USP—to further protect NECC's products.

Mr. Cadden also hired outside experts and consultants to ensure safety. He hired ARL to performed independent testing of NECC's products. This commitment and cost is particularly noteworthy given that compounders were permitted to do their own testing and often did because it was cheaper. Mr. Cadden retained UniClean to perform professional-level cleaning on a monthly basis, even though the USP permitted all cleaning to be performed by internal staff. Mr. Cadden retained Scientific Air Analysis ("SAA") to test the air quality in the clean room twice per year. NECC's clean rooms were the highest quality that SAA's Steven O'Neil had seen in his 32 years testing clean rooms. *See* 3/10/17 Trial Trans., at p. 27:17-21. Notably, most of these extra precautions were not dictated by the USP or by regulators— Mr. Cadden insisted on them because he cared above safety and cared about NECC's customers.

B.    NECC's historical product testing results were more favorable than those achieved by other comparable compounders.

The government's own witnesses established that NECC had more favorable historical product testing results than other compounders. Despite the government's false effort to portray NECC's out-of-specification ("OOS") test results in 2012 as spiraling out of control,[27] NECC

---

[26] These gowns became mandatory for compounders under the post-2012 change to federal law, 503(B).

[27] The government put an ARL document of supposedly OOS results in front of the jury and emphasized that the number increased in 2012 indicating a sign of bigger problems. First, this evidence violated an explicit Court order that the government was not to present evidence to the jury of OOS drugs that were never shipped. ECF Order (Dkt. #834). Second, the government misled the jury by failing to explain that NECC had increased its testing volume in 2012. Means clarified outside the jury's presence that OOS numbers would increase as testing volume increased. *See* 3/10/17 Trial Trans., at p. 79:7-14. Third, the Court rejected as unreliable 29 entries on that chart—including one allegedly OOS drug that appeared in the indictment (and that the government only grudgingly agreed to dismiss) as the basis of formal RAs and counts. *See* Memorandum and Order on Defendant's Motoin to Exclude "Out of Specification" Evidence (Dkt. #916). (The government even tried to present evidence to the jury about this Count after Means' testimony established unequivocally that that lot was *not* OOS.)

had far *fewer* OOS results from ARL for its products in 2012—and in any other year addressed

at trial—than ARL's other customers, most of whom were compounders. The government's own

witness, Tommy Means of ARL, testified that compounders, by definition, will have OOS results

with some regularity, possibly as high as 5% or in some cases even greater. *See* 3/10/17 Trial

Transcript, at pp. 76:20-77:2. The evidence at trial was that NECC's OOS rate was, at most, just

under 2%. *See* Trial Exhibit 3295.[28] Despite the government's unfair effort to portray NECC's

OOS results as aberrant, Means testified unequivocally that NECC's rates of OOS drugs were

well below the norm.

> C.     NECC's compounding practices were comparable to those of other compounders
> at the time.

Part of the government's effort to demonize Mr. Cadden was to portray NECC's

compounding practices as falling far below industry standards. The government did so by

focusing the jury on red herrings that the government knew were irrelevant, but that had visual

appeal to the jury. To illustrate, but by no means an exclusive list:

- The government fought mightily before and during the trial to show graphic photographs of the neighboring recycling center even though it did not have any expert testimony that the recycling business impacted the clean room in any way. To the contrary, Steven O'Neil of SAA testified that the recycling business had no impact due to the design of the clean room. *See* 3/9/17 Trial Trans., at pp. 133:8-134:7. And both FDA and MA BOP inspectors inspected NECC numerous times and never raised concerns about the recycling center.

- The government repeatedly referred to "cracked floors with oil bubbling up" throughout trial and even in its closing, *see* 3/16/17 Trial Trans., at p. 17:14, though the testimony was far more benign.

- The government told the jury in its opening that there were "mice in the facility" though there was no evidence of mice in the clean room. *See* 1/19/17 Trial Trans., at p.28:23-24.

- The government displayed a powder hood with green residue, giving the impression that that powder hood was moldy; in reality, as Samuel Penta later made clear, the green color

---

[28] This exhibit deals only with potency tests, but the percentage of OOS sterility tests was even lower.

was dye that the powder hood was *designed to collect in the very area in which it was seen*—and multiple tests of that hood showed zero contamination. *See* Trial Exhibit 3170.

The government's portrayal of these, and other, aspects of NECC's operations is false. NECC's practices and procedures about which Mr. Cadden was aware were consistent with those in the industry at the time. An accurate view of NECC's similarity to other compounders shows that Mr. Cadden did not have the level of culpability to warrant the shockingly harsh sentencing range calculated by Probation. To be clear: Mr. Cadden is not arguing that "everyone else was doing it" and that that should somehow absolve him. Rather, the reality is that the industry standard at the time was simply not what the government now portrays it to have been and that fact is important in evaluating his lesser culpability and his sentence.

      *1.*      *Many experts in the field—including the government's trial expert, Eric Kastango—agree that NECC was not an outlier.*

The Court need not rely upon Mr. Cadden to reach this conclusion; the same conclusion has been reached by industry experts, including the government's USP 797 trial expert. The Institute for Safe Medicine Practices ("ISMP") observed that the NECC outbreak, "cannot be considered an outlier event" given the 200 reported adverse events involving 71 compounded products in the past two decades. ISMP, *"Sterile Compounding Tragedy is a Symptom of a Broken System on Many Levels,"* October 18, 2012, attached at Tab 13. The government's USP 797 expert, Eric Kastango echoed this assessment that NECC was not an outlier. He and a co-author have written, "But while larger than other outbreaks, this was not an isolated event." E. Kastango and K. Douglass, *Quality Standards for Large Scale Sterile Compounding Facilities,* Clinical IQ, attached at Tab 4. At trial, Kastango also testified that he gave compounder clients a "self-assessment" tool so they could measure themselves against USP 797 and that most compounders were not compliant with 797. *See* 2/28/17 Trial Trans., at p. 138:11-14.

32

Citing a letter from Mr. Kastango, the ISMP reported: "An analysis of recent harmful

cases of contaminated products from compounding pharmacies revealed breaches of USP <797>,

unsafe staff behaviors, untrained and unskilled personnel, improper use of equipment, extended

beyond use dating outside of manufacturer labeling without sufficient testing, and/or a lack of

basic compounding skills involved in almost all cases." ISMP, *Sterile Compounding Tragedy is*

*a Symptom of a Broken System on Many Levels*," October 18, 2012, at p. 2 (Tab 13). Implicitly

acknowledging that NECC was not materially different than other compounders, Mr. Kastango

wrote after the outbreak that "[b]usiness as usual is *no longer acceptable*." E. Kastango,

"Lessons Learned from Compounding Tragedies," The Canadian Journal of Hospital Pharmacy,

2013 May-June; 66(3): 152-52, attached at Tab 3 (emphasis in original). An FDA survey of

compounded drug products conducted in 2003 showed that the testing failure rate for

compounded products was significantly higher than that of manufactured products and was

"higher than expected." FDA CDER "Report: Limited FDA Survey of Compounded Drug

Products," 3/17/03, attached at Tab 14. In short, the distorted picture the government tried to

portray, the practices at NECC, especially those that Mr. Cadden was involved in on a day-to-

day basis, were no different than any other compounder, as demonstrated at trial.

