UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA   )
                      )
          v.           )
                      )
BARRY J. CADDEN,        )
                      )
       Defendant.   )
_____)

Court No.:  14-cr-10363-RGS-1

## **<u>GOVERNMENT SENTENCING MEMORANDUM</u>**

The United States of America hereby submits this memorandum in aid of sentencing for defendant Barry J. Cadden.  Cadden now stand before the Court convicted of 57 felony counts, including racketeering, racketeering conspiracy, mail fraud, and violations of the Food, Drug, and Cosmetic Act ("FDCA").  A jury unanimously found that Cadden operated his company, New England Compounding Center ("NECC"), as a fraudulent enterprise, dispensing hundreds of thousands of substandard and dangerous drugs manufactured in filthy conditions for use on unsuspecting patients throughout the nation.

Because of the defendant's crimes, at least 76 people are dead.  More than 700 additional people in twenty different states have suffered tremendously, most of whom will continue to do so for the remainder of their lives.  The fungal meningitis outbreak that resulted from Cadden's criminal conduct was an unprecedented public health crisis in our nation's history.  His choices to deliberately ignore pharmacy regulations showed an unconscionable disregard for the lives of the patients using his drugs.  Accordingly, Cadden deserves a commensurately severe punishment for his crimes.  Therefore, the United States recommends this Court sentence Cadden to a period of incarceration of no less than 35 years.

## CADDEN'S CRIMINAL CONDUCT

After a ten-week trial, the Court is well-versed in the facts of this case, and thus, only a brief overview is provided here.  In sum, the jury heard overwhelming evidence that Cadden operated NECC as a criminal enterprise that marketed itself as "dedicated to providing the highest quality compounded medications and services to patients and prescribers," Exh. 67, at 2 (NECC's Quality Assurance Report Card), but instead sold grossly substandard drugs that were manufactured in filthy conditions.  The evidence presented at trial revealed that Cadden's conduct led to hundreds of shipments of nonsterile, sub-potent, and super-potent drugs being sent to medical facilities throughout the country for use on unsuspecting patients.  See Exhs. 1648 (summary chart showing 32 shipments of drugs compounded with expired methotrexate); 1649 (summary chart showing 192 shipments of contaminated methylprednisolone acetate); 1650 (summary chart showing 478 shipments of non-sterile drugs); 1651 (summary chart showing 325 shipments of sub/super-potent drugs); 1652 (summary chart showing 24 shipments made by an unlicensed pharmacy technician).

Moreover, Cadden's fraudulent business practices led to the nationwide fungal meningitis outbreak, which was traced back to three lots of contaminated methylprednisolone acetate ("MPA") – 05212012@68, 06292012@26, and 08102012@51 lots.[1]  More than 17,300 vials of

---

[1] As they did at trial, the defendant continues to persist in the unfounded argument that the May lot was not contaminated.  This argument runs afoul of the uncontroverted testimony of Drs. Brandt and Park of the CDC, and Dr. Chaturvedi of the New York Department of Public Health.  These CDC witnesses are among the world's most preeminent experts in the field of mycology and epidemiology.  All three of these expert witnesses testified that fungi was recovered from the May lot.  See Trial Tr. at 129-30 (Mar. 2, 2017) (testimony of Dr. Brandt) (finding *Paecilomyces formosus* and *Methylobacterium* in the May lot); Trial Tr. at 46 (Jan. 10, 2017) (testimony of Dr. Park) (explaining that the CDC found "patients that were only exposed to the 05 lot had Exserohilum"); Trial Tr. at 55, 57 (Mar. 3, 2017) (testimony of Dr. Chaturvedi) (finding *Paecilomyces formosus* and *Exserohilum rostratum* in the May lot).  The jury obviously credited these witnesses in convicting Cadden of Racketeering Acts 4, 8-9, 15, 19, and 23-24 (Counts 7, 11-12, 18, 22, and 26-27), all of which charged the defendant with mail fraud for shipments of the May lot of MPA.  For definitive proof of contamination of the May lot, the Court can turn to the submitted victim impact statements from the following victims, all of whom received only injections from the May lot and developed fungal

the contaminated MPA shipped to 76 medical facilities in 23 different states.  As the Court heard,

NECC's contaminated MPA resulted from several separate and distinct violations of Chapter 797

of the United States Pharmacopeia ("USP-797"): improper sterilization, improper testing,

improper cleaning and disinfecting, and improper environmental monitoring.  Contrary to the

defense's repeated post-conviction assertions, the evidence overwhelmingly demonstrated that

Cadden was well-aware of these deficiencies in NECC's production processes, and the potential

danger it could cause to patients, but chose to ship the deficient drugs anyway.

*Cadden's Fraudulent Production Practices*

First, Cadden knew that NECC was improperly sterilizing the MPA, and was not verifying

the sterilization process as required by USP-797.  See e.g., Trial Tr. at 59-65 (Feb. 23, 2017)

(testimony of FDA Investigator Degarmo) (testifying that Cadden told her NECC was autoclaving

the MPA for 20 minutes as required by the formula worksheets, but NECC's autoclave records

indicated the MPA was sterilized for *as little as 4 minutes*) (emphasis added); Trial Tr. at 42 (Feb.

17, 2017) (testimony of NECC QA officer Annette Robinson) (stating that during the outbreak,

Cadden instructed her to order biological indicators to verify sterilization in the autoclave and told

her that "*we should have been using them all along*") (emphasis added); Trial Tr. at 67 (Feb. 23,

2017) (testimony of FDA Investigator Degarmo) (testifying that Cadden admitted that NECC did

not verify the load patterns of their autoclave cycle to ensure sterility).

Second, the jury heard overwhelming evidence that Cadden knew that NECC was not

testing the MPA as required by the USP.  See e.g., Trial Tr. at 37 (Feb. 22, 2017) (testimony of

FDA Investigator Donohue) (testifying that she warned Cadden in 2002 about NECC's lack of

infections:  4117555 (deceased victim), 4150142, 4150182, 4318878, 4150028, 4150039, 4117556 (deceased victim), 4150046, 4149922, and 4149717.

end-product testing and that *"people can get really sick or die"* if his drugs were not properly sterilized) (emphasis added); Trial Tr. at 44 (Feb. 22, 2017) (testimony of FDA Investigator Donohue) (testifying that she warned Cadden on numerous occasions that NECC was not testing enough samples and not in compliance with the USP); Exh. 798, at 9 (Ltr. from Cadden to FDA Investigator Donohue (Feb. 26, 2003)) (claiming that NECC would perform *end-product testing and quarantine drugs going forward*) (emphasis added); Exh. 799, at 3 (Ltr. from Cadden to FDA Investigator Donohue (May 16, 2003)) (informing the FDA that NECC would be sending "*representative samples* of sterile medication preparations" as required by USP-71) (emphasis added); Exh. 239 (E-mail from Cadden to Sharon Carter (Jul. 25, 2012) (explaining the lack of end-product testing as "[w]hat your [sic] not seeing, is what we are currently not doing *but should be doing*") (emphasis added); Trial Tr. at 69 (Feb. 23, 2017) (testimony of FDA Investigator Degarmo) (explaining that Cadden admitted during the outbreak that NECC was *only testing the bulk MPA solution not the end product and sending only a single 5ml vial,* contravening USP-797 and NECC's own SOPs).

Third, the evidence demonstrated that Cadden directed NECC's drugs to be shipped prior to receipt of test results in violation of USP-797.  See e.g., Trial Tr. at 154-55 (Jan. 26, 2017) (testimony of Nick Booth) (testifying that on multiple occasions he observed Cadden personally approving the shipment of drugs prior to the receipt of test results); Exh. 243 (E-mail from Cadden to Christopher Leary (Aug. 17, 2012)) (instructing Leary to ship drugs prior to receipt of test results); Exh. 266 (E-mail from Cadden to Glenn Chin and Leary (Aug. 28, 2012) (stating, "I have no way of explaining to a client that we shipped before we had full sterility data."); Trial Tr. at 73 (Feb. 23, 2017) (testimony of FDA Investigator Degarmo) (identifying 13 shipments of contaminated MPA that were sent prior to receipt of test results).  To conceal this practice, Cadden

directed NECC staff to mislabel drugs with lot numbers from older tested lots.  See e.g., Exh. 231 (E-mail from Cadden to Chin (Aug. 10, 2011)) (directing Chin to "make as many lots as you like 'internally' but only *label vials with lot # of tested lots to cover our ass*") (emphasis added); Trial Tr. at 130 (Jan. 25, 2017); (testimony of Owen Finnegan) (explaining that the drugs would be labeled with the lot number of whatever had been tested); Trial Tr. at 89 (Feb. 6, 2017) (testimony of Cory Fletcher) ("We obviously wouldn't have test results for the 8/10 lot.  So if drugs needed to go out in the meantime, we would have labeled them with the '6/29' lot.").  Despite these widespread fraudulent practices, during the critical early stages of the outbreak, Cadden falsely told FDA Investigator Degarmo that all of NECC's *drugs were quarantined pending the receipt of test results*.  Trial Tr. at 72 (Feb. 23, 2017).

