UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 14-10363-RGS

UNITED STATES OF AMERICA

v.

GREGORY A. CONIGLIARO, ALLA STEPANETS, and
SHARON CARTER

MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS
TO DISMISS COUNT 3 OF THE INDICTMENT

October 10, 2017

STEARNS, D.J.

A scholarly-minded member of the Massachusetts Appeals Court once wrote: "If sheer volume of literature be the measure of fascination, then few subjects have been as intriguing for criminal law scholars as the nexus between the doctrine of impossibility and the crime of attempt." *Commonwealth v. Bell*, 67 Mass. App. Ct. 266, 266 (2006) (Katzmann, J.). This case raises a variant of the classical example of the thief who reaches into an empty pocket, *see People v. Jaffe*, 185 N.Y. 497 (1906). Can a person be liable for conspiring to divest a government agency of a legal right that the agency doubts it ever possessed? Like most things in the law, it depends.

Count 3 of the Indictment names Barry Cadden, the former New England Compounding Center (NECC) President, Sharon Carter, its onetime Director of Operations, Alla Stepanets, a pharmacist-cum-shipping clerk,

Gregory Conigliaro, NECC's former Vice-President and head of regulatory compliance, and Robert Ronzio, who held the position of National Sales Manager, with conspiring to defraud the Food and Drug Administration (FDA) of its right to have its affairs conducted "free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment, and obstruction."[1] More precisely, the defendants are alleged to have colluded to create an elaborate Potemkinesque-facade posturing NECC as a Massachusetts state-regulated pharmacy dispensing patient-specific drugs, when in truth, it was operating as a drug manufacturer producing prescription drugs in bulk quantities.[2] The alleged object of the conspiracy was to avoid presumably more stringent regulatory oversight by the FDA. The most plausible theory of the Indictment (although it is not articulated) is this: Had the FDA known what the alleged conspirators were up to, it might have imposed more stringent safety standards on NECC (or shut the

---

[1] Cadden was acquitted of Count 3 by the jury at his trial earlier in 2017. Ronzio pled guilty in 2016.

[2] The Indictment alleges three direct material misrepresentations to the FDA. One, Cadden stated in a May 20, 2003 letter to the FDA that NECC did not comply with the FDA's guidance regarding good manufacturing practices "since we are a compounding pharmacy, not a manufacturer." Indictment ¶ 89. Two, on October 1, 2004, Greg Conigliaro wrote to the FDA describing NECC as "a small-scale, family-run, compounding-only pharmacy, not a manufacturer." *Id.* ¶ 90. And three, On January 5, 2007, Cadden responded to an FDA Warning Letter stating that NECC "dispenses compounded medications [only] upon receipt of valid prescriptions." *Id.* ¶ 91. *See* Indictment at 40. It may be worth noting that the drugs at issue, while prescribed, are not scheduled narcotics regulated by the federal Controlled Substances Act.

company down altogether).  This enhanced FDA oversight, in turn, might have prevented the national tragedy that ensued when fungi-contaminated vials of injectable methylprednisolone acetate (MPA) were sold to hospitals and clinics by NECC in the summer of 2012.  All of these alleged direct misrepresentations to the FDA were made before February of 2007.

This is the second time this court has visited Count 3, although not, as it is now framed, through the prism of the doctrine of legal impossibility.  On November 13, 2015, Greg Conigliaro moved to dismiss this same Count, arguing that, given the equivocal positions taken by FDA officials on the extent of the agency's regulatory authority, the indictment failed to plead with sufficient clarity conduct "'plainly and unmistakably' within the province of [the defraud clause of 18 U.S.C. § 371]," *see United States v. Barker Steel Co.*, 985 F.2d 1123, 1129 (1st Cir. 1993) (quoting *United States v. Gradwell*, 243 U.S. 476, 485 (1917)), and as such, section 371 was void for vagueness.  Dkt #395.  The court denied the motion, ruling that the Grand Jury had sufficiently pled a conspiracy on the part of Conigliaro and other defendants to induce the FDA "into believing that NECC was doing business as a compounding pharmacy when in fact it was in the business of manufacturing drugs," and as a result "NECC avoided the higher level of regulatory oversight that state and federal agencies, including the FDA, would have brought to bear."  Dkt #671 at 5.  In other words, the court, as required in acting on a Rule 12(b)(6) motion to dismiss, accepted the factual premises of the Indictment as true.

