UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 14-10363-RGS

UNITED STATES OF AMERICA

v.

BARRY J. CADDEN, et al.

MEMORANDUM AND ORDER ON DEFENDANTS' JOINT MOTION TO
EXCLUDE EVIDENCE OF PATIENT HARM RELATED TO
METHYLPREDNISOLONE ACETATE

May 7, 2018

STEARNS, D.J.

The motion pending before the court is straightforward. The background against which it is raised is not. The issue is this: Should the court exclude evidence of patient deaths (and grievous injuries) attributed to three batches of fungal-contaminated methylprednisolone acetate (MPA) compounded at New England Compounding Center (NECC) at the trial of low and mid-level NECC employees who are not alleged to have had any role in the preparation of the tainted drugs? To ask the question is to answer it. The answer, however, requires explanation.

Let me begin with the indictment. As handed up by the Grand Jury, the 73-page indictment names fourteen defendants in 131 separate counts

and seventy-eight RICO predicate acts.[1] To further complicate matters, the substantive RICO allegations, although set out under an umbrella Count I, define two separate and distinct racketeering enterprises. The first, which is set out in paragraphs 40 through 62, alleges twenty-five separate acts of second-degree murder related to the shipment of the three lots of contaminated MPA on various dates in June, July, August, and September of 2012. Only Barry Cadden and Glenn Chin, the head pharmacist and supervising pharmacist respectively of NECC, were alleged to have participated in the murder racketeering enterprise.[2] Of the ten remaining defendants, four – Gene Svirskiy, Joseph Evanosky, Scott Connolly, and Christopher Leary – were, together with Cadden and Chin, alleged to have been part of a mail fraud racketeering enterprise. This second enterprise is described in paragraphs 64 through 71 of the indictment.

---

[1] Twenty-two of the counts were brought against Carla Conigliaro and Doug Conigliaro, the majority owners of NECC. The Conigliaros were not alleged to have been participants in the day-to-day operations of NECC. The counts in which they were named allege various criminal contempts of Bankruptcy Court rulings and the illegal structuring of certain cash transactions involving their personal bank accounts. The court dismissed the contempt charges and the Conigliaros pled guilty to the structuring offenses.

[2] Cadden and Chin were each tried separately in 2017. After lengthy trials, each was convicted for his participation in the mail fraud enterprise, but were exonerated by different juries of the predicate acts of second-degree murder.

To further complicate matters, Count 2 of the indictment charges the same six defendants with participation in a generic racketeering conspiracy limited to the misrepresentations underlying the mail fraud allegations, namely that the drugs being offered to customers were compliant with United States Pharmacopeia (USP) standards 797 and 71, when in fact they were not. Two additional defendants – Sharon Carter and Alla Stepanets – are folded into this conspiracy, but only insofar as they are alleged to have authorized the shipment of drugs that they knew had not been adequately tested or that were made with expired ingredients.[3] Four defendants – Svirskiy, Leary, Evanosky, and Stepanets – are charged with violations of the Food, Drug, and Cosmetic Act (FDCA). Rounding out the picture, two final defendants, Kathy Chin (the wife of Glenn Chin), and Michelle Thomas are licensed pharmacists who worked in NECC's shipping department. Kathy Chin in four instances and Thomas in two are alleged to have shipped orders to patently fictitious individuals in violation of the FDCA.

---

[3] Count 3 of the indictment alleges an altogether different conspiracy to defraud the United States by misrepresenting NECC to the Food and Drug Administration (FDA) as a state-regulated pharmacy, when in fact it was operating as a drug manufacturer and thus subject to federal regulation. This conspiracy is alleged to have included Cadden, Carter, Stepanets, Greg Conigliaro (the brother of Doug Conigliaro), and Robert Ronzio (who for a period of time served as NECC's National Sales Director). Cadden was acquitted by the jury of participation in this conspiracy. Ronzio pled guilty pursuant to a cooperation agreement with the government.

The argument made on behalf of all defendants is easily summarized. Since none of the remaining defendants is alleged to have had any responsibility for the contaminated MPA lots that caused death or grievous harm to patients, evidence of that harm has no relevance to their guilt (or innocence) of mail fraud and FDCA violations. Moreover, given the highly emotive nature and scale of the tragedy that engulfed many of the patients who were injected with the contaminated MPA, defendants argue that evidence of patient harm would result in unfair prejudice by inviting jurors "to render a verdict on an improper emotional basis." *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000).