>    2.    *Inspections of other compounders, even after the outbreak, revealed that*
>           *most had similar practices to those at NECC.*

Another government witness, Samuel Penta of the MA BOP, proved made clear that

NECC was in lockstep with most Massachusetts compounders. According to Penta and a report

issued by the Commonwealth, only four of 39 Massachusetts compounders inspected in the fall

of 2012 were found to be in full compliance with applicable standards. *See* 2/16/17 Trial

Transcript, at p. 46:7-25. A staggering eleven of those 39 Massachusetts compounders were

issued full or partial "cease and desist orders" because they posed an immediate threat to public health and safety. *Id.,* at p. 47:7-10.

Massachusetts was not unique; the same was true nationally. Prior to the meningitis outbreak in 2012, there had been numerous other deaths and outbreaks arising out of compounded products. 1/10/17 Trial Transcript, at pp. 81:1-22 (Testimony of Dr. Park, of the CDC, concerning a fungal outbreak at Franck's Pharmacy that left 47 people blind, among other historical problems with compounders), 82:10-12 (Dr. Park's testimony that compounders have a higher incident rate of problems). NECC's difference was that it was the one that caused the outbreak.

A well-respected compounding expert, Scott Sutton, carefully documented the FDA's inspection summaries (483s) from numerous FDA inspections of compounders conducted after the outbreak. Dr. Sutton, with whom Mr. Kastango collaborated and whom Mr. Kastango cites as a reliable source, *see* 3/1/17 Trial Trans., at p.56:8-18, reported in one published paper that his review of FDA 483 observations of compounders revealed several common findings: (1) Lack of procedures to prevent microbial contamination; (2) Problems with the Environmental Monitoring program; (3) Problems with batch release; (4) Lack of validation of the sterilization method; (5) Inadequate control/cleaning/qualification of critical equipment used in manufacture; (6) Issues with personnel gowning; (7) Expiry dating of manufactured medicines not supported by a stability study; (8) Issues with laboratory procedures or control of contract lab; (9) Issues with investigations; and, (10) Control of incoming raw materials and components. Scott Sutton, Ph.D., GMP and Compounding Pharmacies, American Pharmaceutical Review, April 30, 2013 attached at Tab 19.

Dr. Sutton also observed that many compounders analyzed, just like NECC, had

"extremely large batch sizes." *Id.* Dr. Sutton's attached article, which Mr. Cadden respectfully

requests that the Court review,[29] includes important charts showing other compounders'

violations in relation to those of NECC's when numerous compounders were inspected in

volume after the outbreak. As the Court will readily see, NECC had *fewer* significant violations

cited in its 2012 483 report than most compounders on that chart. *Id.* Table 1. These other

compounders' violations, as is readily apparent, were neither trivial nor insignificant relative to

NECC's alleged deviations.

For example, other compounders (in addition to their other violations) tested stock

medications, not the final dosage forms or vials, a practice that the government portrayed as so

unheard of as to be criminal. *See, e.g.,* 483 of Specialty Compounding, LLC for an inspection

from 8/13/13-9/13/13 attached at Tab 15 (testing stock only); 483 of Martin Avenue Pharmacy,

Inc. for an inspection from 6/30/14-7/21/14 attached at Tab 16 (none of the pharmacy's sterile

human and animal drug products tested for pyrogens or sterility in the three months prior to the

FDA inspection). Although end-product testing was the norm, other compounders at the time,

like NECC, tested batches prior to filling the drugs into vials, not the final product.

This was made clear by Meghan Liotta, whom the government listed as a witness but

who did not testify.[30] Ms. Liotta was one of the members of the team at PSI that was hired to

help NECC in 2006 as part of the Consent Order; she now works at the Professional

Compounding Center of America as Director of Quality Assurance and Regulatory Affairs. Ms.,

---

[29] The article is attached, but the charts in the online version are more legible.
http://www.americanpharmaceuticalreview.com/Featured-Articles/135985-GMP-and-Compounding-Pharmacies/

[30] Mr. Cadden moved to exclude Ms. Liotta's testimony when the government indicated she would testify. (Docket No. 855.) The Court denied that motion with a caveat (Docket No. 886); the government ultimately did not call Ms. Liotta as a witness.

Liotta testified before the grand jury that testing stock solutions is not "best practices," but that it was nonetheless common. 4/30/13 GJ Test., at pp. 37-38. She went on to normalize this practice to a great degree, saying: "It's not the first time I've seen it [lack of end product testing]. But we try not to encourage it." *Id.* The government tried mightily to push Liotta to agree that testing only the stock solution was "unusual," but Ms. Liotta did not agree. The government asked, "And so, was it fairly unusual, in your experience, to find a compounding pharmacy that even has stock solutions?" Ms. Liotta would not adopt this characterization, noting, "I mean, I've seen it before. But, it wouldn't be best practice." *Id.* It is noteworthy that someone actually working in the compounding industry did not ring the alarm about this practice; it was simply "not best practice."[31]

> 3.      *Even where violations were found, compounders were rarely if ever shut down, even temporarily.*

As is also clear from the inspection reports, most compounders found to be out of compliance with USP 797—even after 2012[32]—were not shut down. Rather, as had always been the case, they were permitted to continue operating while they, with the FDA's guidance, tried to come into compliance. Full compliance, of course, is impossible. One example is Downings Labs LLC, d/b/a NuVision Pharmacy from Dallas, Texas. (Copies of FDA documents detailing the violations and chronology are attached at Tab 17.) Downing had numerous violations during the FDA's post-NECC inspections, including 110 failed potency tests over approximately one year and lack of procedures to prevent microbiological contamination of injectable drug products, to name just two. *Id.* (483 for inspections dating 3/18/13-4/16/13). Despite corrective

---

[31] Further as the Court heard at trial, ARL had instructed NECC to provide only two samples of drug, the other failure the government portrayed as sinister at trial.

[32] This is particularly significant given that all compounders were on notice after the outbreak that regulators would be inspecting at a vastly increased pace—even then, there were countless pharmacies out of compliance in material ways with USP 797.

actions, there were still numerous deviations when the FDA returned in June 2014. *Id.*

Downing's non-compliance continued according to yet a third FDA inspection beginning

September 14, 2015. *Id.* Only then, effective January 8, 2016, was Downings closed via Consent

Order. *Id.* Downings is not an outlier; the FDA routinely worked with compounding pharmacies

and manufacturers to assist them in reaching compliance. To treat these very same types of USP

797 deviations—or even misrepresentations about USP 797 being followed—as a basis for a

draconian sentence for Mr. Cadden is unjust.