Fourth, the evidence showed that even when Cadden was notified of non-sterile test results, he did not inform his customers of those results despite the fact that the health of patients was at risk.  For example, when Cadden was notified of the non-sterile results for Good Shepherd, he instructed Annette Robinson to lie to ARL and say that the lot had been discarded.  Specifically, he wrote, "[o]bviously do not discuss with him…I do not see anything else to do…*just tell him it's easier and cheaper to just discard lot and remake if u need to tell him anything.  No more investigation*." Exh. 1002 (emphasis added).  Robinson testified that Cadden's instruction troubled her because "I think I would want to know what was in it and who caused it.  It's going into people's bodies." Trial Tr. at 164 (Feb. 16, 2017).  In fact, the non-sterile lot had already shipped to Good Shepherd Hospital.  Lanndon Rose, the director of pharmacy at Good Shepherd Hospital, testified that he never received notice from NECC about any problems with the drug, and that it was used on patients at the hospital.  Trial Tr. at 110-11 (Jan. 30, 2017).  See also Trial Tr. at 48 (Jan. 24, 2017) (testimony of Deborah Faint) (testifying that NECC never notified Winchester

Hospital of a non-sterile result); Trial Tr. at 19 (Jan. 25, 2017) (testimony of Andrew Cordiale) (testifying that NECC never notified Glens Falls Hospital of a non-sterile result).

Fifth, there was overwhelming evidence that Cadden and NECC routinely ignored cleaning responsibilities and its own environmental monitoring.  See Trial Tr. at 137 (Jan. 26, 2017) (testimony of Nick Booth) (testifying that "the priority was…to get the drug made and sent out" and as a result cleaning was missed); Trial Tr. at 143-44 (Jan. 24, 2017) (testimony of Owen Finnegan) ("Cleaning became much less of a stressed importance.  It was much more stressed that production was done, that we got the orders out.").  NECC's decreased cleaning led to increased action-level hits in its environmental monitoring.  Robinson testified that in 2012, "there was a lot of mold" detected in her environmental monitoring and when she discovered mold, she showed them to Cadden "[b]ecause mold is bad, and just something needed to be done."  Trial Tr. at 122 (Feb. 16, 2017).  When the mold growths were particularly bad, Robinson testified that she showed the actual petri dishes to Cadden so he could see for himself.  Id. at 123.  Robinson explained that in those circumstances, the mold would cover the plates.  Id.  Cadden was well aware of the presence of mold inside NECC's clean rooms.  See e.g., Exh. 334 (E-mail from Cadden to E. Cardona (Feb. 29, 2012)) (stating that NECC's internal environmental monitoring results "showed more 'mold' on 5-6 floor areas than we have ever seen before"); Exh. 160 (E-mail from Cadden to Chin (Jul. 3, 2012)) (stating "we have another fungal bloom on June 28th"); Exh. 161 (E-mail from Cadden to Chin, Leary, and Svirskiy (Jul. 9, 2012)) (stating "we had another fungal bloom last month").  Nevertheless, despite his knowledge that fungi was abundantly present within his cleanrooms, Cadden did nothing about it: no microbiologist was ever consulted, no extra cleaning was ever performed, and drug production never, ever stopped.

*The Scope of Contamination*

The extent of Cadden's unsound practices is reflected in the wide scope of contamination found in NECC's purportedly sterile drug products.  With respect to the three contaminated lots of MPA, Dr. Mary Brandt, the former head of the Mycotic Diseases Branch at the CDC, testified that the CDC and the FDA found *four* different types of fungi in the three lots of MPA.  Trial Tr. at 124-25 (Mar. 2, 2017); Exh. 1954 (summary chart of CDC testing).  With respect to the patient samples that the CDC received during the outbreak, Dr. Brandt testified that the CDC found *fourteen* different types of fungi in patients, with the most common, *Exserohilum rostratum*, found in 191 specimens from 150 case patients.  Trial Tr. at 105-06 (Mar. 2, 2017).  In addition to the MPA, *nine* other drugs, including steroids such as Betamethasone and Triamcinolone, as well as a cardioplegia solution, were identified as containing bacteria and fungi.  Trial Tr. at 124-27 (Mar. 2, 2017).  These other contaminated drugs were included in more than 450 shipments to customers for use on patients.  See Exh. 1650.  In the words of one public health official, Cadden operated NECC as a "fungal zoo."

## SENTENCING RECOMMENDATION

### A.  The Sentencing Guidelines

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines were no longer mandatory.  However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence.  Gall v. United States, 552 U.S. 38, 49 (2007).  While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," Kimbrough v. United States, 552 U.S. 85, 90 (2007), it

remains the case that "the Commission fills an important institutional role: it has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" id. at 109 (quoting United States v. Pruitt, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)).  The Supreme Court noted that "in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  Kimbrough, 552 U.S. at 109 (quoting Rita v. United States, 551 U.S. 338, 350 (2007)).  Accordingly, the First Circuit has explained:

> First, the court should calculate the [Guidelines Sentencing Range], including any appropriate departures.  After calculating the GSR, the court should consider the factors set forth in 18 U.S.C. § 3553(a) to determine whether a sentence outside the guidelines range is appropriate.  Finally, the court must determine what sentence is appropriate and explain its reasoning.  The court should select a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.

United States v. Smith, 531 F.3d 109, 111 (1st Cir. 2008).

In this case, the government agrees with the United States Probation Office, which calculated the defendant's sentencing guidelines range as life imprisonment.  The government's calculation varies slightly from that included in the Pre-Sentence Investigation Report ("PSR") however, and thus the government's suggested guidelines range calculation is described below.

## *Loss Calculation*

In Count 1, the defendant was convicted of racketeering, in violation of Title 18, United States Code, Section 1962(c).[2]  Under the United States Sentencing Guidelines ("U.S.S.G."), the

---

[2] In his submission on the loss calculation, Cadden states that despite his conviction on Count 1, "NECC does not fit the traditional paradigm of a RICO enterprise."  Def.'s Memo. Regarding Loss Calculation (Doc. No. 1128), at 5. There is no legal basis, and indeed Cadden offers none, for the remarkable statement that certain RICO convictions

applicable sentencing guidelines provision is § 2E1.1, which states that the base offense level is the greater of 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a)(2). In this case, Cadden's underlying racketeering activity consisted of mail fraud, and thus, the underlying guideline provision of § 2B1.1 would apply.

The government concurs with the PSR's calculation of the total loss pursuant § 2B1.1 as $132.8 million, the total sales of NECC's drugs from 2006 through 2012, the racketeering period charged in the Indictment and for which the jury found him guilty.[3] The reasoning underlying this calculation is detailed further in the government's memoranda regarding the calculation of loss amount (Doc. Nos. 1115 and 1127). Applying the PSR loss amount under § 2B1.1, Cadden's base offense level is increased by 24 levels.

---

are entitled to greater weight than others. And this Court should plainly reject Cadden's suggestion that his kind of RICO – whether that means affluent, white-collar, or something else – is deserving of greater lenience.

[3] In his loss memorandum, Cadden argues that this Court should limit his loss amount to a mere $189,848. Cadden's reasoning is both factually and legally unsound.

   As a factual matter, Cadden attempts to parse the 17,300 vials from the contaminated MPA to claim that some of them may have been fine. This argument runs directly afoul of the uncontroverted testimony at trial that a lot cannot be "slightly contaminated." See Trial Tr. at 14 (Jan. 10, 2017) (testimony of Dr. Ben Park) ("Q: Is there any safe level of contamination within a sterile drug? A: No."); Trial Tr. at 88 (Feb. 1, 2017) (testimony of Tiffany Hyde) (testifying that a "not sterile" sample means the entire batch is contaminated); Trial Tr. at 88 (Feb. 28, 2017) (testimony of Eric Kastango) ("Sterility is an absolute concept. It's like being pregnant. Either you're pregnant or you're not. Either a batch is sterile or its not. So you can't have partially sterile medication."). It strains credulity to argue that any customer would have purchased a vial of MPA from one of the three contaminated lots, knowing that some of the vials had fungi in them. All of the vials of the contaminated lot were worthless.

   As a legal matter, Cadden tries to limit his loss to solely the charged predicate acts. Something which the First Circuit plainly proscribes. See United States v. Carrozza, 4 F.3d 70, 74 (1st Cir. 1993) (rejecting guideline calculation limiting offense level to underlying predicate acts). Cadden's figure omits the more than 1,000 other shipments that were introduced into evidence as relevant conduct of expired drugs, contaminated MPA, non-sterile drugs, and sub/super-potent drugs. See e.g., exhs. 1648 (summary chart showing 32 shipments of drugs compounded with expired methotrexate); 1649 (summary chart showing 192 shipments of contaminated methylprednisolone acetate); 1650 (summary chart showing 478 shipments of non-sterile drugs); 1651 (summary chart showing 325 shipments of sub/super-potent drugs); 1652 (summary chart showing 24 shipments made by an unlicensed pharmacy technician).

   Moreover, Cadden's argument that the loss value should be limited to only those shipments in which patients were harmed has been expressly rejected by the First Circuit as well. See United States v. Gonzalez-Alvarez, 277 F.3d 73, 80 (1st Cir. 2002) (rejecting defense argument that loss is limited to defective milk that harmed consumers).

Page 9

*Number of Victims*

The government concurs with the PSR's inclusion of a 2-level offense level increase pursuant to § 2B1.1(b)(2)(A)(i) because his crimes involved 10 or more victims.   As was demonstrated at trial, Cadden's mail fraud scheme targeted thousands of customers throughout the nation.   The three lots of contaminated MPA alone were shipped to 76 different facilities in 20 different states.   Roger Edwards, the forensic accountant, testified at trial that NECC had approximately 8,500 active customers.   Accordingly, the 2-level increase to his offense level applies.