The renewed motion to dismiss is based on a different proposition – that conceding the factual allegations of the Indictment, including those involving the fraudulent creation of patient prescriptions – accomplishing the goal of the conspiracy was a legal impossibility.  As Conigliaro now frames the issue: The testimony and documentary evidence admitted at the trial of Cadden "unequivocally establish[ed] that there [was] no discernible federal law defining any clear distinction between a compounding pharmacy and a drug manufacturer.  Thus, it was legally impossible for the FDA to be defrauded in the manner the government [has] alleged." Conigliaro Mem. at 1-2 (Dkt #1014).

Viewing the Cadden trial evidence in the light most favorable to the government, as the court must in the present context, there was ample *prima facie* support for the existence of a conspiracy to misrepresent NECC as a compounding pharmacy falling under the presumably less stringent (and certainly less robust) regulatory oversight of the Massachusetts Board of Pharmacy (MABOP).  *See* Gov't Opp'n at 12-16 (Dkt # 1032).  On the other hand, the government's *prima facie* case was answered by the introduction of the testimony of Dr. Margaret Hamburg in hearings before Congress that followed the outbreak of spinal meningitis traced to NECC's contaminated vials of MPA.[3]  In brief summary, the (then) Commissioner testified that the

---

[3] Dr. Hamburg was initially subpoenaed as a defense witness by Cadden.  In resolving a motion to quash, the government agreed in lieu of her personal appearance at trial to the admission of her testimony before the House of Representatives Subcommittee on Oversight and Investigations, Committee on Energy and Commerce, November 14, 2012 & April 16, 2013.

FDA had been unable to draw any "bright line" demarcating compounding pharmacies and drug manufacturers given "an evolving industry overlaid on top of a fragmented and ambiguous legal framework." As a result, "our [the FDA's] authority over compounding is limited, unclear, and fragmented." Moreover, Dr. Hamburg pointed out that overregulation of the compounding industry was not necessarily desirable:  "These outsourcers produce high volumes of high risk drugs, often for hospitals that rely on them to meet critical product needs for their patients. . . . Applying [the regulatory tools we have] in full force could lead to significant dislocations in the healthcare system, and likely shortages."[4]  Also introduced at trial was an October 14, 2011 internal memorandum prepared by senior FDA officials reminding their superiors, that while the FDA had the statutory authority to do so, it "has chosen not to draw the line between manufacturing and traditional compounding with formal regulations." These officials acknowledged that the result was "a difficult regulatory environment which has led to uncertainty in enforcement and has provided no clear guidance to industry."

---

[4] Defendants point to similar Congressional testimony by Dr. Janet Woodcock, the Director of the Center for Drug Evaluation and Research at the FDA, given contemporaneously with that of Dr. Hamburg. Dr. Woodcock testified that there is no clear test for differentiating compounding pharmacies from drug manufactures, particularly as hospitals have been turning to compounding pharmacies as a substitute for an in-house pharmacy. She also acknowledged that much of what NECC was doing in making large batches of anticipatory drugs and shipping them to diverse locations without a prescription was a common practice in the industry, and one that the FDA had no clear authority or jurisdiction to regulate.

Finally, the jury heard testimony from the lead onsite FDA investigator that, during the week after being made aware of the outbreak of fungal meningitis, the FDA was consumed by an internal debate over whether the agency had jurisdiction at all to intervene. The jurisdictional issue was not resolved until Friday afternoon, September 28, 2012, and as a result, the FDA's investigative team's arrival at NECC was delayed to Monday, October 1, 2012. *See* Cadden Tr. Day 32 at 112-119.

      This evidence was sufficient to persuade the jury to acquit Cadden of the charge of conspiring to defraud the FDA. As the government's own summary of the evidence and the allegations of the Indictment underscore, the evidence against defendants Conigliaro, Stepanets, and Carter is far weaker than the evidence offered against Cadden. In its specifics, Conigliaro is accused of writing a letter on October 1, 2004 (well outside the statute of limitations and well before the transmogrification of NECC into a compounding behemoth) to the FDA representing NECC as a "compounding-only pharmacy, not a manufacturer." Stepanets is said to have instructed an NECC salesperson in 2010 to avoid using the label "generic" in describing NECC product because "we are not a manufacturer." Aside from these two references to NECC as not a drug manufacturer, the remaining allegations against these three defendants involve their knowledge that the patient names that NECC was being given by its customers and sales force as proof of valid prescriptions were stale, recycled, or fictitious.