The government in response argues that it can contain any prejudicial overspill by forgoing the introduction of evidence of the autopsies and next-of-kin testimony offered in the *Cadden* and *Chin* trials. Rather, the government proposes to limit itself to the testimony of Dr. Benjamin Park, the Centers for Disease Control (CDC) specialist who played a leading role in the official response to the fungal meningitis outbreak. (Dr. Park testified at both the *Cadden* and *Chin* trials). The government contends in its brief that evidence of the MPA contamination and the subsequent deaths and injuries are "highly probative of the racketeering enterprise that defendants Svirskiy, Leary, Evanosky, Carter, and Stepanets are charged with operating along

with convicted defendants Barry Cadden and Glenn Chin." Gov't's Opp'n at 1, Dkt # 1474.[4]  As may be apparent, there are two flawed premises in this statement.  The first is the failure to distinguish between the two alleged racketeering enterprises, one which involved murder and grievous injury while the other did not.  The second is the suggestion that Cadden and Chin were convicted of operating the murder racketeering enterprise when they were not.

More substantively, the government looks for rescue in the conspiracy allegations set out in Count 2, invoking the principle derived from *Pinkerton v. United States*, 328 U.S. 640, 645-648 (1946), that where a conspiracy comes to fruition, each member of the conspiracy is liable for the reasonably foreseeable acts of his or her coconspirators committed in furtherance of the conspiracy, even if he or she did not directly participate in those acts.  *See* Gov't's Opp'n at 2 (citing *United States v. Mangual-Santiago*, 562 F.3d 411, 422 (1st Cir. 2009)).  This reliance on basic conspiracy law, however, overlooks an important limiting principle that restricts the application of the *Pinkerton* doctrine:  A conspirator cannot be held accountable for the crimes of others that are outside the scope of the conspiratorial agreement or for

---

[4] The government does not contend that the patient harm evidence has any relevance to the cases against Greg Conigliaro, Kathy Chin, or Thomas.

5

criminal acts that he or she could not have reasonably foreseen as a natural outgrowth of the criminal enterprise in which he or she agreed to take part. *See United States v. Dunston*, 851 F.3d 91, 97-98 (1st Cir. 2017) (conspirators liable for narcotics they "personally handled or anticipated handling," as well as "drugs involved in additional acts that were reasonably foreseeable . . . and committed in furtherance of the conspiracy"); *United States v. Jones*, 965 F.2d 1507, 1517 (8th Cir. 1992) (defendant liable only for sales of drugs falling within the scope of his agreement with other conspirators). *Cf. United States v. Willis*, 49 F.3d 1271, 1274 (7th Cir. 1995) ("[I]t is highly questionable to leap from one person's knowledge that the organization is big to knowledge of its full scope."). Nor as a secondary matter can a defendant be held liable for acts undertaken by coconspirators that preceded his or her joining the conspiracy even if he or she was aware that such acts took place. *United States v. O'Campo*, 973 F.2d 1015, 1026 (1st Cir. 1992) ("reasonably foreseeable" prior conduct is "oxymoronic").

Here it is implausible, and in any event not alleged, that in joining the conspiracy to commit mail fraud, or the conspiracy to mislead the FDA, any of the remaining defendants would or could have foreseen death or grievous bodily injury as probable consequences of the criminal agreements.

The government's next argument is that the evidence is admissible as a scene-setting device necessary "to complete the story of the crime on trial." Gov't's Opp'n at 3, Dkt # 1474 (quoting *United States v. Sabetta*, 373 F.3d 75, 83 (1st Cir. 2004)). It is true that the law of evidence recognizes an "information received" rule that allows arresting or investigating officers to explain the reason for their presence at the scene of a crime or how they came to be involved in the investigation. As the leading treatise on evidence explains, "[t]he officers should not be put in the misleading position of appearing to have happened upon the scene and therefore should be entitled to provide some explanation for their presence and conduct." 2 McCormick on Evid. § 249 (7th ed. June 2016). But as the treatise cautions, "[t]hey should not, however, be allowed to relate historical aspects of the case . . . . Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted. The need for this information is slight, and the likelihood of misuse is great. Instead, a statement that an officer acted 'upon information received,' or words to that effect, should be sufficient." *Id*; *see also United States v. Reyes*, 18 F.3d 65, 70 (2d Cir. 1994) (background evidence with respect to the origins of a criminal investigation may be appropriately admitted where it is

"helpful in clarifying noncontroversial matter without causing unfair prejudice on significant disputed matters.").