Again, these examples are not intended to excuse NECC's deviations at times from USP

797. But they demonstrate that full, 100% USP 797 compliance was simply not the true standard

of care in 2012.[33] They also demonstrate that deviating from USP 797 was not viewed as

criminal or as a reason to shut down a compounder, even temporarily. Compounders were and

are permitted to improve their practices to come into compliance while still operating—just as

NECC was allowed to do in 2006. To now treat these very same types of deviations warranting a

virtual life sentence is wrong. To treat NECC, and by extension Mr. Cadden, as outliers would be

unfair.

### 4. The government's distortion of NECC as an outlier is illustrated by its incorrect presentation of NECC's environmental monitoring program.

The government's inaccurate presentation of NECC's environmental monitoring program

and results at trial graphically illustrates how the government sought to take an issue that is

common to many compounders and present NECC as a gross outlier.[34] A microbiologist retained

---

[33] One of the government's central claims for its mail fraud case was that NECC/Cadden falsely represented to customers and potential customers that it was USP-compliant, and otherwise compounded high-risk drugs properly. Whether or not they complied with the provisions of USP 797 thus becomes central to the truth or falsity of these representations.

[34] As the Court will recall, the government relied almost exclusively on Mr. Kastango to criticize NECC's environmental monitoring. Mr. Kastango is not a microbiologist and only a microbiologist is equipped to speak to the impact of mold and bacteria.

by Mr. Cadden examined NECC's environmental monitoring results from 2011 and 2012 and concluded that excursion rates at NECC for each of those years were at acceptably low levels. (A copy of Dr. Kenneth Muhvich's expert report addressing this topic is attached at Tab 18.)

Even putting this aside, Mr. Kastango's testimony to the contrary was faulty for other reasons. Mr. Kastango and his expert report misstated and misrepresented the guidance relating to mold. As the Court heard during cross-examination, USP 797 speaks only to mold found in an *air* sample, an incident that *never* occurred in NECC's main clean room or in its glove boxes. *See* Trial Exhibits 3232B, 3233, 3234. Mr. Kastango deleted this critical language from his expert report and wrote it off at trial as a "typo."[35] *See* 3/1/17 Trial Trans., at p. 72:5.

Additionally, as was also demonstrated during Mr. Kastango's cross-examination, Mr. Kastango's expert advice was that compounders need not test floors in a clean room for mold—the locations of the vast majority of mold at NECC. *See* Trial Exhibit 3232A. This instruction is also echoed by the USP which states that sampling of floors and other similar areas need only take place "infrequently." *See* Trial Exhibit 3206 (USP 1116), at pp. 702-703. Consistent with Mr. Kastango's advice to his clients that they did not need to test the floors in a clean room (though different from his testimony at trial), Dr. Muhvich explains that "it is not uncommon nor overly alarming to find mold or bacteria excursions in the gowning room"; he adds, "[i]t is also less concerning if mold is found on the floor of the clean rooms, as opposed to on a surface or in the air, because the risk of contamination of an ISO 5 hood from microbes located on the floor is extremely low." *Id.*[36]

---

[35] Notably, the proposed revision of USP entered into evidence at trial, *see* Trial Exhibit 3207, maintains this very distinction, despite Mr. Kastango's rather surprising contention that the distinction between air and surface samples was a "typo."

[36] Mr. Cadden presents this information not to relitigate it but to help the Court fairly assess his actual culpability for sentencing purposes.

A review of any of the 483s issued to compounding pharmacies by the FDA will leave no doubt that the compounding standards were unclear, that other compounders were found to have violations comparable to NECC's, and that NECC was like any other compounder in 2012.[37]

> 5.    *Most compounders deviated from USP 797 because there*
> *was no clear and consistent guidance about compounding*
> *or USP 797 itself, and because no pharmacy could be in*
> *perfect compliance with the myriad aspirational best*
> *practices of USP-797 at all times*

Compounders' consistent deviations from USP 797 are not surprising given the utter lack of guidance offered to compounders prior to the outbreak. Mr. Penta testified that the BOP had no familiarity, let alone expertise, with compounding. *See* 2/15/17 Trial Trans., at p. 12:18-23. BOP inspectors had no training in compounding and were so uninformed that they did not dare enter the clean rooms. *See* 2/15/17 Trial Trans., at pp. 66:24-67:4 (Penta). The FDA, for its part, acknowledged that it lacked "clear policy" in the area of compounding, *see* Trial Exhibit 2651, and had provided a "lack of notice" to the industry, *see* Trial Exhibit 2226. As a result of this, the FDA had a complete moratorium on inspecting compounding pharmacies beginning in 2008[38] and continuing until the 2012 outbreak. *See* Trial Exhibit 2377. Regulating compounders was left to the states; as the Court heard at trial, the majority of states in which NECC was licensed did not even require adherence with USP 797's recommendations.

Worse, USP 797 is vague, confusing, and ambiguous. The government's USP 797 expert has stated that "[m]any aspects of USP-797 are vague in detailing the activities required to meet standards in areas such as proper environmental monitoring, employee training and cleaning, and sanitizing." *See* Trial Exhibit 3190; *see also* 3/1/17 Trial Trans., at p. 55:13-17 (Kastango

---

[37] Those 483s can be found at:
https://www.fda.gov/drugs/guidancecomplianceregulatoryinformation/pharmacycompounding/ucm339771.htm.

[38] The exception was in instances of death or bodily harm.

agreeing that there are "ambiguities" in 797). Mr. Kastango testified that a bedrock of the prosecution's argument—that all mold, and not just mold found in the air, required immediate action—*was not actually written in USP 797. Id.,* at pp. 72:23-73:3. Mr. Kastango dismissed this failure to include this language as a "typo." *Id.,* at p. 72:5. The idea that the rules Mr. Cadden was supposed to follow were clear is simply false.

At trial, this lack of guidance from the BOP and the FDA was presented as a boon to NECC and Mr. Cadden. It was not. *See* Scott Sutton, Ph.D., GMP and Compounding Pharmacies, American Pharmaceutical Review, April 30, 2013 attached at Tab 19 (noting that improved compounding guidance is important both to the public and to the compounder). The lack of guidance and education for compounding pharmacists, including Mr. Cadden, created a situation where compounders had to figure out this complicated industry themselves.[39] And they had to do so for 50 states. The post-outbreak inspections show that this was no easy task—not just for Mr. Cadden, but for virtually all compounders. As a result, there have always been, and will likely always be, deaths and illnesses due to the risks of compounding.[40]

In short, the instinct to punish Mr. Cadden harshly is a function of the scope of the outbreak, and the horror associated with it, and less a function of Mr. Cadden's individual actions. As the ISMP noted at the time of the outbreak: "While we have read comments in the media that suggest a commitment to ensuring that all the responsible staff at the New England pharmacy are identified and punished, we cannot support the outcome bias that accompanies

---

[39] USP 797, as the Court saw at trial, is contradictory, confusing, and simply not helpful in the real world.