*Substantial Risk of Death or Serious Bodily Injury*

The government concurs with the PSR's inclusion of a 2-level increase pursuant to § 2B1.1(b)(15) because his crimes involved a substantial risk of death or bodily injury.   The heart of the mail fraud scheme of which Cadden was convicted was misrepresenting NECC's compliance with MABOP regulations and USP-797.   As was demonstrated at trial, Cadden instructed his sales force to preach the high quality of NECC's drugs, and touted NECC's "commitment to quality" in his marketing materials. Exh. 1750.   In the 18-page marketing folder admitted into evidence at trial, NECC was represented as "USP-Chapter 797 compliant" *twenty separate times*. Id.

The language of USP-797, which Cadden was required to know and follow under Massachusetts law, put him on notice that his failure to follow the guidelines stated in the chapter could likely lead to the deaths of patients exposed to his nonsterile drugs.   Specifically, the introduction to the Chapter states, "[t]he objective of this chapter is to describe conditions and practices to prevent harm, *including death*, to patients that could result from…microbial contamination…."   Exh. 52 (34 USP <797>, at 336) (emphasis added); see also, Exh. 52 (34 USP

<797>, at 362) ("Chapter purpose is to prevent harm and death to patients treated with [compounded sterile preparations]."). The next sentence states, "[c]ontaminated [compounded sterile preparations] are potentially most hazardous to patients when administered into body cavities, *central nervous and vascular systems*, eyes, and joints, and when used as baths for live organs and tissues." Exh. 52 (34 USP <797>, at 336) (emphasis added); see also Exh. 52 (34 USP <797>, at 340) (noting nonsterility…in [compounded sterile preparations] are potentially more dangerous to patients when the CSPs are administered into the vascular and *central nervous systems* than when administered by most other routes") (emphasis added). With respect to high-risk compounding, which comprised the vast majority of NECC's business, the chapter states that "[h]igh-risk level [compounded sterile preparations] pose the greatest threat to patients because compounding personnel are tasked with the requirement of processing nonsterile components and devices in order to achieve sterility." Exh. 52 (34 USP <797>, at 349). Eric Kastango, the USP expert, testified that it was called high-risk in USP-797 "[b]ecause when it's not sterile, we know what can happen, devastating patient harm and death can occur." Trial Tr. at 51 (Feb. 28, 2017). With respect to mold specifically, the Chapter states in two different sections that "[h]ighly pathogenic microorganisms (e.g., Gram-negative rods, coagulase positive staphylococcus, *molds* and yeasts) can be *potentially fatal* to patients receiving [compounded sterile preparations] and must be immediately remedied…." Exh. 52 (34 USP <797> at 350) (emphasis added).

Thus, Cadden was well aware that misrepresenting his compliance with USP-797 and flagrantly violating its requirements raised the risk of death or serious bodily injury to all patients who were administered NECC's drugs. Accordingly, the 2-level enhancement pursuant to § 2B1.1(b)(15) applies.

### *Vulnerable Victims*

The government concurs with the PSR's inclusion of a 4-level increase pursuant to § 3A1.1(b) because his crimes involved a large number of vulnerable victims.  A "vulnerable victim" is one "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  U.S.S.G. § 3A1.1, cmt. n.2.  The commentary provides an example of "a fraud case, in which the defendant marketed an ineffective cancer cure."  Id.  In United States v. Stella, 591 F.3d 23, 26 (1st Cir. 2009), the defendant, a licensed nurse, was convicted of tampering with pain medication, such that the drugs were rendered ineffective.  The district court applied the vulnerable victim enhancement, finding that the victims "were vulnerable by reason of their illnesses and the need for medication."  Id. at 30. In affirming the application of the "vulnerable victim" enhancement, the First Circuit stated, "these patients, unlike the general public, had no way to help themselves or, because of their pain and their medical conditions, to detect or prevent against the drug dilution, and so were vulnerable within the meaning of § 3A1.1(b)."  Id. at 30.

The fungal meningitis victims in this case are similarly situated.  By reason of their debilitated health conditions, they sought epidural steroid injections at medical centers and pain clinics for back and joint pain.  In many cases, these injections were the victims' last hope for avoiding serious back surgeries and alleviating chronic pain.  They were given NECC's contaminated drugs without any choice or say of their own, and had no way to detect or prevent against the fungal contamination.  They trusted that the drugs would relieve, and not cause, them pain.  The drugs were shipped to 76 facilities in 23 states, and used on thousands of unsuspecting, trusting, vulnerable patients.  Accordingly, the vulnerable victim adjustment under § 3A1.1(b) applies, and 4 levels are added to Cadden's offense level.

*Organizer and Leader of Criminal Activity*

The government concurs with the PSR's inclusion of a 4-level increase pursuant to § 3B1.1(a) because Cadden acted as an organizer and leader of criminal activity involving five or more participants.  Throughout the trial, Cadden has attempted to disassociate himself from the operations of NECC, claiming that he was simply upper management.  See e.g., Exh. 3000 (defense-created organizational chart with Cadden omitted).  The jury categorically rejected that argument.  Instead, the jury clearly relied on the testimony of the witnesses and Cadden's own words and e-mails that demonstrate that Cadden had intimate knowledge and understanding of NECC's fraudulent compounding operations, and the danger those operations posed to patients.

Specifically, Cadden was the manager of record and pharmacist-in-charge at NECC, a designation that refers to "the ultimate person responsible for all activities that occur in his pharmacy, including all people who report to him."  Trial Tr. at 123-24 (Mar. 1, 2017).  NECC pharmacy technicians Owen Finnegan, Cory Fletcher, and Nick Booth testified that Cadden would regularly direct the operations of the clean room and the processing of orders.  See Trial Tr. at 131-32 (Jan. 24, 2017); at 155 (Jan. 26, 2017); 102-104 (Feb. 6, 2017).  Glenn Chin, the supervising pharmacist in the clean room, routinely relayed Cadden's instructions to the clean room staff for processing drug orders.  See Trial Tr. at 103 (Jan. 19, 2017); at 132 (Jan. 24, 017); at 98-88 (Jan. 26, 2017).  Annette Robinson, the Quality Control officer, testified that Cadden was responsible for reviewing and updating all of the SOPs related to NECC's high-risk compounding.  Trial Tr. at 66-69 (Feb. 16, 2017).

E-mails were admitted into evidence that corroborate Cadden's extensive leadership role in directing NECC's fraudulent compounding operations.  See e.g., Exhs. 142 (E-mail from Fletcher to Cadden (Dec. 31, 2008)) (requesting approval to ship untested hydroxyprogesterone);

212 (E-mail from Cadden to Chin (Jan. 9, 2009)) (instructing Chin to relabel old lot of retinoic acid injectables with new lot number because "[i]t's not worth time to make a new lot"); 143 (E-mail from Fletcher to Cadden (Jan. 20, 2009)) (requesting approval to ship untested hydroxyprogesterone); 144 (E-mail from Fletcher to Cadden (Jun. 12, 2009)) (seeking approval to use sub-potent hyaluronidase); 146 (E-mail from Cadden to Chin (Feb. 10, 2011)) (directing Chin to use expired neostigmine bromide); 231 (E-mail from Cadden to Chin (Aug. 10, 2011)) (instructing Chin to "make as many lots as you like 'internally' but only label vials with lot # of tested lots to cover our ass"); 139 (E-mail from Cadden to Chin and Fletcher (Dec. 19, 2011)) (discussing using four-year old expired methotrexate powder); 186 (E-mail from Cadden to Chin (Jan. 12, 2012)) (directing the filling of vials for Ameridose with "no trace of this process"); Exh. 243 (E-mail from Cadden to Christopher Leary (Aug. 17, 2012)) (instructing Leary to ship drugs prior to receipt of test results); Exh. 266 (E-mail from Cadden to Glenn Chin and Leary (Aug. 28, 2012) (stating, "I have no way of explaining to a client that we shipped before we had full sterility data."); 168 (E-mail from Cadden to Chin, Leary, and Gene Svirskiy (Sept. 20, 2012)) (instructing them not to wait for test results on gentamycin).

In an e-mail to a potential customer, Cadden explained his prominent operational role in the company:

> I started this company with my wife (a pharmacist also) in 1998 as the only 'compounding-only' pharmacy in New England at that time and have grown it to this size + level of success by making EVERY important decision on a daily basis since then.  I not only direct sales thru Rob on an 'hourly' basis at times, but also personally direct our clean room teams, non-sterile lab team, quality dept., finance…etc on a daily basis…I sometimes say NECC and Ameridose are my 4th and 5th children.

Exh. 1962 (E-mail from Cadden to R. Fink); see also Trial Tr. at 49 (Jan. 19, 2017) (Cadden referring to NECC as his "baby"); at 87 (Mar. 3, 2017) (same).

Taken together, the testimony of these numerous former NECC employees combined with the substantial number of corroborating e-mails make it abundantly clear, as the jury found, that Cadden directed NECC's fraudulent compounding operations.    Specifically, evidence was presented that he directed the fraudulent activities of the other co-defendants: Glenn Chin, Gene Svirskiy, Christopher Leary, J. Matt Evanosky, Scott Connolly, Sharon Carter, and Alla Stepanets. In addition, evidence was presented that he directed, through Chin and others, the activities of the pharmacy technicians within the clean room to carry out his orders.    Accordingly, a 4-level increase pursuant to § 3B1.1(a) applies.