Attempts to predict how a jury will decide "have lighted fools the way to dusty death." WILLIAM SHAKESPEARE, MACBETH, act 5, sc. 5. And the rule is ancient and unshakeable that an acquittal of a conspirator at an earlier trial has no conclusive significance for fellow conspirators who face later, separate trials. *See, e.g., United States v. Espinosa-Cerpa*, 630 F.2d 328, 330-333 (5th Cir. 1980); *cf. Standefer v. United States*, 447 U.S. 10, 22 n.16 (1980). But the prospect of further trials in pursuit of the same tread-worn theory inspires a sinking Groundhog Day feeling – the prospect that presenting the same evidence to a second or third, or even fourth jury, will inevitably result in the identical outcome.

If this is true, or at least highly probable, why must the gears grind forward with all the wear and tear on defendants, the court, and citizen jurors that a potentially hapless undertaking entails? The answer, which may not be satisfying, is that the law, for better or worse, enshrines more than its share of formalistic precepts. One of the most sacrosanct totems is the rule that, with the rarest of exceptions, a court may not usurp the function of the jury by pretermitting a trial based on facts that are not undisputed, stipulated to, capable of judicial notice, or that fall within an exception to the rules of evidence, most notably an exception to the rule against hearsay. *See Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 566 (1931) (noting that where a "conclusion rested upon inferences from facts within the exclusive province of the jury," such a conclusion may "not be drawn by the court . . . without usurping the functions of that fact-finding body"); *see*

7

*also United States v. Espinal-Almeida*, 699 F.3d 588, 610 (1st Cir. 2012) (noting the exception that a court "may however take judicial notice of the foundational facts if the evidence resulted from 'a process or system that is generally known and accepted as accurate.'" (citing 31 Wright & Gold, *Federal Practice and Procedure* § 7114 (2012)).

The evidence that is critical here – the testimony of Commissioner Hamburg, Dr. Woodcock, and other FDA officials, as well as the internal corroborating documents – is within the protected territory of disputed fact and fits under no recognized evidentiary exception that the court can identify, nor is it susceptible to judicial notice.[5]  As defendants candidly

---

[5] The Rules of Evidence allow for a hearsay exception for government records, Rule 803(8), but so far as the court is aware, this rule has never been extended to testimony offered before Congress.  The court is particularly reluctant to find the public records exception applicable here, where the factual basis for the conclusions offered in the testimony – and the extent to which those conclusions were the product of a well-reasoned government decision-making process that reflects the views of that government agency, rather than the individual speaker – is not readily apparent.  Rule 803 is what I have to work with.  Maybe it should be different.  At least one highly respected former federal judge might agree.  *See* Richard A. Posner, *The Federal Judiciary: Strengths and Weaknesses* (Harvard Univ. Press, Cambridge MA 2017) at 355-362.  Next, judicial notice may only be taken of facts that are not subject to reasonable dispute.  *See* Fed. R. Evid. 201 (b) (defining a judicially noticeable fact as "one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").  The issue of the FDA's jurisdiction over compounding pharmacies is precisely what is in dispute in this case.  *See United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 570 (1st Cir. 2004) (noting that "Rule 201 is applied with some stringency, because accepting disputed factual propositions about a case 'not

acknowledge, that while legal impossibility is always a defense, "mixed factual and legal impossibility [as here before the evidence is presented] is not." Conigliaro Mem. at 2 (Dkt #1014). Such being the case, whatever the eventual prospects of defendants on a Rule 29 motion,[6] the court has no choice but to put the matter down for trial.

## ORDER

For the foregoing reasons, the motions to dismiss are DENIED. As is its practice in complex civil and criminal cases, the court will issue an order setting time limits on the trial and, to that end, ORDERS the parties to submit their estimates of the total hours, exclusive of opening statements and closing arguments, but inclusive of each party's own cross-examination, that it will take to try Count 3 of the Indictment against the remaining defendants. Submissions are to be made on or before October 25, 2017.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

tested in the crucible of trial is a sharp departure from standard practice.'") (quoting *Lussier v. Runyon,* 50 F.3d 1103, 1114 (1st Cir. (1995)).

[6] On this issue, I reserve judgment. Perhaps the government has some additional evidence on the FDA's assessment of its legal position with respect to its ability to regulate compounding pharmacies like NECC that for some reason it chose to withhold in the Cadden trial.

9