The First Circuit cases cited by the government are consistent with the limited nature of the "information received" rule. In *United States v. Charles*, 456 F.3d 249 (1st Cir. 2006), the government was permitted to elicit the fact that an agent had seen the defendant attempting to tie a baggie of crack-dusted marijuana to explain why the officers had moved in to make an arrest, and to refute the defendant's claim that in assaulting the agents he was "acting only in self-defense rather than trying to avoid arrest for possession of drugs." *Id.* at 256. Similarly, in *United States v. D'Alora*, 585 F.2d 16, 20 (1st Cir. 1978), evidence was properly admitted to show that defendant had been the financier of a drug deal ten days earlier at which the larger deal for which he was arrested was put in motion, because this evidence "tended to logically associate [defendant] with [the] particular crime" charged. *Id.* at 20 (quoting *United States v. Eatherton*, 519 F.2d 603, 611 (1st Cir. 1975)). In *Sabetta* itself, the government was permitted to elicit testimony that defendant's coventurer had expressed the desire to shoot two men who had attacked him to explain why he had asked the defendant to

bring a gun with him to the scene.⁵ Tellingly, in each of these cases the evidence helped to explain particular conduct on the part of a defendant (*D'Alora* and *Sabetta*), or tended to undercut the credibility of a defendant's defense to a crime charged (*Charles*). In no fashion would evidence of patient harm attributable to the fungal meningitis outbreak serve either of these functions in the trial of the remaining NECC defendants.⁶

---

⁵ *United States v. Parnell*, 32 F. Supp. 3d 1300 (M.D. Ga. 2014), also cited by the government, is inapropos with respect to the remaining defendants. In *Parnell*, the owners of a peanut company, who had knowingly shipped peanuts contaminated with salmonella to purchasers, failed to persuade the district court to exclude evidence of the nationwide salmonella outbreak that resulted. The court held that evidence of the illnesses was relevant to prove that the peanuts were in fact contaminated and to explain why the government undertook the investigation that eventually led to the defendants. Here there is no dispute by the remaining defendants but that the three lots of MPA vials were contaminated. Defs.' Reply at 2, Dkt #1483. These defendants have also stated that they will not challenge at trial the propriety or timing of the government investigation of NECC. Most significantly, evidence of the salmonella outbreak and its scope were directly relevant to the defendants' culpability, also an issue at the *Cadden* and *Chin* trials (like the *Parnell* defendants, Cadden and Chin were alleged to have direct responsibility for the deaths and injuries caused by the infected MPA). The issue of culpability for the MPA-induced deaths and injuries has no relevance to the cases of the remaining defendants, and in any event that question has been answered in the negative by two separate juries with respect to the two NECC defendants (Cadden and Chin) who *were* alleged to have had such culpability.

⁶ In an unfathomable argument, the government maintains that evidence of patient harm "is probative of the materiality of the fraud on NECC's customers." Gov't's Opp'n at 3, Dkt #1474. The materiality of a false representation for purposes of mail fraud is not measured by the harm that it causes, or even by whether it was acted upon by the recipient. As I

9

These "scene-setting" permissions are, of course, a far cry from the introduction of testimony regarding a lengthy investigation into the causes of a national public health catastrophe that killed dozens of patients, injured hundreds of others, and disrupted the lives of thousands more who were potentially exposed to fungal disease. As vividly explained by Dr. Park at the trials of Cadden and Chin, investigators from the CDC and the FDA were led to scores of doctors, hospitals, and clinics in the desperate effort to identify and treat the universe of those who had been exposed and to determine the cause of the outbreak and the nature of the disease it involved, which given the rarity of fungal meningitis infections, was only identified for certain well into the investigation.