[40] It also speaks volumes about the riskiness of healthcare and laboratories generally. The NIH had its own scandal in 2015, sparking Congressional inquiries, after the FDA discovered two vials of a contaminated drug sample at the Clinical Center's Pharmaceutical Development Section scheduled to be used on human subjects. The agency suspended activity at the lab shortly after. The CDC also had a significant problem at its own lab that put peoples' lives in danger. *See, e.g.,* Article from the Atlantic, "Head of CDC's Scandal-Plagued Lab Resigned," attached at Tab 20. Even the Northeast Regional Lab that tested numerous NECC samples lost its accreditation due to its failure to follow proper procedures. *See* Trial Exhibit 3163.

such a proclamation. We remind our colleagues that the latest event is a symptom of a broken system on many levels...." *Id.*

## IV.    The statutory goals of deterrence, protecting the public, and restitution are not served by a lengthy sentence.

The impact of the crime on Cadden already, as well as the lack of any colorable deterrent effect of a lengthy sentence, also support Cadden's recommendation.

Cadden has been confined to his home with an ankle bracelet since December 2014—nearly three years.[41] This pre-trial confinement, as discussed above, is already more significant punishment than any comparable compounding pharmacist has received.

He has also been financially punished for the conduct at issue in the indictment. Mr. Cadden and his wife paid more than $21 million to resolve the civil claims against him; this money was or is being distributed to patients who suffered as a result of receiving NECC's MPA. Forfeiture proceedings are underway to try to take whatever is left of his assets.[42]

His future prospects are no brighter. Cadden cannot practice pharmacy and has no prospect of ever doing so. His likelihood of securing any gainful employment after he is released from custody is improbable for this reason and because of his notoriety. As the Court is well aware, there has been intense, national attention to NECC and to Cadden in particular. His face has been displayed for five years in newspapers, television news, and online; he has received death threats. It is unlikely any employer will associate with Cadden in the future.

The Court should also consider the extreme isolation Cadden has experienced since October 2012. In addition to his confinement, he has—by choice and also by necessity—

---

[41] On June 24, 2016, his home confinement was relaxed slightly and he was permitted to leave his home during the day, but with a strict curfew.

[42] Cadden declined to complete Probation's financial disclosure due to pending civil and criminal forfeiture proceedings.

withdrawn from friends, family, school events, and all other public activity that is not absolutely

required. To illustrate, he feared that his presence at his children's sporting events would bring

them unwanted attention and scrutiny, so he stopped attending those events for their sake; this

withdrawal has been extremely painful.

Given the pain and suffering endured by patients who received contaminated MPA, and

their families, Cadden neither asks for, nor expects to receive, sympathy for these repercussions.

But the Court should nonetheless factor into its sentencing decision these unusually harsh effects

from the conduct of which he was convicted and the utter lack of any additional deterrent effect

from a lengthy sentence.

## V.     The Presentence Report Offense Level Computation is inaccurate and does not reflect the appropriate sentence to reflect Mr. Cadden's culpability.

### A.     Acquitted conduct should play no role in the advisory Sentencing Guideline calculation.

The government's initial submissions to Probation suggest that the government may

argue for a life sentence—or its functional equivalent—by using acquitted conduct to exceed the

statutorily imposed maximum sentence under the RICO statute. 18 U.S.C. § 1963(a). It is black

letter law that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a

crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond

a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *United States v.*

*Booker*, 543 U.S. 220, 244 (2005). Without a *conviction* for second degree murder, the RICO

statute provides for a maximum sentence of twenty years. 18 U.S.C. § 1963(a).[43]

---

[43] To the extent the government argues that there is no *Apprendi* issue because the Court could sentence Mr. Cadden to consecutive sentences that would exceed twenty years in total, the Supreme Court ruled in *Apprendi* that exercising such an option would still unconstitutionally exceed the statutory cap for an individual count. *Apprendi*, 530 U.S. at 474.

The government persists in pretending that it "won" the 25 second degree murder charges on which Cadden was acquitted. In doing so, it appears intent on asking the Court to find that Mr. Cadden is responsible for these murders based on its wildly speculative allegation that a majority of the jurors "found" Cadden committed second-degree murder, and that the verdict confirmed that the murder charges were proven by a preponderance of the evidence. *See* Government Objections to the PSR, at p. 6.

But the government's protestations collide with reality. The jury was instructed that it had to reach a unanimous verdict of guilty or not guilty. *See* 5/16/2017 Trial Transcript, at pp. 136:1-3 ("A defendant is innocent in the eyes of the law unless and until you, as the jury, decide unanimously that the government has proved his guilt beyond a reasonable doubt."); 183:18-24 ("Your verdict must be unanimous as to whether Mr. Cadden is guilty or not guilty of each of the charges that is being submitted to you for a verdict. Each charge must be considered separately. You may find Mr. Cadden guilty of all charges, you may find him not guilty of all charges, or you may find him guilty of some charges and not guilty of others. But remember that your verdict as to each charge must be unanimous.").

The jury verdict form re-stated for each count the unanimity requirement on which the jury had been thoroughly instructed. The jury marked each charge on that form either "guilty" or "not guilty." Each of these results was read by the Clerk in open court, including the 25 not guilty murder RAs. The jury foreman then affirmed in open court that these were the jury's verdicts, as did the full jury collectively. *See* 3/22/17 Trial Transcript at pp. 4, 14. And the Court accepted the verdicts as recorded on the verdict form. *Id.,* at pp. 6-8. The jury's verdict established that Mr. Cadden was acquitted of all 25 charges of second degree, and the

government's representations that it "won" each of these counts for sentencing purposes dishonors the jury's decision. [44]

The government's request to consider the second-degree murders as relevant conduct—in direct conflict with the verdict—also must be rejected. This conduct does not meet the requirements of U.S.S.G. §1B1.3. First, the evidence established that Mr. Cadden did not commit an act or omission or aid or abet, counsel, command, induce, procure or willfully *cause* these deaths. U.S.S.G. §1B1.3(a)(1)(A). Without belaboring the evidence that the Court is well aware of, Mr. Cadden had not been in the clean room since 2008. He did not compound the MPA at issue or play any role in the contamination of certain shipments of the June and August lots. Although the government never established how these MPA shipments became contaminated, it most likely occurred as a result of human error during the filling process in which Mr. Cadden was not involved. Mr. Chin compounded the MPA, autoclaved it, and filled the vials. To the extent that Mr. Chin did not follow NECC's operating procedures, regarding testing, autoclaving, or otherwise, the evidence at trial established that Mr. Cadden reasonably believed that he did. There is no evidence that Mr. Cadden was the cause of these deaths—*and further no evidence even of what the cause was*. Where even the government could not prove what specific act caused the MPA to become contaminated, there is no basis to hold Mr. Cadden responsible for the deaths under any standard.

Further, the second-degree murder allegations do not fall within the jointly undertaken criminal activity provision, U.S.S.G. §1B1.3(a)(1)(B). There is no evidence that anyone at NECC committed second-degree murder—no less that such acts were foreseeable to Mr.