### Abuse of a Position of Public Trust

The government submits that a 2-level increase pursuant to § 3B1.3 applies because Cadden abused a position of public trust.    A "position of trust" is one "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)."  U.S.S.G. § 3B1.1, cmt. n.1.  The commentary also explains that this adjustment applies "in a case in which the defendant provides sufficient indicia to the victim that the defendant legitimately holds a position of private or public trust when, in fact, the defendant does not."   Id. at n.3.   For example, when a defendant perpetrates a fraud by misrepresenting oneself as a licensed physician.  In Stella, the above-cited case involving the nurse who tampered with drugs, the First Circuit explained, "[i]t is relevant to whether there is a position of public trust if the public expects people in the position of the defendant will comply with health and safety regulations.   Massachusetts's regulatory regime for registered nurses bears out the existence of the public's expectation that these professionals will comply with relevant laws to protect patients."   Stella, 591 F.3d at 28 (internal quotation omitted).   The First Circuit found, "[t]he district court properly concluded that [the defendant] in fact served in a position of public

trust and that she had abused her position of trust." Id. at 29; see also United States v. Mekowulu, 556 Fed. Appx. 865, 869 (11th Cir. 2014) (affirming application of abuse of trust enhancement for licensed pharmacist convicted of filling illegal prescriptions).

In this case, Cadden, a licensed pharmacist, unquestionably filled a position of trust in which he exercised substantial discretion. Similar to the circumstances in Stella, Massachusetts's regulatory regime reveals the public's expectations that licensed pharmacists hold a position of public trust and must comply with the rules in place to protect patients. Moreover, it was Cadden's position as a licensed pharmacist that allowed him to operate NECC as a fraudulent racketeering enterprise. He could not have done it otherwise. Accordingly, the government submits that Cadden's crimes were an abuse of a position of public trust and pursuant to § 3B1.3, 2-levels added.

### *Government's Offense Level Calculation*

**Calculation of Offense Level:**

|  | Offense Level |
|---|:---:|
| Mail fraud racketeering base offense level (§2B1.1(a)(1)) | 7 |
| - Total fraud loss (2006-2012) > $65M (§2B1.1(b)(1)(M)) | +24 |
| - Involved 10 or more victims and committed through mass marketing (§2B1.1(b)(2)) | +2 |
| - Conscious or reckless risk of death or bodily injury (§2B1.1(b)(15)) | +2 |
| **Offense Level for Grouped Mail Fraud Acts/Counts** | **35** |
| - Vulnerable Victims (§3A1.1(b)) | +4 |
| - Organizer or leader of criminal activity (§3B1.1(a)) | +4 |
| - Abuse of position of trust (§3B1.3) | +2 |
| **Total Adjusted Offense Level** | **45** |

Based on an offense level of 45, and a criminal history category of I, Cadden's sentencing guidelines range is life imprisonment.

### B.  The Second-Degree Murders

The verdict form returned by the jury revealed that a majority of the jurors found Cadden guilty of 21 out of 25 of the charged murder racketeering acts.  See Doc. No. 990, at 4-7. Specifically, the majority of the jury found Cadden guilty of eight murders in Michigan (8-4); seven murders in Tennessee (8-4); three murders in Indiana (9-3); and three murders in Maryland (7-5).  Id.  While they failed to reach unanimity on these racketeering acts, the jury's verdict confirmed that the murder racketeering acts were proven by a preponderance of the evidence.[4]

It is well-settled that conduct proven by a preponderance of the evidence may be properly considered at sentencing.  See United States v. Watts, 519 U.S. 148, 149 (1997) (holding that acquitted conduct that is proven by a preponderance of the evidence may be considered at sentencing); United States v. Alejandro-Montanez, 778 F.3d 352, 361 (1st Cir. 2015) (affirming sentence where district court considered acquitted conduct); United States v. Paneto, 661 F.3d 709, 716 (1st Cir. 2011) (holding that "a sentencing court may consider acquitted conduct in determining the applicability vel non of a sentencing enhancement"); United States v. Gerhard, 615 F.3d 7, 34 (1st Cir. 2010) (affirming use of hung conduct for sentencing purposes); United States v. Gobbi, 471 F.3d 302, 313-14 (1st Cir. 2006) (holding that post-Booker, acquitted conduct

---

[4]  In arguing against inclusion of the murders to the United States Probation Office, Cadden has suggested that the vote totals were an initial "straw vote" and the presence of a check mark next to the murder racketeering acts indicate that the jury unanimously acquitted him of these acts.  Review of the verdict form, however, belies that argument.  A legend appears on the bottom of the verdict form on four pages stating a check mark meant an unanimous vote.  The legend appears on pages 1, 7, 9, and 11, each of which contains the start of a series of guilty verdicts where no numbers appear, and instead only checkmarks next to the word guilty.  The legend is not included on the pages where the jury indicated their vote counts.  Thus, it appears from the verdict form that the jury was unanimous on the guilty verdicts, but divided on the rest.  See David Boeri, Judge Told Jurors in Meningitis Outbreak Case to be Unanimous – But Verdict Form Shows Division, WBUR, May 15, 2017.

may still form the basis for a sentencing enhancement); United States v. Bayes, 210 F.3d 64, 70 (1st Cir. 2000) ("In any event, the court's consideration of hung-jury conduct was permissible as a matter of law.").

Based on this well-settled case law, the government submits that the Court should include the 21 murders in which the majority of the jurors found Cadden guilty for purposes of sentencing. Pursuant to § 2A1.2, each of the 21 murders would result in an offense level of 38. Grouped together pursuant to § 3D1.4, the murder racketeering acts would result in a level 43. When combined with the offenses and adjustments outlined above, Cadden's total offense level would be level 53.

## C.  The § 3553(a) Factors

Following calculation of the sentencing guidelines, the Court must next turn to the factors set forth in 18 U.S.C. § 3553(a) to determine whether a sentence outside the guidelines range is appropriate. See Smith, 531 F.3d at 111; United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006) (noting that a sentencing court need not consider each factor the same, or "address those factors, one by one, in some sort of rote incantation"). The government submits that a sentence of incarceration for Cadden of no less than 35 years is consistent with the § 3553(a) factors as applied to this case.

### 1.  The Need for the Sentence to Reflect the Seriousness of the Offenses, Promote Respect for the Law, and Provide Just Punishment for the Offenses

The government submits that a lengthy sentence of incarceration for Cadden is necessary to "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The seriousness of Cadden's crimes cannot be understated. As the Court is well-aware, Cadden's criminal conduct caused the largest public health crisis ever caused by a pharmaceutical drug in our nation's history. It was in fact

unprecedented. [5]   Cadden has often cited throughout this case to the transgressions of other compounding pharmacies; but no other compounding pharmacy has done what NECC did, nor caused the harm NECC caused.  No compounding pharmacy has killed over 70 people.  As Dr. Benjamin Park testified, "in my 15 years being at CDC investigating outbreaks, the only thing that rises to this level was the Ebola epidemic…but this one…was here in our country, and…was entirely preventable."  Trial Tr. at 40 (Jan. 10, 2017).  The effect of Cadden's criminal conduct touched thousands of innocent peoples' lives throughout our country and will affect them and many more who love them forever.  A more detailed description of the impact of Cadden's crimes on the victims is included below.

### 2. Avoiding Unwarranted Sentencing Disparities

A 35-year sentence for Cadden is consistent with other sentences imposed in cases involving widespread fraud schemes that harmed a large number of victims.  As detailed below, district courts, in reaching their sentencing decisions, weigh heavily the effect of the defendant's criminal conduct on the lives of their victims.

***United States v. Parnell***, *13-cr-12-WLS, (M.D. Ga. 2015):*  in this case, the defendant, Stewart Parnell, was the owner and president of Peanut Corporation of America.  The defendant, and his brother, sold peanut butter that falsely certified that it was free of "harmful microbiological content."  To sell their product, the defendant falsely represented to customers that his food was safe, while knowing that he had not taken steps to ensure it was so.

---

[5] In his correspondence to the United States Probation Office, Cadden has also made the astounding claim that if the outbreak "had not happened to NECC, it would have happened to another compounder."  This is wholly unsubstantiated and categorically untrue.  There has never been anything like what happened in this case (before or since), and it was not preordained.  There is absolutely no evidence that any other compounding pharmacy deliberately and flagrantly violated the rules, lied to regulators, and compounded drugs in such an extraordinarily reckless and dangerous manner as Cadden did.

In fact, the peanut butter contained salmonella, a potentially deadly pathogen. The contaminated peanut butter led to a salmonella outbreak, in which 9 people died, and thousands were sickened. The victims did nothing more than eat peanut butter crackers. The CDC testified that it was one of the largest multi-state outbreaks that it had investigated.

Following trial, the defendant was convicted of sixty-seven counts of mail and wire fraud, along with FDCA violations. In sentencing the defendant, the district court stated:

> This case involved a food important to the health and survival of many people. They cannot see the Salmonella, and it cannot be washed away or extracted from peanut butter or other products. So the public is fully at the mercy of producers, processors, and manufacturers once they select and consume the product.
>
> The emails and other communications and testimony of witnesses presented during trial make it clear that the product was shipped, not only at times when testing had not been done at all or the results of testing received, but in circumstances in which it was known that the product tested positive for Salmonella. There were negative test results from batches or lots that were substituted for use in connection with batches or lots of product that had actually tested positive.
>
> As best as the Court can determine, these acts were driven simply by the desire to profit and protect profits, notwithstanding the known risks involved. And this is commonly and accurately referred to as greed.
>
> Now, there is nothing sinister simply in the desire to profit from one's work or investments. But to do so with a known risk to the health and life of the ultimate consumer cannot in any way be countenanced by this Court or any court.