---

explained to the jurors in the *Chin* trial:

> The term "false or fraudulent pretenses" means any false statement or assertion that concerns a material aspect of the matter in question, that was either known to be untrue when made or made with reckless indifference to its truth and made with the intent to defraud. The definition includes actual, direct false statements, as well as half-truths and the knowing concealment of facts. To satisfy its burden of proof that a fact is "material," the government is not required to show that it succeeded in influencing or deceiving the decision maker to whom it was addressed. Rather, a fact or matter is "material" if it has a natural tendency to influence or is capable of influencing the decision maker involved.

*Chin* Jury Instrs. at 37, Dkt # 1328 (Tr. Day 24, 160:2-14).

The government's next argument is that any unduly prejudicial aspect of the patient harm evidence can be cured by offering it exclusively through the testimony of Dr. Park. The argument appears to rest on a conclusory dictate by the district court in *United States v. Caputo*, 374 F. Supp. 2d 632, 640 (N.D. Ill. 2005), that "[a]llowing doctors to inform the jury regarding the nature and extent of the [eye] injuries [caused by defective sterilizer] will allow the Government to introduce those facts without he undue risk of prejudice attendant to the patients' testimony." Putting aside the scant evidence supporting this proposition, it is not borne out by the court's experience in the *Cadden* and *Chin* trials.

Dr. Park is a convincing witness and by all accounts one of the true heroes that emerges in the tragic story of the response to the fungal meningitis outbreak. If anything, his evident competence and dedication to scientific method is what makes his testimony so powerful and thus problematic in the context of a trial of defendants who are not alleged to have had any causal connection to the patient deaths and injuries resulting from the fungus-infected lots of MPA.

Dr. Park's testimony was essentially the same in both the *Cadden* and *Chin* trials. He described the early reports of unusual patient symptoms – notably "a very peculiar type of stroke" involving the central portion of the

brain – that gave him and other CDC investigators an inkling that a monumental health crisis was looming. He explained that fungal meningitis, the suspected delivery agent, has a very high mortality rate and that the CDC estimated that half of those infected could possibly die. From his perspective early in the investigation, "a mass casualty type of event" of uncertain proportions was in the offing. "I felt like I was standing at the cliff and couldn't see the bottom of it." Dkt # 1307 (Tr. Day 3, 110:22-23). He then walked the jury through the process by which the CDC ultimately identified MPA compounded by NECC as the culprit and learned that as many as 14,000 patients had been injected with the contaminated steroid. He meticulously described the symptoms of a fungal infection affecting the spine and the difficulty of treating the side effects. He then produced a map tracking the CDC's identification of 753 confirmed cases of fungal meningitis spread among twenty states and resulting in sixty-four confirmed deaths. He summarized his testimony by noting that "this was probably one of the, if not the largest healthcare associated outbreak in the United States' history . . . . the only thing that I can compare it to, just in terms of the speed and the importance of it, was really the Ebola outbreak, to be honest with you." *Id.* 132:16-18.

While there are aspects of Dr. Park's testimony that would be relevant to the six remaining defendants who are charged with mail fraud racketeering or conspiracy to commit mail fraud (but not the three defendants who are not so charged) – most notably his observation that testing of other NECC products (vials of betamethasone and triamcinolone and bags of cardioplegia solution) revealed high levels of contamination – these evidentiary shards are impossible to isolate from his more dramatic description of mass-scale injury and death related to the tainted MPA.[7]

Assuming for present purposes that the Rule 401 test of relevance is in some respects met,[8] defendants argue that evidence of patient harm should nonetheless be excluded under Rule 403 as unduly prejudicial.[9] Defendants cite to the previously mentioned case of *United States v. Varoudakis* as the leading authority on the subject in the First Circuit (a decision with which

---

[7] To the extent that contamination of the drugs is contested (defendants say it will not be), the evidence can be offered through the technicians who actually performed the testing.

[8] Fed. R. Evid. 401 states: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

[9] Fed. R. Evid. 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

13

this court is painfully familiar). In *Varoudakis*, the Circuit Court held that while the district court had a proper basis for admitting a coconspirator's testimony that she had witnessed the defendant (who was accused of burning down his restaurant for the insurance proceeds) previously set fire to a leased Cadillac in order to avoid excess mileage charges, it erred in failing to exclude the testimony under Rule 403. The Circuit Court agreed with the district court that (unlike here) the evidence of the prior arson was not so heinous or shocking as to invite an emotional reaction from the jury. But the district court was faulted for not having considered whether the government had reasonable alternatives to the potentially prejudicial testimony (because of its tendency to suggest a propensity to commit crimes).