---

[44] As this Court has noted previously, in explaining why it rarely, if ever, considers acquitted conduct murders: "I very much respect the jury's verdict, and if the jury says that a person is not guilty, it would be a very unusual case that I would think otherwise." *United States v. Delaney*, Criminal Action No. 09-10312-RGS, sentencing dated 9/21/11, at p. 18 (excerpt attached at Tab 21). This case does not present the rare exception.

Cadden. Relevant conduct must be within the scope of the jointly undertaken criminal enterprise, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity. Even in a violent RICO enterprises—a far cry from the facts here—courts undertake a detailed factual analysis to determine the scope of allegedly jointly undertaken activity. *United States v. Patriarca*, 912 F. Supp. 596, 607 (D. Mass. 1995) (rejecting murder as relevant conduct; "Nor is [defendant's] title as "Boss" of the Family for part of the period pertinent to his sentencing dispositive of this issue. It is the scope of [the] participant's agreement—rather than his place in the hierarchy that is crucial for sentencing purposes")(internal citation omitted). The government has not met this standard here.

Finally, the Court should not, as the government suggests, use the acquitted second-degree murders to dictate the offense level for the RICO charge because the murders drastically and disproportionally alter the guideline range for that charge (from the defendant's requested offense level of 19 to an offense level of 43). The First Circuit has recognized that Guideline offense-level increases based on acquitted conduct risk violating the defendant's Sixth Amendment and due process rights if the additional increases are responsible for such a disproportionate share of the sentence that they become the "tail which wags the dog of the substantive offense." *United States v. Lombard*, 72 F.3d 170, 176 (1st Cir. 1995) (quoting *McMillan*, 477 U.S. 79, 88 (1986)).[45]

In *Lombard*, the defendant had been acquitted of murdering two men in a prior trial, but after being pleading guilty to federal firearms charges, among others, the court imposed an enhancement for using the firearm to commit another offense, specifically the murders. *Id.,* at

---

[45] Although the First Circuit recently recognized that *Lombard* was a unique exception and not the rule, *United States v. Gonzalez*, 857 F.3d 46, 60 (1st Cir. May 15, 2017), the same unique circumstances apply here. Given that the Guidelines are now advisory, this Court has the ability to depart from the Guideline calculation that the court in *Lombard* lacked at the time.

172. As with the government's proposal, that enhancement dictated the offense level, which in *Lombard* resulted in a mandatory life sentence due to criminal history. *Id.,* at 175. The First Circuit highlighted that the interplay of multiple factors required reversal. First, in assessing the nature of the enhancement, the Court noted, "[a] charge of murder represents the very archetype of conduct that has historically been treated in the Anglo-American legal tradition as requiring proof beyond a reasonable doubt." *Id.,* at 177 (internal citation omitted). Second, as here, the murder dictated the baseline offense (here the highest level being RICO), not just an increase based on specific facts of the offense. Third, the firearms statute did not provide a maximum sentence, so the court felt compelled to impose the life sentence based on the Guideline calculation. "The qualitative difference between the life sentence imposed and the terms of years that Lombard might otherwise have received as a prior offender (262-327 months) implicate[d] basic concerns of proportionality both between the enhancement and base sentence and between the offense and punishment as a whole." *Id.,* at 178. Such concerns are paramount here where the same jury heard all of the evidence and only convicted Mr. Cadden based on the mail fraud RAs.

The cases cited by the government in its Objections to the PSR (p. 6) do nothing to bolster its claim because they address *obvious* instances of conduct that were part of the offense, not complicated questions of intent and state of mind that are typically left to the province of the jury. *United States v. Alejandro-Montanez,* 778 F.3d 352, 362 (1st Cir. 2015) (despite acquittal on firearm charge, enhancement for the presence of a firearm during a drug trafficking-offense obviously applied where evidence showed defendants foresaw the presence of a firearm: a vehicle driven to the location of the drug deal contained three firearms, a defendant carried a firearm on his person, and another defendant was present specifically for "security" purposes); *United States v. Paneto,* 661 F.3d 709, 716 (1st Cir. 2011) (acquitted felony drug trafficking

conduct applied to enhancement for possession of a firearm in connection with a felony where police found drugs in the defendant's apartment after an undercover drug transaction, witness testified that that he had purchased drugs from defendant, and firearm was in close proximity to the drug stash); *United States v. Gerhard*, 615 F.3d 7, 17 (1st Cir. 2010) (despite hung jury on substantive charge of possession of a firearm in furtherance of a crime of violence, evidence including a video of defendant carrying a rifle, his stated intention to serve as "security" during standoff with federal authorities, and defendant's own statements confirming "we have weapons and we are going to defend ourselves" all clearly supported application of enhancement for possession of dangerous weapon while obstructing or impeding officers); *United States v. Gobbi*, 471 F.3d 302, 313-14 (1st Cir. 2006) (despite acquittal on charge of possession of a handgun in furtherance of a drug-protection detail, enhancement for possession of dangerous weapon during the course of the substantive drug trafficking felony for which defendant was convicted was appropriate where the record contained ample evidence that defendant encouraged his coconspirator to display a gun as a show of force during drug transaction and helped dispose of the gun thereafter).

The above cases presented tangible evidence of the defendant's significant participation in serious illegal conduct above and beyond that on which the defendant was convicted. In the absence of such evidence here, the Court should not permit twenty-five acquitted charges of second-degree murder drive to drive the sentence in these convictions of mail fraud offenses, particularly where the government is relying on the same conduct for both the acquitted murders and the convicted mail fraud. Punishing Cadden twice for the same conduct is not a result countenanced by the Guidelines.

B.    There is no legal or factual support for the other offense characteristic or
      role adjustment advocated by probation.

      1.    *Mr. Cadden should not be punished for conscious disregard of death or
      bodily injury where the jury rejected that finding.*

For this enhancement to apply, the *offense* must involve "the conscious or reckless risk of

death or serious bodily injury." 2B1.1(b)(15). The offenses of conviction, RICO, mail fraud, and

FDCA violations for fake names on prescriptions, did not involve such risk. As discussed above,

the second-degree murder allegations should not count as relevant conduct. Further, the jury

acquitted Cadden of second degree murder based on this precise element. The jury was well-

aware of the deaths and injuries that resulted from the outbreak, but it nonetheless rejected this

finding for each of the second-degree murder charges. The key issue for this adjustment is what

Cadden knew at the time the drugs at issue were compounded—not what happened months later.

The evidence—and the jury's verdict—flatly contradict this enhancement. *See United States v.

Gibson*, 409 F.3d 325, 339 (6th Cir. 2005) (no enhancement for defendant convicted of

conspiracy and authorizing, ordering, or carrying out violations of mandatory mining health and

safety standards).

      2.    *The government has not proven that the vulnerable victim adjustment
      applies.*

This adjustment under U.S.S.G. §3A1.1 was not included in the original PSR. *See*

5/25/17 PSR, ¶ 127 (no victim related adjustment). Mr. Cadden objects to the addition of this

adjustment because the second-degree murder allegations are not relevant conduct and the

evidence does not establish that there were vulnerable victims. A "vulnerable victim" means a

person "who is unusually vulnerable due to age, physical or mental condition, or who is

otherwise particularly susceptible to the criminal conduct." U.S.S.G. 3A1.1, Application Note 2.