Sentencing Tr. at 152-53 (Sept. 21, 2015). Judge Sands sentenced the defendant to imprisonment for 28 years.

**_United States v. Moskop,_** _2013 WL 74600 (7th Cir. 2013):_ in this case, the defendant, Edward Moskop, operated Financial Services Moskop & Associates, a business that sold insurance policies and investment products to individual clients. In 1990, the defendant's license to sell securities had been revoked. Nevertheless, for the next 20 years, the defendant misrepresented

himself as a licensed broker and continued to sell securities.  During that time, the defendant ran a Ponzi scheme, stealing more than $1.4 million from 26 victims.  To perpetrate the fraud, he advertised fictitious investment products and deceived clients about the status of their money by creating false statements.  He targeted elderly clients, and stole the life savings of many of those victims.  As a result of his actions, the defendant's victims suffered financial ruin and severe emotional trauma.

The defendant pled guilty to mail fraud and money laundering.  In sentencing the defendant, the district court noted the length of the defendant's fraud, as well as the fact that he targeted the elderly and the sick, created fraudulent documents to lull them, and showed a callous disregard for the financial ruin that he caused them.  The district court further noted that his victims "suffered numerous physical manifestations of emotional harm" as a result of the fraud.  Accordingly, he was sentenced to 20 years imprisonment.

_**United States v. Sarcona,**_ _2012 WL 28819 (11th Cir. 2012):_  in this case, the defendant, Frank Sarcona, was the founder of LipoBan Clinic, a direct mail-order business that was marketing and selling a weight-loss product known as "LipoBan Dietary Supplement."  The defendant sold his product with "highly misleading, if not patently false, representations" including that a licensed doctor was inviting customers to participate in a weight-loss study involving the drug.  In truth, the doctor was not licensed in the United States, there was no weight-loss study, and the testimonials in the marketing materials were false.  Over a four-year period, the clinic generated revenues of $16 million.

Following a jury trial, the defendant was convicted of twenty-seven counts, including conspiracy to commit fraud, substantive counts of wire and mail fraud, and violations of the FDCA. He was sentenced to 20 years imprisonment.

**_United States v. Carroll,_** _16-cr-60227-DTKH (S.D. Fla. 2017):_  in this case, the defendant, Clifford Carroll, was the founder and president of NuMedCare LLC, a compounding pharmacy in Boca Raton, Florida.  The defendant, and his fifteen co-conspirators, established a wide-ranging fraud scheme by which the pharmacy paid illegal kickbacks to physicians to write phony prescriptions and solicited patients for unnecessary prescriptions.  The pharmacy, in turn, submitted the fraudulent prescriptions to insurance companies for reimbursement.  The defendant further misrepresented to the insurance companies that the pharmacy was compounding its drugs for individual patients, and therefore received reimbursements based on the price of individual ingredients contained within such medications, when in fact the drugs were compounded in bulk quantities.

In January 2017, the defendant pled guilty to RICO conspiracy, as well as filing a false tax return.  He was sentenced to 12.5 years imprisonment.

**_United States v. Reyes-Rivera,_** _812 F.3d 79 (1st Cir. 2016):_  in this case, the defendant, Dilean Reyes-Rivera, was president of Global Reach Trading, a for-profit corporation that operated as a front for a Ponzi scheme.  The defendant solicited investors by promising to invest in low-risk, short-term, high-yield investment securities.  The defendant, and his company, did not have a license to sell investment securities.  In total, the defendant defrauded more than 230 investors out of over $22 million.  Many of these victims were retirees or pensioners.

In November 2012, the defendant pled guilty to conspiracy to commit wire fraud and bank fraud.  In preparation for sentencing, approximately 50 victims submitted victim impact statements describing how they lost their life savings, how many suffered "physical and emotional problems, such as anxiety, high blood pressure, insomnia, depression, and panic attacks.  One victim described becoming incapacitated and being hospitalized in a psychiatric facility and placed on

psychotropic medications.  Another became suicidal." Id. at 83-84.  In sentencing the defendant, the district court varied upward because of the pain and suffering the defendant caused the victims. The defendant was sentenced to more than 20 years (242 months) imprisonment.

***United States v. Bunchan,*** *580 F.3d 66 (1st Cir. 2009):*  in this case, which was before this Court, the defendant, James Bunchan, operated two multilevel marketing companies, World Marketing Direct Selling and Oneunverseonline.  The defendant represented to investors that the companies generated profits through selling cosmetics, health and diet supplements, and other products.  In fact, the companies operated as Ponzi schemes, whereby profits were generated through the recruitment of new investors.  In marketing materials sent to investors, the defendant falsely claimed that investors would receive "$300.00 each and every month for the rest of your life and pass on down to your children after your death." Id. at 68.  The defendant's scheme was targeted at the Cambodian immigrant community.  In total, he stole nearly $20 million from over 500 people.  While in jail, awaiting trial, the defendant initiated a murder-for-hire plot that targeted potential witnesses and the prosecutor.

Following a jury trial, the defendant was convicted of conspiracy, sixteen counts of mail fraud, and fifteen counts of money laundering.  In sentencing the defendant, this Court noted, among other things, the lack of remorse of the defendant and "the enormity of the harm done to the victims in this case" who were "singled out, targeted and sought out specifically because of their vulnerability." Sentencing Tr. at 56 (Nov. 28, 2007).  This Court sentenced the defendant to 35 years imprisonment.

Applying these benchmarks to the instant case, the government submits that a lengthy period of incarceration is warranted here.  Specifically, Cadden's case mirrors the facts outlined in Parnell.  First, Cadden marketed and sold NECC's drugs representing that they were safe, while

knowing that he had not taken the necessary steps to ensure they were.  Second, internal records and emails and testimony of former employees demonstrated NECC's drugs were shipped without any testing, or prior to receiving test results.  Third, Cadden was aware of positive sterility test results, but failed to notify customers about them.  Fourth, Cadden instructed his employees to mislabel drugs with the lot number of tested drugs "to cover our ass."  Exh. 231 (E-mail from Cadden to Chin (Aug. 10, 2011)).  Fifth, throughout the past three years, and the ten-week trial, Cadden has shown no remorse for his actions.  Lastly, like <u>Parnell</u>, <u>Moskop</u>, <u>Reyes-Rivera</u>, and <u>Bunchan</u>, this case involves a large and vulnerable victim population who was targeted by Cadden's fraudulent scheme.  Though in this case, the number of victims who were harmed was much larger, and the harm more significant.

3.  <u>The Nature and Circumstances of the Offenses – the Impact on the Victims</u>

A.  <u>Summary of Victim Responses</u>

Before deciding on Cadden's sentence, the Court must consider the far-reaching impact the defendant's criminal conduct has had on the victims in this case.  The total number of victims Cadden's drugs killed would fill this Court's gallery.  The total number of victims sickened by Cadden's drugs would fill the seats in over ten courtrooms.  Each one of those seats filled by a person who suffered immensely because of Cadden and NECC.

During the trial, the Court only heard from three individual victims, two who lost their husbands and one who lost his father.  As this Court can surely imagine, this was but a small fraction of what the victims in this case have gone through.  And suffered.  And lost.  The breadth and the depth of those things are immeasurable, and hard to capture in words.  Yet 191 individuals in this case have tried to do just that – despite the pain many of them experienced in reliving it – in order to give this Court a sense for how Cadden's crimes have devastated their and their loved

ones' lives.  In this memorandum, the government presents a subset of those words for the purpose of illuminating what it could not during the trial:  that Cadden's crimes, his callousness for the safety of those who took the drugs he made millions on, have caused harm and suffering that few people reading this memorandum can comprehend.

The stories of the victims who lost loved ones are excruciating.  The deaths themselves were extremely painful, and in many cases confounding for the victims' families and the doctors treating them until news of the outbreak had spread and provided answers.  For some, like Tom Rybinski and his family, and Mary Plettl and hers, the answer to what was killing them came only shortly before they died.  For others, like the families of Judge Eddie Lovelace and Karina Baxter, the answer to what had killed them didn't come until after their deaths.  Upon learning of the outbreak, Judge Lovelace's family exhumed his body because they knew that the Judge would want an answer about what happened so that justice could be done.  Karina Baxter's autopsy took place at the request of her family only after her body had been donated and embalmed, as they were seeking the same answer and the same justice.

The magnitude and ripple effects of the pain caused by the loss of life is immeasurable.  In the case of Emma Todd, who died almost six months after her tainted steroid shot, her widowed husband of 64 years (she was 15 and he was 18 when they married) died just four months after she did, struggling to live on without the wife he adored and had been married to for over six decades.  And so suddenly in a 4-month span, Kenneth Todd lost both of his parents who had moved in with him so he could care for them.  Sharon Wingate's husband Doug got the shot so he could dance with Sharon on a cruise they were about to go on to celebrate their 25-year wedding anniversary; he got sick before they were able to go on that cruise, and died a mere twelve days after his shot. Sharon has since moved out of the house she and Doug had lived and raised their children in,

having found the pain of living there without him too great.  Penny Laperriere, whose husband Lyn died forty-one days after his tainted steroid shot, had to sell their home and move into a condominium, auction and sell all of her household belongings, and give away their two beloved dogs because she could no longer afford to take care of them.  In the case of Kathy Dillon, who died fifty-four days after receiving her tainted shot, her daughter who suffers from physical and mental disabilities and had achieved a quality of life well beyond what the doctors had predicted for her because of Kathy's dedicated care, lost her mom, caretaker, and best friend, and has since had to go on antidepressant medication and receive counseling.  Wayne Reed, who suffers from Lou Gehrig's disease and is confined to a wheelchair, lost his wife Diana and also his primary and only caretaker.  Matthew, the son of Earline Williams, who died 53 days after receiving a tainted shot, believes his mother hid from him how sick she was because she did not want to worry him. Matthew only learned from his aunt that his mom had received a letter confirming she had had a contaminated shot.  When Earline died, Matthew lost her not only his mom, but his daughter's friend and caretaker.  Larry Roe, Sally Roe's husband, who was 91 at the time of Sally's death, told the government during the investigation that he spent much of his days just staring out the window missing Sally, and that seeing justice for her death was the only thing keeping him alive. He died in 2016.