> Here is the crux of our analysis. "The prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence." Wright & Graham, *supra,* § 5214. Doubts about the probative value of prior bad acts evidence are thus "compounded" when prosecutors have other evidence available, "rendering negligible their need to show intent by the prior bad acts." [*U.S. v.*] *Lynn*, 856 F.2d [430] at 436 [(1st Cir. 1988)], *see also* Wright & Graham, *supra,* § 5250 ("The probative value of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point.").

233 F.3d at 122.

One case cited by defendants, *United States v. Bainbridge Mgmt., L.P.*, 2002 WL 31006135 (N.D. Ill. Sept. 5, 2002), is particularly compelling in its

14

similarity to the issues confronted by this court and is thus worth quoting at some length.

> The indictment charges the Bainbridge defendants with mail and wire fraud, health care fraud, and racketeering. The crux of the indictment involves a kickback and bribery scheme. Physicians allegedly used unnecessary medical procedures to generate fees and obtain funds from Medicare, Medicaid, and private insurers. The alleged result of two particular unnecessary tests — the death of two patients — is not a fact central to the scheme. The patients' deaths are not probative of the necessity of the medical procedures performed. Nor are the deaths probative of the elements of wire and mail fraud, racketeering, or health care fraud. The government asserts the jury should know the victims of the scheme. The direct victims in the indictment are the Medicare and Medicaid funds, and the private insurers who paid for unnecessary medical procedures. Further, any probative value of the evidence is substantially outweighed by its prejudicial effect. Evidence is unfairly prejudicial if it will "induce the jury to decide the case on an improper basis rather than on the evidence presented." Evidence about the death of two patients is inflammatory and likely to prejudice the jury against the corporate defendants who are not charged with causing the patient's deaths.

*Id.*, at *2 (internal citations omitted).

Like the *Bainbridge* court, I am persuaded that the proposed evidence of patients' deaths and injuries entails a substantial risk that jurors will decide the case "on an improper basis rather than on the evidence presented." And I am further persuaded that this case neatly fits within the *Varoudakis* paradigm. The government has more than ample alternative means of showing that the alleged representations made by defendants as to

15

the hygienic conditions of NECC's clean rooms, the freshness of its drug ingredients, and the integrity of its sterility testing, were false without resorting to evidence of patient deaths and injuries. Consequently, even if the Rule 401 threshold were to be surmounted, Rule 403 would require that evidence of patient harm be excluded.

The final issue raised by the government is the objection that it is being "forced to try the remaining defendants based on counterfactual scenarios, untethered to reality." Gov't's Opp'n at 5-6. I am somewhat puzzled by the complaint. The court is not asking the government to distort evidence or to offer anything less than full proof of the crimes that the remaining defendants are alleged to have committed, including proof that some of the drugs marketed by the mail fraud defendants were dangerously contaminated. What the court is directing is that the government refrain from offering graphic evidence of crimes for which it does not allege the remaining defendants bore any responsibility. Vicarious liability, whether vertical, or as the government would have it here, inverted, has no place in the criminal law as our Rules of Evidence recognize. "[T]hough in a civil suit, the principal may in some cases be answerable in damages to the party injured through the default of the deputy; yet, in a capital prosecution, the sole object of which is the punishment of the delinquent, each man must

16

answer for his own acts or defaults." Sir William Oldnall Russell, *A Treatise on Crimes and Indictable Misdemeanors*, Vol. I at 459 (2d ed. 1826).[10]

ORDER

For the foregoing reasons, the Motion to Exclude Evidence of Patient Harm Related to Methylprednisolone Acetate is <u>ALLOWED</u>.

SO ORDERED.
/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE

---

[10] I leave open the possibility that the answers by prospective jurors to the questionnaires that will be circulated prior to empanelment may show that the NECC case is so notorious that few members of the venire are unaware of the connection between NECC and the fatal outbreak of fungal meningitis. If this is the case, it can be addressed by an explanatory limiting instruction by the court explaining that the deaths and other patient harms that occurred are not germane to the allegations against the defendants on trial.