"Before imposing a vulnerable victim enhancement under § 3A1.1(b), a court must determine 1)

that the victim of the crime was vulnerable and 2) the defendant knew or should have known of the victim's unusual vulnerability." *United States v. Pol-Flores*, 644 F.3d 1, 4 (1st Cir. 2011) (internal citations and quotations omitted); *United States v. Footman*, 66 F. Supp. 2d 83, 94–95 (D. Mass. 1999), aff'd, 215 F.3d 145 (1st Cir. 2000) ("The touchstone is 'unusual.' The [enhancement requires] that the defendant 'knew or should have known that the victim... was unusually vulnerable...' 'Unusual' is plainly meant to identify a select group different than the constituency who will be the 'usual' victims of the specific offense.") (emphasis in original).

First, the "victims" of the mail fraud offenses that Mr. Cadden was convicted of were the clinics who suffered part of the actual financial loss. Because the second-degree murder acts do not constitute relevant conduct, and the representations comprising the mail fraud charges were made directly to the clinics/customers, the Court should not look beyond the clinics. The clinics were run by highly trained professionals making medical decisions based on their own training and experience, in combination with market conditions that made certain key drugs unavailable. These professionals do not qualify as vulnerable victims.

Even if the Court looks beyond the clinics, the evidence at trial established that the patients who received MPA injections were not more vulnerable than the typical patient population. Witnesses testified about the very active lifestyles of many of the patients and the experienced doctors treating them in the usual course. *See, e.g.,* 1/18/17 Trial Trans., at p. 35:14-20 (Collette Rybinski); 1/30/17 Trial Trans., at pp. 130:25-131:23 (Sharon Wingate). Particularly where Mr. Cadden did not have a direct relationship as a treater of these patients—or even a direct relationship like Mr. Chin as the pharmacist running the clean room and compounding the MPA—this adjustment should not apply. *See United States v. Stokes*, 392 F. Appx. 362, 371 (6th Cir. 2010) ("the traditional doctor-patient relationship, on its own, provides an insufficient basis

for applying the vulnerable-victim enhancement...the district court must find that the victim-patient was more vulnerable to the crime than the average patient upon whom the doctor could prey"); *United States v. Singh*, 54 F.3d 1182, 1191 (4th Cir. 1995) ("In other words, because of age, mental or physical condition, or any other relevant deficit, in a proper § 3A1.1 enhancement the victim must be more susceptible to abuse from a perpetrator than most other potential victims of the particular offense.").[46] Although Mr. Cadden has the utmost sympathy for these patients, and for the terrible suffering they have endured, legally they do not qualify as vulnerable victims.

Finally, the application of an additional adjustment for a "large number of vulnerable victims" (two additional points), in combination with a two-point enhancement for the number of victims exceeding ten under the fraud guidelines (as requested by the government and adopted by Probation), should be rejected as double counting. The defense does not object to the 2-level enhancement for ten or more victims under U.S.S.G. §2B1.1(b)(2)(A)(i) based on the clinics that suffered part of the actual loss from shipments identified in the Indictment.[47] But the Court

---

[46] The government's objections to the PSR cite to the commentary to U.S.S.G. §3A1.1, cmt. N. 2 which cites an example victim as a fraud case in which the defendant marketed an ineffective cancer cure. There is no evidence that Mr. Cadden intentionally marketed ineffective drugs. The vast majority of NECC's drugs were used safely to treat patients. In regards to Methotrexate, the testing established that the Methotrexate shipped was within specification. Trial Exhibits 2701, 2701A.

[47] Beyond those clinics, the defense objects to the application of U.S.S.G. §2B1.1(b)(2)(A)(i) for other victims based on physical injuries suffered by individuals who were not victims of the offense. Further, the defense objects to use of this same adjustment based on the claim that the fraud involved mass marketing.

The government has not yet articulated a basis for applying the mass-marketing enhancement. There was no evidence at trial regarding NECC's website, but it was not interactive and did not allow customers to place orders. At most, witnesses at trial discussed NECC's calls and emails to a targeted group of customers – doctors and clinics – and in person discussions at the clinics and trade shows regarding NECC's *legitimate* business and *legitimate* products. This is not enough to justify the enhancement. As the court in *United States v. Exec. Recycling, Inc.*, 953 F. Supp. 2d 1138 (D. Colo. 2013) explained:

Having reviewed the Guidelines, Commentary, and the relevant case law, the Court concludes that the mass marketing enhancement does not apply here. While Defendants maintained a public website, the purpose of that website was to convey information about their business, including the legitimate aspects of their business. The only interactive part of the website was a button that permitted the user to contact Executive Recycling. The evidence at trial showed that Defendants' business relationships were primarily generated through face-to-face contacts, industry conferences, and personal outreach. The website facilitated these engagements in the sense that it

50

should not punish Mr. Cadden for the number of individuals impacted by the outbreak, particularly where alleged victims beyond the clinics named in the Indictment do not bear a direct relation to the offenses on which he was convicted.[48]

C.    Role Adjustments

The PSR includes a role adjustments for organizer or leader under U.S.S.G. § 3B1.1(a), which is not grounded in the evidence (Section I *infra.*). The government advocates for an additional adjustment for abuse of position of trust, which was not adopted by Probation and is also unsupported (Section II *infra.*).

1.    *Organizer*

The government has not proven that Mr. Cadden was an organizer of a criminal activity that involved five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1(a). Cadden's title of President of NECC or pharmacist in charge does not equate with a role enhancement. U.S.S.G. § 3B1.1, note 4.[49] Even if NECC is viewed as criminal—contradicted by the evidence that the vast majority of its business was legitimate—Mr. Cadden was not the leader

---

was a reference point for customers, but customers could not engage Defendants' services directly through the website. Thus, the Court finds that the Defendants did not use mass marketing to "solicit" customers and that the fraud here was not "committed through" mass marketing.

953 F. Supp. 2d 1138, 1168–69 (D. Colo. 2013); *Contrast United States v. Feldman,* 647 F.3d 450 (2d Cir.2011) (applying enhancement where defendant set up completely fraudulent website to solicit customers to "purchase" an organ in another country when he had no power to arrange the transplant); *United States v. Pirello,* 255 F.3d 728 (9th Cir.2001) (enhancement applied where "by placing a classified ad on the Internet, [defendant] was able to solicit funds instantaneously and continuously from over 200 million individuals worldwide").

[48] While the commentary to the advisory Guidelines allow the Court to apply both enhancements, §2B1.1, comment 4(D), based on the facts here the defense objects to such double counting.

[49] The Notes to Section 3 instruct:

In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

of the alleged criminal participants. *See United States v. Gotti*, 459 F.3d 296, 348 (2d Cir. 2006) (in RICO indictment of 17 members of a New York crime family, no enhancement for defendant despite trial court's finding that he was the "acting boss" of the family).