The stories of the victims who did survive are also extraordinary and heartbreaking.  As many of their victim impact statements demonstrate, the anti-fungal treatments that they had to endure in order to kill the fungus growing in their bodies were brutal and caused horrific side effects, such as hallucinations and extreme fatigue, memory loss, vomiting, and loss of bowel control.  Because nothing of this nature or of this magnitude had happened before, and because of the severe risk that the fungus growing in the victims' bodies would kill them, many of the victims

were administered these harsh anti-fungal drugs in high dosages in order to save them.  Yet many

victims describe feeling during their treatments that death was preferable.  In some patients, even

after all of those treatments, the fungus still survived and does to this day.  Those and many of the

other surviving victims live today with the knowledge that the fungus could start growing and kill

them at any time.  No one can tell them it will not.  One of those victims has said that her goal was

just to live long enough to see both of her children graduate from high school.

The stories of the victims are about more than loss of life and health, however.  In fact, the

191 victim impact statements that the government received demonstrate a striking range of further,

far-reaching harms.  The loss of well-being, and for many life, is just where the harm for them all

began; that was the starting point.  Because from there, other devastation followed, including

financial ruin, loss of careers, emotional stress, increased pain, other medical issues and disabilities

caused by the fungus and anti-fungal drugs, and mental health issues.  Some victims lost their

marriages, homes, jobs, belongings, pets, and/or life savings.  One family could not even afford a

headstone when they buried their mother after she was killed by her tainted shot.  Many endured

not only their own pain, but the pain of seeing their family members suffer, and in some cases

attempt or commit suicide.  Most if not all have suffered from a complete lack of trust in the health

care field – a field that they should have been able to rely on in this country.  Their eyes are now

turned toward the justice system.

The 191 victim impact statements, submitted in this case on behalf of 157 victims,

represent less than one quarter of Cadden's total victims.  But in just that small subset, the victims

reported experiencing the following:

- **Financial Ruin.**  Fifteen (15) of the victims who responded reported that their
  fungal infections had ruined them financially.  They lost their life savings.  Many
  had to sell their homes and other belongings.  Many had their credit scores ruined

and no longer have any retirement savings.  They have had to max out credit cards to pay for their medications and are constantly harassed by bill collectors.

- **Loss of Income.**  Fifty-two (52) of the victims who responded reported losing their income.  Many of them lost valued careers and/or businesses, and do not expect to ever be healthy enough to work again.  One infected victim reported, "In Jan 2014 I decided it was best for myself and my company to just resign because I just couldn't continue to perform and work from home.  I couldn't believe that it was all taken from me, just like that!  My career, my health and my dignity.  Now I am forced to live on disability and take handfuls of pills several times a day to survive."

- **Continued Medical Expenses.**  Seventy-eight (78) of the victims who submitted victim impact statements still incur ongoing and expensive medical expenses as a result of their fungal infections.  Some still must pay hundreds of dollars per month for their medications.

- **Emotional Distress.**  One hundred nineteen (119) of the victims who responded experienced emotional distress as a result of their or their loved ones' infections. The reported experiencing, for example, depression; anxiety; stress in trying to perform simple daily tasks; feeling angry or moody; being fearful of doctors, needles, and medication; and loss of any mental filter.  One infected 37-year old victim who was discharged from the Army because of the debilitation of his infection reported, "I am battling with the mental strain of realizing I will never get better, I will never run again, I will never be able to do athletic activities with my daughter."

- **Mental Health Issues and Treatment.**  Twenty-two (22) of the victims reported suffering from mental health issues and/or seeking mental health treatment as a result of their illnesses or those of their loved ones.  At least one victim reported not being able to get mental health services because his insurance does not cover it.

- **Chronic Pain.**  Ninety-two (92) of the survivor infected victims who responded still experience ongoing chronic pain.  Fifty-eight (58) of the victims still have to take medication as a result of their infections.  Ten (10) victims still require home health care.  Many of the victims spend most of their lives in bed.  One infected victim got the steroid shot in order to avoid having to take opiates; now she has to take them daily to manage her pain.  Another reports having to make weekly ER visits for extreme pain she cannot take.  Another reports, "Pain now dictates my every day; I rarely can leave the house."  Another reports, "I was so glad that I did not have a gun in the house; the excruciating pain caused me to long for escape.  At times I thought of killing myself to bring relief."

- **Other Medical Issues.**  Sixty-six (66) of the surviving infected victims who responded suffer from ongoing medical issues as a result of their fungal infections. They reported issues such as dizziness, imbalance, incontinence and loss of bowel

control (many victims report having to wear adult diapers), kidney failure, numbness, loss of cognitive functions, cancer, arachnoiditis, inability to sleep, strokes, sensitivity to light, blurry vision, bone infections, hyperhidrosis (excessive sweating), shortness of breath, severe stuttering, memory loss, loss of sex drive, constant fatigue, heart attack, hearing loss, skin ulcers, blood clots, loss of appetite, hallucinations, further back issues, and neuropathy.  Many of them struggle to find physicians who are willing to treat them.

- **Continued Treatment.**  Three (3) of the victims who responded reported that they need to continue to take anti-fungal drugs to try to keep the fungus at bay in their bodies.  Some will need to take the drugs for the rest of their lives.  These individuals live every day with the knowledge that the fungus continues to live in their bodies and may grow and advance at any time.  They also live with the horrific side-effects of taking the anti-fungal drugs that made so many people so sick.  Many of the victims reported still needing to take other drugs such as anti-depressants, opiates, anti-anxiety medication, anti-convulsant drugs, and IVIG infusion therapy.

- **Physical Disability.**  Thirty-six (36) of the survivor infected victims who responded now suffer from physical disabilities as a result of their infections.  Many victims reported needing assistance walking.

The victims in this case were not only the sickened individuals and their loved ones.  The medical facilities that purchased the drugs and their employees, whose chosen work is to take care of people, also suffered emotional and financial harm.  Some of the clinics had to shut down for a period of time during the outbreak.  Many of the doctors suffered, as this Court heard during the trial testimony of doctors John Culclasure, Ed Washabaugh, and Ritu Bhambhani, watching patients deteriorate whom they had injected with what they believed were sterile drugs die.  See Trial Tr. at 126 (Jan. 17, 2017) (testimony of Dr. Culclasure) (testifying that 115 patients from Saint Thomas Clinic were infected, of which 13 died); Trial Tr. at 63 (Jan. 25, 2017) (testimony of Dr. Washabaugh) (testifying that 230 patients from Michigan Pain Specialists were infected, of which 16 died);  Trial Tr. at 124 (Feb. 2, 2017) (testimony of Dr. Bhambhani) (testifying about the deaths of patients Edna Young, Brenda Rozek, and Bahman Kashi).

Those NECC customers that did not happen to have any patients harmed considered themselves very lucky.  As a representative of Port Huron Hospital wrote in the hospital's victim impact statement:

> Prior to receiving the recall notice, the Hospital had verified with NECC that its practices and procedures for compounding drugs were compliant with recognized pharmacy standards.  The Hospital received a written statement from NECC that its compounding practices for sterile products were compliant with federal and Massachusetts regulations.  The Hospital purchased products from NECC because of the assurance by NECC of the compliance of its practices.  The Hospital would not have ordered products from NECC, had the Hospital known of the lack of sterility and the incomplete testing of the products….  Despite not having significant economic losses, the Hospital considers that it was victimized by the NECC misrepresentations of its practices.  It was only by fortunate coincidence that the Hospital did not harm patients with NECC drugs.

## B.  Individual Victim Response Excerpts

While the above summary provides some small sense of the vast harm inflicted by Cadden's crimes, the individual victim impact statements themselves provide a greater appreciation of the magnitude and breadth of harms the victims have endured.  Put another way, the victims can advocate for justice in this case better than the government ever could.  Excerpted below are just a few of the responses.

Judge Eddie Lovelace lived in Albany, Kentucky and was a state circuit judge.  Following a car accident, he received tainted MPA injections at St. Thomas Hospital in July and August 2012.  He died on September 17, 2012, 52 days after his first injection, at the age of 78.  His granddaughter Karen DeRossett wrote:

> My grandpa spent his life working to see justice served, and in the end he died because of a terrible injustice.  I say this not only as his grand-daughter, but as a pharmacist employed at a compounding pharmacy…NECC was manufacturing, not compounding.  Compounding involves making a specific drug to fulfill the order of a specific prescription for a specific patient.  Manufacturers are held to much more stringent regulations by the FDA and required to prove safety and efficacy.  In my opinion, based on reading the accounts of testimony from each day in court, it seems very clear to me Mr. Cadden knew he was evading the FDA and

their regulations.  It seems impossible to me that any licensed pharmacist could not be fully aware of these laws and regulations as they are the cornerstone of Pharmacy law.  Every decision I make throughout my workday is made with the knowledge that I am holding someone's life in my hands.  An error could result in the loss of someone's mother, father, son, daughter, husband or wife.  No health care professional should go to work without the gravity of this realization weighted firmly in their mind….