"It is not enough . . . that the defendant merely controlled, organized, or managed criminal activities; rather, he must instead control, organize, or manage criminal actors." *United States v. Flores-De-Jesus*, 569 F.3d 8, 34 (1st Cir. 2009) (*quoting United States v. Ofray-Campos*, 534 F.3d 1, 40 (1st Cir. 2009). Most of NECC's employees were not "participants," but innocent employees doing their day to day work. U.S.S.G. § 3B1.1, Note 1. Such employees, even if engaged in the activities outlined in the Indictment, have no bearing on this analysis unless they were criminally responsible participants. *See United States v. King*, 257 F.3d 1013, 1024 (9th Cir. 2001), *amended* (July 20, 2001) (no enhancement for defendant directing innocent clerical workers in mail solicitation scheme).

The fraud in this case centered around the clean room.[50] As noted above, Mr. Cadden had not compounded any drug—nor had he even been inside the clean room where the MPA was compounded—since 2008. Mr. Cadden appointed Glenn Chin to direct and supervise NECC's two clean rooms; Mr. Chin, not Mr. Cadden, oversaw the day-to-day compounding operations, handled all clean room hiring, and supervised all the other pharmacists and technicians in the clean rooms. Mr. Cadden did, typically through email, weigh in when problems were brought to his attention by Mr. Chin or others in the clean room, and he had ultimate authority over the operations.

As discussed above (and not repeated in detail here), the evidence at trial demonstrated that, first, that Mr. Cadden was not directly responsible for, and did not know of, many of the

---

[50] The jury rejected the government's theory that Mr. Cadden directed NECC employees in a conspiracy to defraud the FDA (Count 3) with prescriptions for office use drugs that did not contain patient names. Moreover, the evidence at trial established Mr. Cadden's efforts directing employees to get patient specific prescriptions.

troublesome practices inside the clean room that were directed and overseen by Mr. Chin. *See* Section I, *supra.* Second, the evidence showed that Mr. Chin undertook efforts to hide deficiencies from Mr. Cadden. *See* Section I.E, *supra.* This fact further negates any argument that Mr. Cadden directed those practices. Third, the evidence showed that Mr. Cadden often gave instructions to the clean room to follow best practices, but Mr. Chin disregarded and never delivered those messages. *See id., supra.* These facts, in particular the last one, bear relevance to determining the inapplicability of this enhancement. *See United States v. Al-Rikabi*, 606 F.3d 11, 14 (1st Cir. 2010) (no enhancement where no proof of orders given and obeyed, among other factors); *United States v. Lewis*, 476 F.3d 369, 389 (5th Cir. 2007) ("advice or instruction was not heeded, suggesting that [defendant] did not exercise control or authority over these individuals").

Mr. Cadden was similarly disconnected from NECC's environmental monitoring results. Annette Robinson testified that she did not give Mr. Cadden the weekly report that she provided to the clean room staff documenting her environmental findings. *See* 2/17/17 Trial Transcript, at p. 68:11-14. Understandably, those reports went to Mr. Chin and to the pharmacists and technicians working inside the clean room whose job it was to respond to such issues. Ms. Robinson went to Mr. Cadden only when she felt a finding was significant, which was infrequent. *See id.,* at pp. 68:11-25, 69:1-6. For example, Ms. Robinson did not tell Mr. Cadden of mold within the main clean room on a bottle near where the MPA was stored. *See* 2/21/17 Trial Transcript, at pp. 148:2-149:2. Mr. Cadden immediately responded the few times he was told of mold, *id.,* at p. 69:3-6, though the government contends that his response was insufficient.

Even if Mr. Cadden were an equal participant in the clean room fraud—which the evidence proved he was not—he would still not be eligible for this enhancement. As the Court in *Prigmore* explained:

> Often, corporate control will mirror criminal control, but not always. For example, an individual, who has control/authority over a participant in a corporate capacity, could share responsibility with that participant in making decisions in furtherance of the conspiracy. In such a case, no enhancement would be warranted.

*United States v. Prigmore*, No. CR. 93-10276-JLT, 1996 WL 464030, at *8 (D. Mass. Aug. 7, 1996).

Most of the evidence points to Chin directing the fraud. It is not enough if Mr. Cadden was "aware of the fraud and failed to stop it despite [his] ability to do so." *Id.,* at 9. Active management of criminal actors is required. The evidence does not support such a finding.

### 2.    Abuse of Trust

For an abuse of trust enhancement, the government must first prove that Mr. Cadden held a position of trust and, if so, that he used it in a significant way to facilitate or conceal the offense. *United States v. Parrilla Roman*, 485 F.3d 185, 190 (1st Cir. 2007). The Government's reliance on Mr. Cadden's status as the "pharmacist-in-charge" is insufficient where his job revolved around NECC's business operations. The First Circuit has ruled that a professional license or title alone does not trigger this enhancement. *See e.g., United States v. Stella,* 591 F.3d 23, 28, n. 4 (1st Cir. 2009) ("We do not adopt any per se rule that all defendants who hold an RN license automatically hold a position of trust, regardless of the facts of the case").[51] The limited instances in which this enhancement has been applied to a pharmacist focused on the

---

[51] In *Stella*, the First Circuit concluded that a nurse who confessed to tampering with and stealing drugs from her own patients warranted this enhancement. Like the limited unpublished cases addressing pharmacists, discussed *infra.*, this case dealt with the nurse's unfettered access to drugs based on her job and license and her abuse of those drugs, unlike Mr. Cadden's job focused on NECC business functions.

pharmacist's unsupervised access to controlled substances and crimes relating to the illicit distribution of those substances—a much closer link to a pharmacist license than the supervision of business operations. *See e.g., United States v. Ihenacho*, 716 F.3d 266 (1st Cir. 2013).[52] Here, Cadden is not interacting with patients and was not even compounding medications. Notably, on this point, USP does not even require a compounder to be a *pharmacist*.

Unlike the pharmacist in *Ihenacho*, Mr. Cadden's day to day work focused on NECC's business operations, not typically the detailed operation of the clean room that is the subject of the fraud convictions. Mr. Cadden's role as NECC's CEO was not a position of trust, even when accompanied by professional licensure. Similarly, in *United States v. Caplinger*, 339 F.3d 226, 237 (4th Cir. 2003), the Fourth Circuit rejected this enhancement in an investment fraud case where the defendant falsely advertised himself as a prominent physician running a company producing treatments for AIDS and cancer. The Court found that the defendant falsely gained investors' trust through his entrepreneurial relationship and not a doctor-patient relationship. *See also United States v. Morris*, 286 F.3d 1291, 1297 (11th Cir. 2002) (defendant's status as an attorney and co-conspirator's misrepresenting him as a successful trader not enough for enhancement in conspiracy to defraud investor case where defendant did not represent victims or use his position to perpetuate the crime); *United States v. Custodio*, 39 F.3d 1121, 1126 (10th Cir. 1994) (private doctor fraudulently billing government for services provided, or in fact not provided, to military families did not abuse position of trust even though his position allowed him to abuse reimbursement system); *United States v. Hall*, 349 F.3d 1320, 1325–26 (11th Cir. 2003) (no enhancement for pastor running investment scheme because "[w]hen these victims decided to invest their money, they trusted that this was a legitimate investment program as

---

[52] A limited number of unpublished decisions involving pharmacists focused on the same illegal distribution of controlled substances. *See e.g. United States v. Mekowulu*, 556 Fed. Appx. 865 (11th Cir. 2014); *United States v. Hsia*, 527 Fed. Appx. 176, 180 (3d Cir. 2013).

represented by the directors, including [the defendant]; however, this relationship between [the defendant] and his victims is no different than the relationship that exists in every successful fraud").