My husband, a veteran of both Iraq and Afghanistan, made the statement that it was the worst thing he had every witnessed in his life to watch my 98 year old great-grandmother be wheeled into the church to see her only son's lifeless body lying in his casket.  My grandfather was murdered because of another man's greed.  To put it simply, this broke my family…We were left a family whose heart no longer beat.  Every holiday just served to remind us of the devastating loss we had experienced and the void that his loss had left us with.  We all eventually found a new normal.  It took years to be able to share memories of him without crying.  It took years just to make it through a day without crying….

I feel that I suffered from Post Traumatic Stress Syndrome. I developed a constant anxiety about losing those I loved, and struggled to function normally through each day.  I know several of my other family members also experienced the same.

Judge Lovelace's granddaughter Megan Lovelace-Thompson wrote:

His success in the legal field and my pride in that success led me to make the decision to follow in his footsteps. Seeing the joy and pride in his eyes at my law school graduation and swearing-in ceremony made all the years of hard work worth every second. I moved back home to work as his law clerk with dreams of practicing law with him once he retired from the bench…

[The night he died] I left the hospital not knowing if I still had a job.  I left all of my future career plans in that hospital room with my Papaw's body.  Everything had changed….

On September 17, 2012 I spent over eight hours watching one of the true loves of my life die an agonizing death.  Words cannot accurately describe the horror witnessed in that hospital room.  My husband would hold his hands over my ears to attempt to block my Papaw's moans as he slowly died.  I can still hear the choking sounds he made as he lost his ability to swallow.

Infected victim Zachary Foutz was just 15 years old when he received a tainted shot from Insight Imaging in Roanoke, Virginia.  He was admitted into the hospital 30 days after his injection.  His father, Benjamin Foutz, wrote:

The first night Zac was in the hospital, his temperature reached 104 degrees. He was throwing up so violently that his eyes filled with blood and he was crying out in pain…I thought my son was going to die. Thirty-six hours before that night,

Zac had just played the best football game of his life and had been celebrating his 16th birthday with family and friends….

Zac was fighting for his life, in the dark.  On two separate occasions the hospital staff asked if Andrea and I would help hold Zac down so he would not move and fight them while they inserted the needle in his spine, while administering a spinal tap.  Zac is still terrified of needles today…..

Once Zac was discharged from the hospital…this was a very dark time for Zac and our family.  The prescribed drugs he was taking completely took away his energy and caused his hair to fall out…Zac had weekly blood draws, and more spinal taps to endure (Eleven total). Zac would become so sick with headaches and nausea after a spinal tap the doctor prescribed Ativan to help relieve his anxiety… Zac was on antifungal medications for four months but he finally returned to school full time in February of 2013.  Not only had Zac missed school, sports, time with his friends, but he lost his confidence and felt his body was "broken forever".

Infected victim Roseann Fusco works as a deputy city clerk in Florida.  She received a tainted shot at Marion Pain Management in Ocala, Florida at the age of 52.  She was admitted to the hospital 45 days after that injection.  Her husband, Paul Fusco, wrote:

Since there is not really a track record of the long term effects of a person exposed to fungal meningitis or super toxic anti-fungal medications, I live in constant fear for my wife and for any of the victims that had to endure this devastating experience. You put your trust into professionals that take an oath to provide safe products and procedures. After this experience it tends to make you understand how sometimes making big profits can overtake a person's morals and clear thinking.

Evan Goldman was a 37-year old practicing attorney and law firm partner in Maryland prior to his tainted injections at Greenspring Surgery Center in Baltimore.  He was forced by his injuries to stop working in November 2014.  His wife Payton wrote:

When he was healthy, to be around Evan was to be in the orbit of someone special.  Someone who could make a deal out of nothing, someone who could bring opposing worlds together, someone who could be in the center of a million different projects, and make every last one of them his priority and focus.…  Now, to be a part of his world, is to be a part of something painful, lonely, depressing and frustrating…

Evan is a shell of his former self.  He is trapped in a broken body, fully aware of what he has lost, never to recover.  Every day of our lives, Evan is in pain. He is irritable, moody, angry, impatient, confused, and tired.…

> Evan's illness dictates our daily life.  He can never get up in the morning to take the kids to school, make them breakfast, pack a lunch, kiss them goodbye – he is too tired….
>
> Half of my day consists of texting, emailing, and calling Evan to remind him of the simplest task I need his help with.  Evan used to manage multi-million dollar deals in the court room, now he needs three reminders to switch the laundry.  I have gone from being married to an independent work-a-holic, to caring for Evan as if he was my special needs child.…
>
> I am terrified that if something happened to me, the kids will be lost because Evan is simply not capable of caring for them….

Bahman Kashi was a retired diplomat who lived in California with his wife of 59 years.  He received the tainted shot at Box Hill Surgery Center in Abingdon, Maryland.  He died 145 days after his injection at the age of 85.  His son Kiumarce Kashi, who testified during the trial, wrote:

> It was particularly devastating for our mother as she watched her lifelong partner wither away in front of her eyes. Each day's visitation was filled with trauma, tears and despair.  It is never easy to let a loved one go but it was excruciatingly painful to see him suffer day after day in the manner he did and to see the agony and pain on the faces of each close family member. During this ordeal my sister took extended time off from her teaching position at the University, my younger brother delayed taking his Chiropractic National Boards, my older brother moved away from his family and business in Florida for many weeks and I spent many weeks away from my spouse, children and solo medical practice.

Michael Katz is a retired physician who lives in Ohio.  He received his contaminated shot at the age of 65 at Cincinnati Pain Management.  He was admitted to the hospital 15 days after receiving his injection and spent the next four months in the hospital receiving treatment.  His wife, Alida Katz, wrote:

> Michael was a hospital inpatient for four months after being diagnosed.…  Throughout all these months, I was with him for ten to twelve hours every day.  I had to watch his anguish, both physical and mental, unable to help in any way.  I cannot tell you how many tears were shed by both of us, or the number of times he asked G-d to take him and to end his pain.  My answer was always the same; "You can't leave us, we need you. Find that inner warrior. Fight and don't let go."
>
> Michael still has constant pain.  At night, he moans incessantly while sleeping. His physical stamina has decreased drastically.  When we walk anywhere, he has to stop often to rest.  Our hopes of traveling the world are impossible because of this.  We are together all day, every day because of my fear of his losing his balance and falling.

Donna Kruzich was a mother of four who lived in Ann Arbor, Michigan. She received the tainted shot at Michigan Pain Specialists in Brighton, Michigan. She died 48 days after that injection, at the age of 78. Her son Michael Kruzich wrote:

> The week before Donna was admitted to Arbor Hospice, I was traveling to the Mayo Clinic in Rochester, MN accompanying my wife who needed surgery for a second primary life threatening oral cancer. I'm not sure how anyone can begin to grasp my personal agony as I participated by phone, in my car under a cell tower in Wisconsin in the consultation between my family and doctors… to make "end of life decisions" for my mother. Faced with both the care for my wife and the overwhelming responsibility as my mother's designated medical advocate with power of attorney, I experienced overwhelming sadness and grief that to this day holds a grip on me.

Lyn Laperriere lived in Michigan with his wife Penny and their two dogs. He received the contaminated shot at Michigan Pain Specialists and died 41 days later, at the age of 61. Penny wrote:

> Since the night Mr. Cadden murdered my husband I find it difficult to sleep most nights. I was prescribed sleeping pills, anxiety pills and antidepressant pills by my doctor. I went to a bereavement counselor, and mental health therapist. I was diagnosed with PTSD, and had nightmares reliving the end of my husband's life in the hospital, remembering the extreme pain he went through.… To this day I have trouble staying asleep all night….
>
> When my husband first died, at night I would turn over in bed, look at my husband's side of the bed, the empty space next to me, where my husband should be sleeping. The tears would follow, as I cried myself to sleep, every night….
>
> When I left my husband's bedside at the hospital the last time before he died, I looked back down the hall and saw him leaning on the doorframe to hold himself up. I didn't know it would be the last time I would see him alive.… On my way home, I received a call from the hospital to say my husband had flat lined and to come back to the hospital…I went to my husband's side, hanging on to his arm dangling from the bed, and was crying and screaming at him that he couldn't die and leave me, he couldn't leave his dog babies that he loved so much….
>
> I tried to donate his organs to the gift of life before removing him from life support, but the gift of life worker told me they couldn't accept any organs as they could be infected with the mold/fungus….
>
> I couldn't afford to stay in the house for very long, as I had to take money out of the bank for all the upkeep. The financial toll this has taken on me is very painful as well, as my husband was the main breadwinner in our marriage….

I am reliving this nightmare to this day, this nightmare being when I watched my husband slowly die before my eyes the month he was in the hospital in extreme pain every single day….

Not once did Mr. Cadden say how sorry and devastated he was for what he did to my husband, his sorrow to my husband's friends and colleagues and the community… nothing. All he was concerned about was himself….