Mr. Cadden operated with managerial discretion as to business issues, but not the clean room operations central to the fraud. In fact, Mr. Cadden placed his trust—wrongly as it turns out—in Mr. Chin to run the clean room safely. The abuse of trust enhancement cannot apply to Mr. Cadden based on the professional disregard exercised by Mr. Chin. *United States v. Morris*, 286 F.3d 1291, 1295 (11th Cir. 2002) ("abuse of trust enhancement must be based on an individualized determination of each defendant's culpability").

Even if the Court finds that Mr. Cadden occupied a position of trust, the government has not shown that he used it in a significant way to facilitate or conceal any offense. *See United States v. Fontenot*, 14 F.3d 1364, 1372 (9th Cir. 1994) (husband convicted of traveling interstate with intent to hire a person to murder his wife did not abuse position of trust because status as husband did not facilitate commission of the elements of the offense). Mr. Chin concealed the clean room deficiencies and abused the trust that Mr. Cadden placed in him and the professional judgment that Mr. Cadden reasonably relied upon. There is no evidence that Mr. Cadden intended that any of NECC's customers receive inferior drugs—and significant evidence to the contrary given the cleaning and testing efforts that Mr. Cadden believed were standard.[53]

The government has not proven that this enhancement should apply.

---

[53] While the government may point to *United States v. Gonzalez-Alvarez*, 277 F.3d 73 (1st Cir. 2002), to support its claim, unlike Mr. Cadden the defendant dairy farmer there pled guilty to *intentionally* adulterating truckloads of milk with water, and then with salt to hide the adulteration from being detected by testing. *Id.*, at 82. Truck drivers conspiring with him to hide the deficient product delivered the adulterated milk to be added to silos full of milk from other farms. The defendant did not object to the abuse of trust enhancement and clearly "provided contaminated milk to [ company], *intending that it reach the public in its adulterated state.*" *Id.* (emphasis added). In contrast, Mr. Cadden did not abuse any trust placed in him with any intent to harm consumers.

**VI.    The government's loss calculation—or any figure in the same range—does not accurately reflect Mr. Cadden's culpability based on an advisory Guideline sentence.**

The defense addressed its loss calculation in a separate memorandum (Dkt. #1128), that is incorporated by reference herein. Notably, while the government calculates its sentence based on all of NECC's revenues from 2006-2012, the verdict does not support that calculation. The jury never found that the RICO conspiracy extended from 2006-2012. That time frame was never included in the Court's instructions to the jury or in the Verdict Form (Dkt. #990). The jury did not receive a copy of the Indictment stating that time frame.  Thus, there is even less support for the government's inflated calculation.

Moreover, the overstated loss figure suggested by the government misrepresents the true monetary loss amount attributable to Mr. Cadden. Given the "inordinate emphasis" on the loss amount under the advisory Guidelines, a sentence based on the government's loss calculation would result in an "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006). "Loss under the Guidelines is effectively a proxy for evaluating culpability. Sometimes it is appropriate, and sometimes it is not." *United States v. Watt*, 707 F. Supp. 2d 149, 155 (D. Mass. 2010); *United States v. Fry*, 792 F.3d 884, 893 (8th Cir. 2015), citing *United States v. Watt* ("Many courts and commentators state the Guidelines related to fraud convictions do not present a reasonable starting point for sentencing").

Under these circumstances, the government's recommendation "does not provide a realistic guidance" for a reasonable sentence reflecting the realities of this case or a measured consideration of Mr. Cadden's conduct. *United States v. Watt*, 707 F. Supp. 2d 149, 154, n. 9 (D.

Mass. 2010) (absent a statutory maximum sentence of sixty months, the Guidelines sentence –
driven largely by the massive loss amount—called for life imprisonment; the Court imposed a
sentence of two years).

## VII.    Advisory Guideline Calculation

Based on the forgoing analysis, as summarized below, Mr. Cadden's advisory Guideline
calculation is 19, with a criminal history in Category I, resulting in an advisory guideline
sentence range of 30-37 months.

**Calculation of Offense Level**

**RICO (Count 1) and RICO Conspiracy (Count 2):** Base level of 19 or the offense level
applicable to the underlying racketeering activity, whichever is greater. U.S.S.G. §2E1.1(a).
The only racketeering acts (RAs) found by the jury are mail fraud (RAs 1-27, 53-63, 69-78). The
mail fraud RAs and same mail fraud counts are grouped together as one unit under U.S.S.G.
§3D1.2.

|  | **Offense Level** |
|---|---|
| Mail fraud base offense level is 7  (U.S.S.G. § 2B1.1(a)(1)) | 7 |
| Total loss amount is more than $150,000 and less than $250,000 | + 10 |
| Offense involved 10 or more victims | + 2 |
| **Offense level of all racketeering acts** | **19** |

**Mail Fraud (Counts 4-39, 41-56):** The mail fraud counts include the same mailings identified in
RAs addressed above. The sentencing analysis is the same, resulting in an **offense level 19.**

**FDCA Misbranding (Counts 95, 99, 100):** Base level of 6. U.S.S.G. § 2N2.1(a). Counts are
grouped together as one unit under U.S.S.G. §3D1.2.

| **Combined Total Offense Level** |  |
|---|---|
| Highest Offense Level – RICO and mail fraud counts[54] | **19** |
| One additional group of FDCA counts (U.S.S.G. § 3D1.4.9) | 0 |
|  | **19** |
| **Total Adjusted Offense Level[55]** | **19** |

---

[54] As in the PSR, the mail fraud counts are grouped with the RICO counts and are based on the same mailings.

[55] The defense has objected to the proposed victim and role related adjustments.

Respectfully submitted,

BARRY J. CADDEN,
By his attorneys,


_____ /s/ Bruce A. Singal
Bruce A. Singal (BBO# 464420)
Michelle R. Peirce (BBO# 557316)
Callan G. Stein (BBO# 670569)
DONOGHUE, BARRETT & SINGAL, PC
One Beacon Street – Suite 1320
Boston, MA 02108
Telephone: (617) 720-5090
bsingal@dbslawfirm.com
mpeirce@dbslawfirm.com
cstein@dbslawfirm.com

Dated:  June 22, 2017


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non-participants on June 22, 2017.


_____ /s/ Bruce A. Singal
Bruce A. Singal