Mr. Cadden has destroyed this happy family. He's a thief. He's stolen the one person who meant the absolute world to me, who I gave my whole heart to. I can't bear the thought that I have had to carry on my life, without him by my side. I can't put into words how much my heart is broken and how much Mr. Cadden has destroyed me.

Traci Maccoux lives in Minnesota and was 21 when she received the tainted injections at Medical Advanced Pain Specialists in Maple Grove. At that time, she was a college student and swimmer. She was admitted to the hospital 73 days after receiving her first set of contaminated shots. Her parents, Daniel and Cathy Maccoux, wrote:

Traci spent over forty (40) days in the hospital where she underwent multiple invasive procedures, including spinal surgery and a risky blood patch procedure. She had to take Voriconazole, which is a powerful antifungal medication, for nine (9) months to treat the fungal meningitis. The antifungal medicine had terrible side effects that severely impacted all aspects of her life. These included severe hallucinations, speech issues, unsteady gait, vision problems, severe insomnia, and impaired short term working memory. Because of the severe gait issues, she suffered a broken ankle. She could not drive, had to drop out of college, could not work or hold a job, and struggled mentally and emotionally every single day…She was also diagnosed with Arachnoiditis during this time, which is a severe pain disorder caused by the inflammation associated with fungal meningitis with no treatment available. It is incredibly difficult to try to put into words how severe of an impact this horrific experience had on her in all aspects of her life. This is not the life that anyone should have to live, much less a 21 year old college student….

One of the scariest parts of this whole nightmarish ordeal has been all of the unknowns. No one has answers for those that have become ill from the contaminated shots – Will the fungal meningitis come back? What are the long term side effects? Will she ever be able to live a normal life? Will she be able to become pregnant with a healthy child? Does the antifungal medication cause cancer? No one knows the answers to these questions….

As a result, Traci has developed severe PTSD related to doctors, hospitals, and all things medical. For example, last year she developed a severe kidney infection and she let this go far too long because of her fear of the medical system and ended up going into septic shock, which required emergency surgery. At times she has also suffered from debilitating depression and anxiety, which prevents her

from living a normal, young, adult life.  She watches friends who have completed their college degrees now starting their careers and families, while Traci continues to repay student loans with no degree to show for it.

Mary Reck lives in Michigan, and was a 43-year old mother of three when she received the tainted shots at Michigan Pain Specialists.  At that time, she worked with her husband at their wholesale auto parts store.  Mary was admitted to the hospital 72 days after receiving her first injection.  She wrote:

> What I would really like to emphasize is the truly horrible 6 or so months that followed my discharge from the hospital.  Given that people are generally not supposed to be injected with a fungus the doctors were concerned about the course of treatment.…   I was given a strong dose of two different anti-fungal medications…I suffered from profound short term memory loss and also lost a great deal of my hair.  I was unable to drive because of my memory issues as well as feeling slightly drunk all of the time.…
>
> I didn't notice our oldest son's declining health until he had to withdraw from his winter term or face hospitalization himself.  My middle son – who I believe was trying to "fix" everything applied to the hardest biomedical programs in the country, and lived through the limbo/hell of being waitlisted everywhere.  Our daughter was so busy trying to help me be okay that she didn't share how awful her year truly was until it was over.  We would have advocated for her with the school if we had known.  She ended up switching schools for her final three years of high school.  These are the most profound effects to me. Mr. Cadden's actions hurt my children.

Thomas Rybinski lived an adventuresome life in Tennessee with his wife when he received his tainted shot at St. Thomas Outpatient Neurosurgical Center in Nashville.  At the time, he was a long-time and valued employee at General Motors.  His wife Colette, who testified during the trial, wrote:

> Slowly, pieces of Tom's mind went, not to come back, but gradually get worse.  He progressed to not being able to tell you if a rock floated in water and then couldn't identify my daughter, who saw him and talked to him regularly.  Tom's children have been shattered.  I have had my soul ripped out.…
>
> [Cadden] continued operations playing a lethal game of Russian Roulette, knowing there was a bullet in the chamber but continued to click the chambers until death and hundreds and hundreds of people were sickened and/or died.

Darrell Nealon, the son of deceased victim Dallas Nealon of Ohio, wrote of his father's side effects from the anti-fungal drugs:

> I cannot even begin to put into words how it felt to be with my Dad when he was experiencing hallucinations, he would ask me if I could hear all of the banging of the construction work going on around him, or if I even saw the workers crawling in and out of his ceiling. I of course didn't hear or see any of it. The look on his face when he realized that I couldn't see or hear any of it… total despair. I can still to this day see his face and the sadness in his eyes just could bring me to tears myself.

Douglas Wingate was a father of two and husband to Sharon Wingate; they lived in Virginia. He was also a popular account manager at Pepsi. He received his tainted shot at Insight Imaging in Roanoke, Virginia and died 12 days later at the age of 47. Sharon, who testified during the trial, wrote:

> The death of Doug, my husband of 25 years left me so broken, so lost. He was 47, I was widowed at 51. A little bit of me died with my husband. I lost my best friend, my companion, my soul mate, the one I would grow old with….
>
> I had to re-invent myself, I had to be strong for our children, while all I wanted to do was curl up and let the world go by. Coming home from work was unbearable, seeing his car in the driveway, I would sit in my car and sob….
>
> My son and I spent approximately 18 months in grief counseling, I can't begin to express the anger our son harbored, he didn't care if he lived or died, he didn't care to take another breath, can you imagine how hard that is on a mom. I would have meltdowns, where I would just start sobbing, my son would hear me and come to me and hug me until I calmed down, no 14 year old should have to shoulder that kind of responsibility.

Rachelle Shuff lives in Indiana. She is a wife and mother of two who did it all prior to her contaminated shots at the age of 44. She was a Branch Manager at a credit union, and she taught courses at her local community college. While trying to recover from a car accident, she received contaminated injections at OSMC in Elkhart. Rachelle still has fungus living in her body that the anti-fungal drugs were unable to kill, and that could grow again at any time. Her daughter, Sydney Shuff, wrote of her mother:

My mom was always a person to find a bright side to everything. She would sing to my brother and I in the morning to wake us up, and now she was lying in a dark room asking God to take her from this Earth to put her out of her suffering. I don't know your life, Judge Stearns, but to see your mother, who was so strong and amazing, at a complete loss of hope is one of the hardest thing a 16-year-old girl can ever see. My mom is the strongest woman I know and to watch her suffer every day, without having the hope of a cure in the future, is one of the hardest things a daughter can do....

One moment that I will never forget is in one of my mom's hospitalizations… our priest came in to talk with my mom and give her the sacrament of the anointment of the sick. My brother, dad, aunt, grandparents and I were all standing in the room observing the beautiful sacrament… As we all stood there, she asked our priest, why this happened to her and if God could take her now and put her out of all her pain. In that moment, my mom divulged her loss of hope.

From that day on, my mom has never been the same person. My mom used to smile and it would brighten a room. Now her smile always has pain and fear in it.

With my mom being so sick from the contaminated shots, I have grown up a lot quicker than my peers, because I have had to. I have lived my life with a constant fear of what will happen next to my mom. At any moment, the fungus could spread to her organs and then she will be taken from Spencer and I and that is a fear that I live with every day.…

A reoccurring night mare that I have is that my mom won't be able to see my graduation from Emory University, that she won't be able to see me get married, or that she won't be there the next time I come home.

Rachelle's husband Greg wrote:

Her suffering has broken everything we had into pieces. She is up out of bed at the most 6 hours a day and that is a struggle. She cries when the pain becomes so extreme and intolerable. She isn't able to do any of the things she loved or the things, like dishes, cooking and laundry, that she didn't like to do….

At times, I thought I would wake up and all this would be a nightmare. I would hear her laughing again and singing. This is a nightmare but it really happened. She has been robbed of her life, my life and our beautiful children's life. We have lost so much because of NECC.... The contaminated shots were over making more money, huge profits, fancy multiple houses and fast cars. My wife's life was priceless.

The above excerpts are just a fraction of the stories of suffering contained in the 191 victim impact statements, which in turn are just a fraction of the stories of suffering of Cadden's over 700 victims. The government urges that, in deciding on an appropriate sentence for Cadden, the Court consider the stark juxtaposition of two things: (1) the evidence of the extreme disregard

Cadden showed in marketing and selling NECC's drugs to across the country as safe and USP-797-compliant when NECC's production practices fell so dramatically short, even while knowing the risks to the thousands of patients he exposed to it, and (2) the suffering of the victims that directly resulted.  It is an astonishing and tragic picture.  And it is not one for which Cadden is deserving of leniency or a departure from the sentencing guidelines range.  Rather, if there were ever a fraud case that deserves the greatest punishment allowable, this is it.

## CONCLUSION

For all these reasons, and for the reasons set forth in the PSR, the United States respectfully requests that this Court sentence defendant Barry J. Cadden to a period of incarceration of no less than 35 years.

Respectfully submitted,

WILLIAM D. WEINREB
ACTING UNITED STATES ATTORNEY

By:    /s/ George P. Varghese
AMANDA P.M. STRACHAN
BBO # 641108
GEORGE P. VARGHESE
Assistant United States Attorneys
John J. Moakley United States Courthouse
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
(617) 748-3100
amanda.strachan@usdoj.gov
george.varghese@usdoj.gov

Dated:  June 22, 2017

Certificate of Service

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendants, who are registered participants as identified on the Notice of Electronic Filing (NEF).

By:    /s/ George P. Varghese
GEORGE P. VARGHESE
Assistant United States Attorney

Dated:  June 22, 2017