UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| UNITED STATES OF AMERICA ) | | |
| ) | Court No.:  14-cr-10363-RGS-1 | |
| v. ) | | |
| ) | | |
| BARRY J. CADDEN, ) | | |
| ) | | |
| Defendant. ) | | |
| _____ ) | | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND MEMORANDUM IN
SUPPORT OF THE GOVERNMENT'S RENEWED MOTIONS
FOR RESTITUTION AND FORFEITURE**

The United States of America hereby submits this memorandum in aid of the resentencing

of defendant Barry J. Cadden and in support of the Government's Renewed Motions for Restitution

and Forfeiture.

In March 2017, a jury unanimously found that defendant Cadden operated his company,

New England Compounding Center ("NECC"), as a fraudulent enterprise, dispensing hundreds of

thousands of substandard and dangerous drugs manufactured in filthy conditions for use on

unsuspecting patients throughout the nation; the jury convicted Cadden of 57 felony counts,

including racketeering, racketeering conspiracy, mail fraud, and violations of the Food, Drug, and

Cosmetic Act ("FDCA").  Both Cadden and the Government pursued appeals of this Court's

judgment and post-trial orders, including the sentence imposed by this Court and its order of

forfeiture.  On July 9, 2020, the United States Court of Appeals for the First Circuit affirmed

Cadden's convictions, vacated his sentence and the forfeiture order, and remanded the matter for

further proceedings consistent with the order.  *United States v. Cadden*, 965 F.3d 1 (1st Cir. 2020).

The First Circuit's order also cleared the way for this Court to consider the Government's pending

motion for restitution, which has been stayed since 2017 pending the outcome of the First Circuit proceedings.  *See* Doc. 1213, 1352.

Taking account of the proper standards for evaluating Cadden's sentencing guidelines range and the factors set forth in 18 U.S.C. § 3553, the Government recommends that the Court sentence Cadden to 210 months of incarceration, the top of the revised sentencing guidelines range. The government also requests that the Court enter an order of forfeiture in the amount of $11,222,643.50 and an order of restitution of $82 million, with joint and several liability with co-defendant Glenn A. Chin.

## PROCEDURAL BACKGROUND

Following his conviction by a jury in March 2017, this Court denied Cadden's motion for judgment of acquittal or for a new trial and sentenced him to 108 months of imprisonment, three years of supervised release, with an order of forfeiture to issue.  Doc. 1135, 1148.

Cadden filed a notice of appeal on July 7, 2017 challenging the jury verdict, order denying the motion for acquittal or new trial, judgment, amended judgment, and order on motion for forfeiture. Docs. 1165, 1253.  The government filed its own appeal shortly thereafter, arguing that this Court had incorrectly calculated Cadden's sentencing guidelines range.  Doc. 1176.  The Court entered an Amended Judgment on October 24, 2017 to reflect a forfeiture money judgment of $7,545,501.00, and the government filed a subsequent notice of appeal challenging the calculation of Cadden's forfeiture obligations under 18 U.S.C. 1963(a)(3).  Docs. 1261, 1262.  Following briefs submitted by both parties with respect to restitution, this Court held that it lacked jurisdiction to consider the issue in light of the First Circuit appeal, and the government's motion for restitution was stayed pending resolution of it.  Docs. 1213, 1353.

On July 9, 2020, the First Circuit affirmed Cadden's convictions, vacated his sentence and forfeiture order, and remanded the matter for further proceedings consistent with the order.  *United States v. Cadden*, 965 F.3d 1 (1st Cir. 2020).  A Mandate was entered pursuant to Federal Rule of Appellate Procedure 41(a) on July 30, 2020.

## <u>CADDEN'S CRIMINAL CONDUCT</u>

Because of the defendant's offenses, more than 100 people are dead.  More than 700 additional people in twenty different states have suffered tremendously, most of whom will continue to do so for the remainder of their lives.  Cadden's criminal conduct led directly to a public health crisis unprecedented in our nation's history.  His choices to flagrantly flout pharmacy regulations and to instruct his employees to do the same showed an unconscionable disregard for the lives of the patients injected with his drugs.

In the course of his trial, the jury heard overwhelming evidence that Cadden operated NECC as a criminal enterprise that marketed itself as "dedicated to providing the highest quality compounded medications and services to patients and prescribers," Exh. 67, at 2 (NECC's Quality Assurance Report Card), but instead sold grossly substandard drugs that were manufactured in unsafe conditions.  The evidence presented at trial revealed that Cadden's conduct led to hundreds of shipments of nonsterile, sub-potent, and super-potent drugs being sent to medical facilities throughout the country for use on unsuspecting patients.

Moreover, Cadden's fraudulent business practices led directly to the nationwide fungal meningitis outbreak, which was traced back to three lots of contaminated methylprednisolone acetate ("MPA").  More than 17,300 vials of the contaminated MPA were shipped to 76 medical facilities in 23 different states.  As the Court heard during Cadden's trial, NECC's contaminated and deadly MPA resulted from several separate and distinct violations of Chapter 797 of the United

States Pharmacopeia ("USP-797"), any one of which on its own could have made the drug perilously unsafe: improper sterilization, improper testing, improper cleaning and disinfecting, and improper and ignored environmental monitoring.  Contrary to the defense's repeated post-conviction assertions, the evidence clearly demonstrated that Cadden was well-aware of these significant deficiencies in NECC's production processes, and the potential danger they could cause to patients, but chose to ship the deficient drugs anyway regardless of the enormous risk.

### SENTENCING RECOMMENDATION

The Court previously calculated Cadden's total offense level as 29.  Specifically, the Court calculated Cadden's offense level as follows:

|  | Offense Level |
|---|:---:|
| Mail Fraud racketeering base offense level (§2B1.1(a)(1)) | 7 |
| - Total fraud loss > $550,000 - $1,500,000 (§2B1.1(b)(1)(H)) | +14 |
| - Involved 10 or more victims and committed through mass marketing (§2B1.1(b)(2)) | +2 |
| **Offense Level for Grouped Mail Fraud Acts / Counts** | **23** |
| - Organizer or leader of criminal activity (§3B1.1(a)) | +4 |
| - Abuse of a Position of Trust (§3B1.3) | +2 |
| **Total Adjusted Offense Level** | **29** |

That total offense level, combined with Cadden's lack of previous criminal history, led the Court to determine Cadden's sentencing guidelines range to be 87 to 108 months.  The Court sentenced Cadden to 108 months—the top-end of this range.

On appeal, the First Circuit found two errors in the Court's calculation of Cadden's total offense level.  Specifically, the First Circuit held that the Court erred in declining to apply (i) a two-level enhancement because Cadden's "offense involved . . . the conscious or reckless risk of death or serious bodily injury" pursuant to USSG § 2B1.1(b)(16); and (ii) a four-level

enhancement pursuant to USSG §§ 3A1.1(b)(1) and 3A1.1(b)(1)(2), because Cadden's offense involved a large number of "vulnerable victims." *United States v. Cadden*, 965 F.3d at 33-36.

The First Circuit accordingly vacated Cadden's sentence and remanded the case with instructions to determine whether these enhancements applied under the appropriate legal standards and to resentence Cadden based on a correctly calculated guidelines sentencing range. *Id.* As discussed below, this Court should apply both of the enhancements to Cadden's total offense level.

### Conscious or Reckless Risk of Death or Serious Bodily Injury

This Court previously refused to apply a two-level enhancement to Cadden's guidelines sentencing range because Cadden's "offense involved . . . the conscious or reckless risk of death or serious bodily injury." USSG § 2B1.1(b)(16).  On appeal, the First Circuit held that this Court erred in rejecting this enhancement by focusing too narrowly on the offense of conviction rather than, as is required in sentencing, the full scope of Cadden's conduct.  As the Circuit Court explained, application of this enhancement is determined "not only" by looking at "Cadden's 'offense[s] of conviction' – which included mail fraud and racketeering premised on mail fraud – but also at all of his 'relevant conduct.'"  *Cadden*, 965 F.3d at 34 (citing USSG § 1B1.1 cmt. n.1(I)).  As the First Circuit further explained:

> [t]hus, if Cadden's acts during the commission of mail fraud -- for instance, by directing the shipment of medications he knew to be substandard and highly dangerous in consequence -- "involved . . . the conscious or reckless risk of death or serious bodily injury," . . . then the District Court should have found that the enhancement applied.

*Id.*

In addition to instructing the Court to take account of the full scope of Cadden's conduct in sentencing, the First Circuit also explained the appropriate *mens rea* requirement to be applied

on remand is whether the Cadden acted with a "conscious <u>or</u> reckless risk."  The court further held that "a conscious risk is one 'known to the defendant' while a reckless risk is 'the type of risk that is obvious to a reasonable person and for which disregard of said risk represents a gross deviation from what a reasonable person would do.'" *Cadden*, 965 F.3d at 34-35 (quoting *United States v. Lucien*, 347 F.3d 45, 56-57 (2d Cir. 2003)).  Given this standard, this Court's previous finding that Cadden did not act "with actual knowledge that his acts, or more accurately his failures to act, were almost certain to result in the death of another" *id.* at 34, does not in fact preclude application of this enhancement.

Considering the full scope of Cadden's relevant conduct and applying the correct *mens rea* requirement, the government submits this enhancement clearly applies.  Cadden ran NECC – a "high-risk compounder" by its very name and nature because the pharmacists made and sold supposedly sterile drugs using nonsterile ingredients.  By assuming responsibility for the sterilization step, NECC's business, as designed by Cadden, was *per se* high-risk to patients.  Cadden knew this, and yet operated the business with complete disregard for legal requirements and safety standards.  The language of USP-797, which Cadden was required to know and follow under Massachusetts law, put him on notice in several sections that his failure to follow the guidelines would likely lead to bodily harm to patients exposed to his nonsterile drugs.  Specifically, the introduction to the Chapter states, "[t]he objective of this chapter is to describe conditions and practices *to prevent harm, including death*, to patients that could result from…microbial contamination…."  Exh. 52 (34 USP 797, at 336) (emphasis added); *see also*, Exh. 52 (34 USP 797, at 362) ("Chapter purpose is *to prevent harm and death* to patients treated with [compounded sterile preparations].") (emphasis added).  The next sentence states, "[c]ontaminated [compounded sterile preparations] are potentially most hazardous to patients

when administered into body cavities, *central nervous and vascular systems*, eyes, and joints, and when used as baths for live organs and tissues." Exh. 52 (34 USP 797, at 336) (emphasis added); *see also* Exh. 52 (34 USP 797, at 340) (noting "nonsterility…in [compounded sterile preparations is] potentially more dangerous to patients when the CSPs are administered into the vascular and *central nervous systems* than when administered by most other routes") (emphasis added).  With respect to high-risk compounding, which was NECC's primary business, the chapter states that "[h]igh-risk level [compounded sterile preparations] pose the greatest threat to patients because compounding personnel are tasked with the requirement of processing nonsterile components and devices in order to achieve sterility." Exh. 52 (34 USP 797, at 349).  Eric Kastango, the USP-797 expert, testified that the business was called high-risk "[b]ecause when it's not sterile, we know what can happen, devastating patient harm and death can occur."  Trial Tr. at 51 (Feb. 28, 2017). With respect to mold specifically, the Chapter states in two different sections that "[h]ighly pathogenic microorganisms (e.g., Gram-negative rods, coagulase positive staphylococcus, *molds* and yeasts) can be *potentially fatal* to patients receiving [compounded sterile preparations] and must be immediately remedied…." Exh. 52 (34 USP 797 at 350) (emphasis added).

Thus, Cadden was well aware that misrepresenting his compliance with USP-797 to customers and flagrantly violating USP-797's requirements created the risk of serious bodily injury or death to all patients who were administered NECC's substandard and dangerous drugs. Nevertheless, despite this knowledge, Cadden regularly and routinely disregarded many of the most significant requirements of USP-797.  Indeed, as the First Circuit made clear, the evidence at trial was sufficient for the jury to reasonably conclude both that "Cadden caused the deaths of patients by directing the shipment of the deficiently prepared medications that caused the deaths" and that Cadden was "well aware of the type of risk that he was running by operating NECC in an

unsafe manner and then permitting a high-risk sterile compounded medication like MPA to be distributed under the false representation that it had been compounded in accord with USP-797." *Cadden*, 965 F.3d at 19-20.

*Improper Sterilization*

First, Cadden knew that NECC was improperly sterilizing the MPA, and did not verify the sterilization process as required by USP-797 in several ways.  As the trial evidence demonstrated, Cadden knew that NECC was not sterilizing the drugs for the 20 minutes required by the logged formula worksheets.  NECC was also not using biological indicators to verify that the sterilization process was working.  Cadden also knew they had not verified the load patterns for sterilizing the numerous high-risk drugs they were making.  Each of these failures to verify sterilization as required by USP-797 created a conscious and reckless risk that the drug could cause death or serious bodily injury.  *See e.g.*, Trial Tr. at 59-65 (Feb. 23, 2017) (testimony of FDA Investigator Degarmo) (testifying that Cadden told her NECC was autoclaving the MPA for 20 minutes as required by the formula worksheets, but NECC's autoclave records indicated the MPA was sterilized for *as little as 4 minutes*) (emphasis added); Trial Tr. at 42 (Feb. 17, 2017) (testimony of NECC Quality Assurance Officer Annette Robinson) (stating that during the outbreak, Cadden instructed her to order biological indicators to verify sterilization in the autoclave and told her that "*we should have been using them all along*") (emphasis added); Trial Tr. at 67 (Feb. 23, 2017) (testimony of FDA Investigator Degarmo) (testifying that Cadden admitted that NECC did not verify the load patterns of their autoclave cycle to ensure sterility).

*Lack of Testing*

Second, the jury heard overwhelming evidence that Cadden knew that NECC was not properly testing the MPA as required by the USP.  First, NECC was not doing end-product testing.

*See e.g.,* Trial Tr. at 37 (Feb. 22, 2017) (testimony of FDA Investigator Donohue) (testifying that she warned Cadden in 2002 about NECC's lack of end-product testing and that *"people can get really sick or die"* if his drugs were not properly sterilized) (emphasis added); Exh. 798, at 9 (Ltr. from Cadden to FDA Investigator Donohue (Feb. 26, 2003)) (misrepresenting that NECC would perform *end-product testing and quarantine drugs going forward*) (emphasis added); Exh. 239 (email from Cadden to Sharon Carter (Jul. 25, 2012) (explaining the lack of end-product testing as "[w]hat your [sic] not seeing, is what we are currently not doing *but should be doing*") (emphasis added); Trial Tr. at 69 (Feb. 23, 2017) (testimony of FDA Investigator Degarmo) (explaining that Cadden admitted during the outbreak that NECC was *only testing the bulk MPA solution not the end product and sending only a single 5ml vial,* contravening USP-797 and NECC's own SOPs). Also, NECC was only testing one 5ml vial from each lot of MPA for sterility.  This was woefully and dangerously inadequate.  For the size of each MPA lot NECC made, the USP required sterility testing of 20 vials each of 1ml, 2ml and 5ml sized-vials to ensure a statistically significant sample was tested to ensure sterility of the lot.  Trial Tr. at 75 (Feb. 28, 2017) (testimony of Eric Kastango); Trial Tr. at 44 (Feb. 22, 2017) (testimony of FDA Investigator Donohue) (testifying that she warned Cadden on numerous occasions that NECC was not testing enough samples and not in compliance with the USP); Exh. 799, at 3 (Ltr. from Cadden to FDA Investigator Donohue (May 16, 2003)) (informing the FDA that NECC would be sending "*representative samples* of sterile medication preparations" as required by USP-71) (emphasis added).  Selling drugs that are marketed and labeled as sterile to medical clinics without properly testing them is a quintessential example of consciously and recklessly putting patients at risk of death or serious bodily injury.

*Shipping Without Test Results*

Third, the evidence demonstrated that Cadden directed NECC's drugs to be shipped prior to receipt of test results in violation of USP-797.  *See e.g.*, Trial Tr. at 154-55 (Jan. 26, 2017) (testimony of Nick Booth) (testifying that on multiple occasions he observed Cadden personally approving the shipment of drugs prior to the receipt of test results); Exh. 243 (email from Cadden to Christopher Leary (Aug. 17, 2012)) (instructing Leary to ship drugs prior to receipt of test results); Exh. 266 (email from Cadden to Glenn Chin and Leary (Aug. 28, 2012) (stating, "I have no way of explaining to a client that we shipped before we had full sterility data."); Trial Tr. at 73 (Feb. 23, 2017) (testimony of FDA Investigator Degarmo) (identifying 13 shipments of contaminated MPA that were sent prior to receipt of test results).  To conceal this practice, Cadden directed NECC staff to mislabel drugs with lot numbers from older tested lots.  *See e.g.*, Exh. 231 (email from Cadden to Chin (Aug. 10, 2011)) (directing Chin to "make as many lots as you like 'internally' but only *label vials with lot # of tested lots to cover our ass*") (emphasis added); Trial Tr. at 130 (Jan. 25, 2017); (testimony of Owen Finnegan) (explaining that the drugs would be labeled with the lot number of whatever had been tested); Trial Tr. at 89 (Feb. 6, 2017) (testimony of Cory Fletcher) ("We obviously wouldn't have test results for the 8/10 lot.  So if drugs needed to go out in the meantime, we would have labeled them with the '6/29' lot.").  During the critical early stages of the outbreak, Cadden falsely told Investigator Degarmo that all of NECC's *drugs were quarantined pending the receipt of test results*.  Trial Tr. at 72 (Feb. 23, 2017).  The fact that Cadden did not even wait for test results before shipping high-risk drugs demonstrates his total disregard for patient safety (and for his testing procedures).  And it is yet another example of consciously putting patients at risk of death or serious bodily injury.

*Failing to Warn Customers of Non-Sterile Results*

Fourth, the evidence showed that even when Cadden was notified of non-sterile test results, he did not tell his customers about those results despite the fact that the health of patients was at risk.  He just let the hospitals unknowingly use it.  In fact, when Cadden was notified of the non-sterile results of an antibiotic wash used to clean post-surgical wounds, he instructed Annette Robinson to lie to the testing company and say that the lot had been discarded (betraying his knowledge that he should not have shipped the drugs before receiving test results).  Specifically, Cadden wrote to Robinson, "[o]bviously do not discuss with him…I do not see anything else to do…*just tell him it's easier and cheaper to just discard lot and remake if u need to tell him anything.  No more investigation*."  Exh. 1002 (emphasis added).  Robinson testified that Cadden's instruction troubled her because "I think I would want to know what was in it and who caused it.  It's going into people's bodies."  Trial Tr. at 164 (Feb. 16, 2017).  In fact, the non-sterile lot had already shipped to Good Shepherd Hospital.  Lanndon Rose, the director of pharmacy at Good Shepherd Hospital, testified that he never received notice from NECC about any problems with the drug, and that the contaminated antibiotic was used on patients at the hospital.  Trial Tr. at 110-11 (Jan. 30, 2017).  *See also* Trial Tr. at 48 (Jan. 24, 2017) (testimony of Deborah Faint) (testifying that NECC never notified Winchester Hospital of a non-sterile result); Trial Tr. at 19 (Jan. 25, 2017) (testimony of Andrew Cordiale) (testifying that NECC never notified Glens Falls Hospital of a non-sterile result).  Cadden's consistent responses to these three nonsterile results in short order in the summer of 2012 – to ignore and bury, rather than investigate and warn – plainly demonstrates his conscious and reckless disregard for patients' health.  He simply did not care whether people got hurt.

*Ignoring Cleaning and Environmental Monitoring*

Fifth, there was overwhelming evidence that Cadden and others at NECC routinely ignored cleaning responsibilities and environmental monitoring results. *See* Trial Tr. at 137 (Jan. 26, 2017) (testimony of Nick Booth) (testifying that "the priority was…to get the drug made and sent out" and as a result cleaning was missed); Trial Tr. at 143-44 (Jan. 24, 2017) (testimony of Owen Finnegan) ("Cleaning became much less of a stressed importance. It was much more stressed that production was done, that we got the orders out."). NECC's decreased cleaning led to increased alert and action-level hits in its environmental monitoring. Robinson testified that in 2012, "there was a lot of mold" detected in her environmental monitoring and when she discovered mold growing in her samples, she showed the results to Cadden "[b]ecause mold is bad, and just something needed to be done." Trial Tr. at 122 (Feb. 16, 2017). When the mold growths were particularly bad, Robinson testified that she showed the actual petri dishes of overgrown mold to Cadden so he could see it for himself. *Id.* at 123. Robinson explained that in those circumstances, the mold would cover the plates. *Id.* In fact, there was ample evidence that Cadden was well aware of the presence of mold inside NECC's clean rooms. *See e.g.*, Exh. 334 (E-mail from Cadden to E. Cardona (Feb. 29, 2012)) (stating that NECC's internal environmental monitoring results "showed more 'mold' on 5-6 floor areas than we have ever seen before"); Exh. 160 (E-mail from Cadden to Chin (Jul. 3, 2012)) (stating "we have another fungal bloom on June 28th"); Exh. 161 (E-mail from Cadden to Chin, Leary, and Svirskiy (Jul. 9, 2012)) (stating "we had another fungal bloom last month").

In short, Cadden knew that failure to comply with USP-797 posed a risk of serious bodily injury or even death to patients exposed to nonsterile drugs. Despite this information, Cadden flouted, and directed others to flout and disregard, USP-797. By doing so, Cadden acted with

"conscious or reckless risk of death or serious bodily injury" to the patients who received medications compounded at NECC—as inevitably and tragically did occur.

The evidence presented at trial is more than sufficient to demonstrate that Cadden's actions "involved a reckless risk of death or serious bodily injury." USSG § 2B1.1(b)(16). *See e.g.*, *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015) (affirming application of two-level increase for defendant who committed health care fraud by placing drug addicts in substandard facility); *United States v. Mateos*, 623 F.3d 1350, 1371 (11th Cir. 2010) (affirming application of § 2B1.1(b)(15) to sentencing of defendant, a licensed nurse, who gave unnecessary injections to HIV-positive patients, none of whom were actually harmed, because "any injection always carries some risk of infection or other complications, and that risk is especially high when the patients have HIV and weakened immune systems"); *United States v. Awad*, 551 F.3d 930, 940 (9th Cir. 2009) (affirming application of the enhancement in a health care fraud sentencing where the defendant failed to supervise respiratory treatments given to patients as required due to the risk of adverse side effects, even though no patient reported any such effects); *United States v. Prigmore*, 1996 WL 464030, at *10 (2d. Cir. 2005) (finding the enhancement applies to the defendants' deliberate violations of FDA regulations regarding heart catheters despite no patient harm); *United States v. Laughlin*, 26 F.3d 1523, 1530 (10th Cir. 1994) (finding enhancement applies where defendant performed unnecessary surgical procedures as part of a fraudulent double-billing scheme that resulted in victim's hospitalization). Accordingly, the two-level enhancement under USSG § 2B1.1(b)(16)) applies.

## Vulnerable Victim Enhancement

This Court previously declined to apply the "vulnerable victim" enhancement under USSG § 3A1.1(b)(1) because it concluded that "the victims at issue, given the nature of the jury's

verdict, were the purchasers of the drugs"—i.e., hospitals and other medical facilities—rather than the patients who received the drugs.  *Cadden*, 965 F.3d at 35.  The First Circuit found that this was error because, under the USSG, a victim is "a person . . . who is a victim of the offense of conviction and *any conduct* for which the defendant is accountable under § 1B1.3 (Relevant Conduct)."  *Cadden*, 965 F.3d at 35 (quoting USSG § 3A1.1 cmt. n.2) (emphasis added).  Thus, "'[t]o come within the guidelines' definition' of 'victim,' 'one need not be a victim of the charged offense so long as one is a victim of the defendant's other relevant conduct.'"  *Id.*  (quoting *United States v. Souza*, 749 F.3d 74, 86 (1st Cir. 2014)).  As the First Circuit explained:

> Cadden's "relevant conduct" included, among other things, any actions that he took to direct the shipment of contaminated medications to hospitals during the commission of mail fraud.  The "victims" of that conduct could plausibly include the patients who foreseeably would use those contaminated medications.  Thus, we agree with the government that the District Court committed an error of law in holding that, due to the nature of Cadden's convictions, the reach of the vulnerable victim enhancement is necessarily limited to those 'victims' who were defrauded – namely, the customers of NECC itself.

*Id.* at 35-36.

The commentary to the Sentencing Guidelines provides a pertinent example of when the enhancement applies:  Patients in "a fraud case, in which the defendant marketed an ineffective cancer cure."  USSG § 3A1.1, cmt. n.2.  Similarly, in *United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997), the defendant was convicted of mail fraud and other offenses relating to the submission of false claims for medical services.  The Fifth Circuit held that patients involved in the scheme—who were not the victims of the false claims, but who were prescribed and became addicted to prescribed narcotics as part of the fraudulent scheme—qualified as "vulnerable victims" under USSG § 3A1.1.

The patients hurt by Cadden's crimes fit squarely within this rubric.  By reason of their debilitated health conditions, they sought epidural steroid injections at medical centers and pain

clinics for back and joint pain.  In many cases, these injections were the victims' last hope for avoiding serious back surgeries and alleviating chronic pain.  They were given NECC's contaminated drugs without any choice or say of their own, and had no way to detect or prevent against the fungal contamination.  These patients trusted their doctors and those doctors trusted the representations made by NECC:  That NECC was the "Ferrari" of sterile-compounders and that it complied with the USP-797 protocols that were intended to ensure that the drugs were safe. Neither patients nor doctors had any way to know that these representations were lies and that NECC—under Cadden's direction—grossly flouted USP-797 and knowingly endangered patient lives.  Both patient and doctor trusted that the drugs compounded at NECC were safe and based on that trust, patients believed that the medications injected into their spines would relieve their pain.  But the trust of these patients and doctors was tragically misplaced.  Instead of relieving patients' pain, NECC's drugs dramatically increased it.  And in more than 100 cases, the patients' trust cost them their lives.  As the children of one deceased victim, Joseph Rushlow said in their victim impact statement:  "Beginning in 2012, the lives of our family and hundreds of other families were changed forever by reckless decisions made by the very people we trust to provide the best available care when they decided to continue to manufacture and distribute a product they knew was being produced in an unsanitary environment … An injection that was meant to give our dad relief from pain became an injection that sent him to his tortuous death."  The drugs were shipped to 76 facilities in 23 states, and used on thousands of unsuspecting, trusting, vulnerable patients.  Rather than being safe and efficacious—as promised—the drugs produced by NECC under Cadden's supervision and directions sickened and, in more than 100 cases, killed patients. These patients were victims of Cadden's crimes, and they were without question highly vulnerable.

Accordingly, the vulnerable victim enhancement under § 3A1.1(b)(1) and (2) applies, and four levels should accordingly be added to Cadden's offense level.

### The Re-Calculated Sentencing Guidelines Range, the Section 3553 Factors, and the Government's Recommended Sentence

Applying the two-level enhancement because Cadden acted with "the conscious or reckless risk of death or serious bodily injury," USSG § 2B1.1(b)(16), and the four-level enhancement because Cadden "knew or should have known that a victim of the offense was a vulnerable victim" and "the offense involved a large number of [such] vulnerable victims," USSG §§ 3A1.1(b)(1) and 3A1.1(b)(1), results in an increase to Cadden's total offense level from 29 to 35. Cadden's corrected sentencing guidelines range is as follows:

|  | Offense Level |
|---|---|
| Mail Fraud racketeering base offense level (§2B1.1(a)(1)) | 7 |
| - Total fraud loss > $550,000 - $1,500,000 (§2B1.1(b)(1)(f)) | +14 |
| - Involved 10 or more victims and committed through mass marketing (§2B1.1(b)(2)) | +2 |
| - Conscious or reckless risk of death or bodily injury (§2B1.1(b)(16)) | +2 |
| **Offense Level for Grouped Mail Fraud Acts / Counts** | **25** |
| - Organizer or leader of criminal activity (§3B1.1(a)) | +4 |
| - Abuse of a Position of Trust (§3B1.3) | +2 |
| - Large Number of Vulnerable Victims (§3A1.1(b)(1) & (2)) | +4 |
| **Total Adjusted Offense Level** | **35** |

This total adjusted offense level, when coupled with Cadden's Category I criminal history, results in a sentencing guidelines range of 168 to 210 months.

The Government submits that this range better reflects the gravity of Cadden's offense and the profound and widespread harm he caused; the Court should sentence Cadden at the top end of the guidelines range—just as it did previously—and impose a term of incarceration of 210

months.[1]   In making this recommendation, the Government does not ask the Court to blithely adhere to the recalculated sentencing guidelines range.   Rather, the corrected guidelines range reflects a moral calculus that is significantly different than the one applied at Cadden's prior sentencing.   The revised range of 168 to 210 months reflects that, under the guidelines, Cadden is culpable for his widespread and far-reaching fraud, and should be held responsible for (i) acting in flagrant disregard for the risk of death or serious bodily injury that his conduct posed; and (ii) the terrible harm that Cadden's conduct imposed on literally hundreds of highly vulnerable patients.

This conclusion holds true when the new guidelines range is viewed through the lens of the Section 3553(a) factors.   To "reflect the seriousness of the offense," "promote respect for the law," and "provide just punishment for the offense," 18 U.S.C. § 3553(a)(2)(A), the Court's sentence must be sufficient to hold Cadden to account for disregarding the tremendous risk of injury and death his conduct posed to his victims.   Similarly, a sentence that does not account for the hundreds of vulnerable victims harmed by Cadden fails to adequately consider "the nature and circumstances of the offense."   18 U.S.C. § 3553(a)(1).   The revised sentencing guidelines range more adequately captures these factors; the previous guidelines range (and the previously imposed sentence of 108 months) failed to do so.[2]   The decisions Cadden made in running NECC led to

---

[1] When previously sentencing Cadden to the top-end of the guidelines range, the Court explained that the "persistence of the misrepresentations in this case [were] aggravated" and that Cadden's fraud "led to something far worse" than ""financial devastation."   Cadden Sentencing Transcript (June 26, 2017) 120:20-121:7.

[2] As the Court previously expressed, "if the [sentencing guidelines range] appears reasonable, the judge is to impose a sentence accordingly, but he or she retains the discretion to depart upwards or downwards from the Guidelines.   However, that discretion is to be exercised only where the Guidelines fail to adequately address the magnitude of a called-for adjustment or perhaps overstate its significance.   Cadden Sentencing Transcript (June 26, 2017) 113.   In this case, the revised guidelines range does not overstate the significance of Cadden's crimes and the harm he caused to hundreds of innocent people.

significant harm to so many.  He failed over a sustained period of time to stop his dangerous conduct or reverse course despite the warning signs of the increasing danger, such as the dramatic scaling of drug production at all costs, escalating environmental monitoring hits for mold and bacteria in 2012, and the nonsterile results received in the summer of 2012 for lots of Bacitracin and Polymyxin Bacitracin.  These were all warning signs of the severe danger that was to come, but that Cadden chose to ignore.  In fact, all he did was ramp up the dangerous production until the devastation he was causing stopped him.  A sentence at the top end of the correct sentencing guidelines range more adequately captures the gravity and context of Cadden's offenses and takes into consideration the horrific harms he caused.

### CADDEN'S FORFEITURE OBLIGATION

Title 18, United States Code Section 1962(a)(3) requires a defendant convicted of racketeering offenses to forfeit "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity."  Pursuant to this statute, this Court imposed a forfeiture order in the amount of $7,545,501.  Doc. 1226.  As the First Circuit subsequently explained, this amount was based upon "the total amount of NECC proceeds that were paid to Barry Cadden personally during the life of the racketeering enterprise, that is, from March 26, 2010 to October 31, 2012."  *Cadden*, 965 F.3d at 36.  Both the Government and Cadden challenged the amount of the Court's forfeiture order on appeal.  The First Circuit found error in the Court's calculation in two respects.

First, agreeing with Cadden, the First Circuit held that this Court erred in finding that all of Cadden's NECC proceeds were "obtained" "from racketeering activity."  *Id.* at 36-37 (quoting 18 U.S.C. § 1963(a)(3)).  Rather, the First Circuit concluded that Cadden's NECC proceeds were interests "outside the [racketeering] enterprise" and so "'subject to a rule of proportionality,' and

[] only forfeitable 'to the extent they are tainted by the racketeering activity.'" *Id.* at 37 (quoting *United States v. Angiulo*, 897 F.2d 1169, 1211-1212 (1st Cir. 1990)).  Accordingly, the Court remanded with instructions that this Court determine, in the first instance, the "portion of Cadden's earnings from NECC over the relevant time period that were tainted by racketeering activity and therefore subject to forfeiture." *Id.* at 38.

Second, agreeing with the Government, the First Circuit found this Court erred by declining to include in its forfeiture order NECC proceeds received by Cadden's wife, Lisa Cadden, as a consequence of her ownership stake in NECC that were deposited in a bank account jointly controlled by both Lisa Cadden and Barry Cadden. *Id.* at 39-40.  The First Circuit concluded that such NECC proceeds were "obtained" by Cadden within the meaning of 18 U.S.C. § 1363(a)(3) and therefore subject to forfeiture to the extent that those proceeds were tainted by racketeering activity:

> Because we hold that Cadden "obtained" the NECC "proceeds" that Lisa Cadden deposited in the couple's joint bank account, we remand for the District Court to consider what amount of Lisa Cadden's earnings should be included in Barry Cadden's forfeiture order because they were tainted by racketeering activity.

*Cadden*, 965 F.3d at 40.

Based upon the First Circuit's reasoning, the Government submits that the proper amount of forfeiture can be calculated in two steps.  The first step is to determine the total NECC proceeds obtained by Cadden—including both amounts paid directly to Barry Cadden as well as the amounts paid to Lisa Cadden that were deposited into their joint bank account—during the life of the racketeering enterprise as defined by the Court, that is, from March 26, 2010 to October 31, 2012.  Second, the Court must assess what percentage of those proceeds are tainted by the racketeering activity and apply that percentage to the total NECC proceeds obtained by Cadden to determine the proceeds subject to forfeiture.

**NECC Proceeds Obtained by Cadden from March 26, 2010 through October 31, 2012**

This Court previously determined that the total proceeds paid to Barry Cadden in the period from March 26, 2010 through October 31, 2012 were $7,545,501—the amount of the Court's prior order of forfeiture.  *See* Doc. 1226.  The basis for this conclusion was Government trial exhibit 1924 (setting forth annual NECC distributions to Barry Cadden and Lisa Cadden from 1998 through October 2012), the trial testimony of Roger H. Edwards, and the July 7, 2017 Declaration of Roger H. Edwards (Doc. 1167-1) ("The Edwards Declaration").

In addition to providing the amount of NECC distributions to Cadden during the life of the racketeering enterprise, the Edwards Declaration also provides, based upon the same records, a calculation of the NECC proceeds distributed to Lisa Cadden and deposited into their jointly controlled account:  $5,657,609.  The total NECC proceeds obtained by Cadden during the life of the racketeering enterprise, calculated as the sum of these two figures is:  **$13,203,110**.

**Proportionality Analysis**

As detailed above, Cadden engaged in a pervasive fraudulent course of conduct by representing to customers that NECC was "dedicated to providing the highest quality compounded medications and services to patients and prescribers," and that NECC's products were compounded in compliance with USP-797, when, in fact, NECC flagrantly disregarded USP-797's dictates and manufactured supposedly sterile compounds in filthy conditions and in highly substandard ways.  *See supra* pp. 8-13.  Moreover, the record evidence also shows that NECC's customers would not have purchased these supposedly sterile products if they knew that NECC's representations regarding compliance with USP-797 were false.  *See, e.g.,* Trial Tr. (Jan 17, 2017) 101-102 (NECC customer testifying that he would not have purchased from NECC if he believed that NECC was not taking proper precautions to ensure sterility of drugs); Trial Tr. (Jan. 25, 2017)

9-10 (NECC customer testifying that he relied upon NECC's representations concerning compliance with USP-797's requirements); Trial Tr. (Jan 25, 2017) 47-48 (NECC customer testifying that he would not have purchased drugs from NECC if he knew they were not sterile).

It follows that all of the revenue that NECC earned from the sales of such supposedly-USP-797 compliant medications, compounded in supposedly-sterile clean rooms during the life of the racketeering enterprise, are appropriately considered proceeds of NECC's fraudulent racketeering enterprise.  The First Circuit's order states that the Government has not, to this point, "identified that amount" of such tainted proceeds and, accordingly, instructs the Court to "assess," based on the existing record, "the portion of Cadden's earnings from NECC over the relevant time period that were tainted by racketeering activity and therefore subject to forfeiture."  *Id.* at 38.

The government took the position at trial that all of NECC's sales were fraudulent because of the extensive misrepresentations NECC sales representatives made about NECC's sterile drug production practices.  As the Court heard from multiple witnesses, NECC's business was overwhelmingly high-risk sterile compounding, which was governed by USP-797.  These false representations were the foundation on which Cadden built NECC and which drove its enormous profits.  As a result, the record of this case does not include evidence sufficient to calculate precisely the revenue generated by NECC in the period from March 26, 2010 through October 31, 2012 from the fraudulent sales of only supposedly sterile medications, excluding the minimal amount of drugs made in the nonsterile clean room.  The record, however, is more than sufficient for the Court to reach the conservative conclusion that at least 85% of NECC's revenue were generated from such sales.  Put simply, NECC's primary business was the high-risk compounding of supposedly sterile prescription drugs, and the sale of these drugs necessarily relied on fraudulent

misrepresentations about NECC's adherence to USP-797.  This conclusion is evidenced by, among

other things:

- ***The physical layout of NECC:***  Within NECC, drugs were compounded in three distinct spaces.  Two of these spaces were so-called sterile clean rooms, including clean room 1, by far the largest of the compounding spaces and the heart of NECC's operations, and clean room 2, where Scott Connolly, Gene Svirskiy, and others made supposedly sterile cardioplegia.  Only one area was dedicated to non-sterile compounding.  *See* Exh. 1383 (NECC Floorplan).  As the floorplan indicates, the vast majority of NECC's compounding space was dedicated to sterile compounding, which drove its business.

- ***The Allocation of Pharmacists and Technicians:***  Just as the lion's share of physical space was dedicated to sterile compounding, the vast majority of pharmacists and technicians worked in clean rooms 1 and 2 and were engaged in high-risk sterile compounding.  *See* Exh. 3000 (listing five licensed pharmacists and *fifteen* pharmacy technicians working in the clean rooms and only three pharmacists working outside the clean rooms (Jill Keough replaced Michelle Thomas in August 2012); Exh. 368 (NECC 2011 Inspection Report) at 2 (listing pharmacists and technicians).  Just as the vast majority of the physical space was dedicated to sterile compounding, so too were NECC's compounding employees.

- ***NECC's Sales and Marketing:***  NECC focus on sterile compounding is further evidenced by NECC's advertising and marketing, which represented NECC to its customers and the public as engaged primarily in the compounding of high-risk, sterile compounds.  *See, e.g.,* Exhs. 103, 733 (advertising NECC's "strong focus on sterile products"); Exh. 67 (NECC "Report Card" representing that "we are meeting the associated requirements outlined in USP <797> 'Pharmaceutical Compounding-Sterile Preparations.'"); Trial Tr. (Jan 13, 2017) 36:18-37:17 (NESS sales representative Mario Giamei testifying that NECC's "sales pitch" touted manufacture of preservative-free injectables).

- ***Cadden's Statements Describing NECC's Business to Sales Staff:***  While training the MSM sales representatives, Cadden described NECC at various points as primarily a high-risk sterile compounder.  *See* Exh. 1742 (Cadden's sales training video, in which he states, "[t]hey are what they call high risk, which is what we do, basically, every day.  We produce, we don't like the term high risk, because it has a negative connotations [sic].  But it's producing final sterile products used on a patient from a non-sterile active ingredient or non-sterile ingredients;" "Some of the products that we produce are very dissimilar from what Ameridose produces.  So that's a simplistic way of looking at the two companies.  Ameridose, large volume admixing FDA licensed products, is what they do.  New England Compounding, they call them high risk aseptic sterile compounding.  Starting from all of the non-sterile ingredients, making those final products and somehow end-product sterilization to produce those final dosage forms;" "Understand that we're not selling jellybeans.  These are, you know, sterile products.").

- ***The Massive Scale of NECC's Shipments of Sterile Compounds:***  Cadden's own trial witness, Jared Gustafson, made clear the massive scale of NECC's sale of supposedly sterile products.  Specifically, Gustafson testified that, from January 1, 2006 through May 20, 2012 NECC

shipped 859,125 vials of injectable steroids.  Trial Tr. (May 10, 2017) at 113:12, including 291,941 vials of supposedly sterile preservative free MPA compounded at a concentration of 80 milligram per milliliter.  His testimony concerning the number of vials, which drove NECC's sales and profits, is summarized below:

| Total Vials Sold from January 1, 2006 to May 20, 2012 | |
|---|---|
| methylprednisolone 80mg / mL | 291,941 |
| methylprednisolone 40 mg / mL | 74,141 |
| betamethasone repository 6 mg/ mL | 189,598 |
| triamcinolone acetonide 40 mg / mL | 303,445 |
| **TOTAL VIALS** | **859,125** |

NECC's business was sterile compounding.  Non-sterile compounding was little more than a sideline business activity, with professional staff and revenue that were *de minimis* in comparison to NECC's sterile compounding operation—as this Court is well familiar from overseeing Cadden's trial (and the three others).  Accordingly, approximating that 85% of NECC's business activities were dedicated to sterile compounding, this Court should apply that same percentage to determine what share of Cadden's NECC revenues are tainted by racketeering activity.  Doing such a calculation leads to the result that **$11,222,643.50** (85% of the $13,203,110 total NECC proceeds obtained by Cadden during the life of the racketeering enterprise) are tainted proceeds and so subject to forfeiture.

## RESTITUTION OWED BY CADDEN

The Government moved for entry of an order of restitution on September 26, 2017. Doc. 1213.  After extensive briefing, the Court stayed the Government's request pending resolution of the parties' appeals to the First Circuit.  Doc. 1353.  The First Circuit's remand now clears the way for the resolution of the Government's pending motion.

The Mandatory Victim Restitution Act of 1996 ("MVRA") makes restitution mandatory for crimes involving fraud or deceit.  18 U.S.C. 3663A(c)(1)(A)(ii).  Here, the jury convicted Cadden of 57 felony counts, including racketeering, racketeering conspiracy, mail fraud, and

violations of the Food, Drug, and Cosmetic Act ("FDCA"); fifty-four of those counts involved "fraud or deceit."

The Court is thus required to identify the victims of Cadden's crimes and determine the amount of restitution owed to them.  In this case, the victims of Cadden's crimes are the patients who were injected with NECC's contaminated drugs, the medical facilities that purchased them, and insurance plans that paid for patients' treatment.  The Government respectfully submits that the record evidence amply demonstrates that the amount owed to these victims is $82 million.

**Patients Harmed by Cadden's Fraudulent Drugs Qualify as Victims under the MVRA**

The MVRA defines a "victim" as:

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).  The First Circuit has explained that this statutory language means that the government must show not only "but-for" causation, "but also that the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)."  *United States v. Cutter*, 313 F.3d 1, 7 (1st Cir. 2002) (quoting *United States v. Vaknin*, 112 F.3d 579, 590 (1st Cir. 1997)).  *See also Chin*, 965 F.3d at 60 ("Put otherwise, the statute asks 'was the harm foreseeable?'") (quoting *United States v. Soto*, 799 F.3d 68, 98 (1st Cir. 2015)).  As the First Circuit further explained in the companion case to Cadden's appeal, the identity of the victims is not narrowly circumscribed by the nature of the offense of conviction (here fraud charges), but instead is based more broadly on Cadden's conduct in the course of that offense:

> [t]he restitution analysis focuses on the causal relationship "between the <u>conduct</u> and the loss," not between the nature of the statutory offense and the loss.  This approach to the "victim" analysis tracks the language of the statute, as it focuses on whether the victim was "harmed as a result of the <u>commission</u> of an offense," or

"by the defendant's criminal <u>conduct</u> in the course of [a] scheme, conspiracy, or pattern [of criminal activity]."

*Chin*, 965 F.3d at 59-60. "When an offense 'involves as an element a scheme, a conspiracy, or pattern of criminal activity,'" like Cadden's fraud and racketeering related convictions, "'any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern' is a victim." *Id.* at 59 (citing 18 U.S.C. § 3663A(a)(2)).

Applying the First Circuit's two-part test, the patients harmed by Cadden's fraudulent drugs clearly fall within the MVRA's definition of a "victim." Cadden was found guilty of operating NECC as a fraudulent criminal enterprise dispensing hundreds of thousands of substandard and dangerous drugs, including the three contaminated lots of preservative-free MPA. Among other crimes, he was convicted of 27 counts of mail fraud related to shipments of the three contaminated MPA lots. It is undisputed that these shipments killed dozens and injured hundreds more. Cadden's counsel conceded as much. *See* Trial Tr. (March 16, 2017) 66:25-67:3 (Cadden's counsel: "[N]or, of course, is there any dispute about the fact that each of these 25 patients died as a result of being injected with methylprednisolone acetate that was compounded at NECC.").

These victims would not have been harmed but-for Cadden's criminal conduct in the course of his fraudulent scheme. 18 U.S.C. § 3663A(a)(2). Cadden oversaw NECC's operation as a criminal enterprise that marketed itself to customers as complying with USP-797 and holding itself to the highest standards, while, in fact, NECC engaged in grossly and recklessly substandard compounding practices. As a result, more than 17,000 vials of contaminated MPA were shipped to medical facilities across the country, where they were injected into hundreds of unsuspecting, vulnerable patients.

But-for NECC's false marketing, these clinics would not have purchased NECC's products. Pharmacists and clinicians explicitly testified that they relied upon NECC's false

representations regarding compliance with USP-797 and would not have purchased drugs from NECC if they did not believe NECC took appropriate precautions to ensure sterility.  *See, e.g.,* Trial Tr. (Jan 17, 2017) 101-102; Trial Tr. (Jan. 25, 2017) 9-10; Trial Tr. (Jan 25, 2017) 47-48. And but-for NECC's recklessly dangerous compounding practices—improper sterilization, *see supra* p. 8, lack of testing, *see supra* p. 9, shipping without test results, *see supra* p. 10, failing to warn customers of non-sterile results, *see supra* p. 11, ignoring cleaning and environmental monitoring, see *supra* pp. 12-13, contaminated drugs would not have been shipped to and used by these clinics.

In addition, the harm caused by Cadden's conduct was certainly foreseeable.  Indeed, the entire objective of the protocols in USP-797, which Cadden was required to know and follow, is "to describe conditions and practices *to prevent harm, including death*, to patients that could result from…microbial contamination…" and "*to prevent harm and death to patients* treated with [compounded sterile preparations].") (emphasis added).  Exh. 52 (34 USP 797, at 336).  In particular, but for Cadden's extensive misrepresentations regarding NECC's facility, processes, and drug quality—including the tainted MPA—the drugs would not have been purchased by deceived clinics and hospitals where they were injected into the victims' bodies, causing death and physical and financial harm.  These harms—over 100 deaths and 793 injured patients—were the direct and foreseeable result of Cadden's criminal conduct.[3]

The government submits that the patients harmed by NECC's contaminated drugs are clearly victims entitled to restitution, as required by the MVRA.

---

[3] The First Circuit made explicit that the evidence was sufficient for a jury to conclude *beyond a reasonable doubt* that "Cadden caused the deaths of patients by directing the shipment of the deficiently prepared medications that caused the deaths" *Cadden*, 965 F.3d at 19, which necessarily implies sufficiency under the lower standard of proof required for imposition of an order of restitution.

**Calculation of the Amount of Restitution Owed to Harmed Patients and Their Families**

Because the patients harmed in the fungal meningitis outbreak caused by Cadden's criminal actions meet the definition of "victim" under the MVRA, they are entitled to mandatory restitution pursuant to the statute.  Specifically, the MVRA states that "when sentencing a defendant convicted of an offense [committed by fraud or deceit], the court *shall order*…that the defendant make restitution to the victim of the offense, or, if the victim is deceased, to the victim's estate."  18 U.S.C. § 3663A(a)(1) (emphasis added).  379 patients harmed in the outbreak have submitted restitution requests, as did certain medical facilities that purchased the drugs and insurance plans that paid for patients' treatment.

Following imposition of Cadden's sentence, the government contracted with Thomas A. Barocci and Joshua Anderson of TAB Consulting to evaluate and analyze the restitution claims submitted by the patient victims in this case.  The accompanying TAB Report (Exhibit A hereto) details their economic analysis of the victims' requests.[4]  The expert declaration at the beginning of the report outlines the methodology used in evaluating and analyzing the various restitution

---

[4] Dr. Barocci submitted his initial analysis in a report dated September 25, 2017.  He submitted an updated report on January 25, 2018 in *United States v. Chin*, 14-cr-10363-2, reflecting (1) an analysis of economic losses to victims who sent in data after the initial report; and (2) an analysis of additional data provided by certain victims included in the first report.  The version of the summary table of the TAB Report submitted herewith under seal (Exhibit C to the TAB Report) corrects two typographical errors with respect to the restitution losses claimed by Victims 1051 and 1337; the out of pocket expenses for each of those victims should say "$0."  The correct figure ($0) was, however, used in calculating the restitution owed to each of those victims—as reflected in the victims' restitution worksheet (Exhibit D to the TAB Report)—and therefore these two typographical errors do not alter the total amount of restitution sought by the government.  This version also corrects a calculation error with respect to Victim 1095, whose losses were undercounted by $3,095, resulting in an increase in the total amount of restitution sought by the government by $3,095.  This version of the TAB Report encompasses the full set of known victims who are seeking restitution in the NECC matters.

claims.  The TAB Report conservatively calculates a total restitution amount of $80.1 million for the 379 patient victims.  *See* Exhibit A.

The TAB Report is well-supported.  The restitution calculations were performed by Thomas Barocci, who holds a Ph.D. in the field of economics and has authored hundreds of similar economic analyses over the past 40 years.  Dr. Barocci, the owner of TAB Consulting, personally reviewed the data and information for each individual prior to the economic analysis being performed, and reviewed it again following completion of the analysis.  While calculation of future medical expenses or lost income must involve certain economic assumptions, the assumptions that were required to complete the analyses for each victim were documented and explained in the TAB Report.  In sum, the TAB Report uses well-established and widely accepted economic analyses routinely used in federal courts throughout the nation.  Indeed, Dr. Barocci and Joshua Anderson of TAB Consulting performed a similar economic analysis in *United States v. Tsarnaev*, 13-cr-10200-GAO, which was adopted *in its entirety* by Judge O'Toole in fashioning the restitution order in that case.  The comprehensive economic analysis set forth in the TAB Report is substantially more than "a modicum of reliable evidence is required to establish a restitution award."  *United States v. Mahone*, 453 F.3d 68, 74 (1st Cir. 2006)).  Accordingly, this Court should order Cadden pay restitution of $82 million as identified in the TAB Report.

In addition, two clinics that purchased NECC's fraudulent drugs and two insurance plans that paid for patients' treatment submitted restitution requests totaling approximately $1.9 million.  *See* Exhibit B, filed under seal.  With respect to the clinics' restitution claims, the restitution award should account for the fact that the clinics endured substantial out-of-pocket losses as a result of Cadden's fraudulent scheme beyond the cost of NECC's contaminated drugs—including the cost of the unreimbursed care of patients infected by NECC's contaminated drugs, expenses associated with

the anti-fungal medication used to treat patients, the cost of an infectious disease specialist to treat the patients, the expenses of clinic staff to respond to the outbreak, and finally attorneys' fees incurred by the clinic as part of the investigation and prosecution of Cadden.

Pursuant to the MVRA, the Court should order Chin to pay restitution to the patient victims, medical facilities that purchased the tainted drugs, and insurance companies that paid the patients' claims, in a total amount of $82 million. The Government requests that the Court order that any restitution payments be made first to the individual patient victims, and that the clinics and insurance plans receive restitution payments only after the patient victims have been fully compensated.

## CONCLUSION

WHEREFORE, for the reasons set forth above, and for such other good cause as the Court may find, the government respectfully requests the Court:

(I)     Sentence Barry J. Cadden to a term of incarceration of 210 months;

(II)    Enter the proposed forfeiture order in the amount of $11,222,643.50; and

(III)   Enter an order of restitution in the amount of $82 million, with joint and several liability with Glenn A. Chin, with the individual patient victims to be paid before the insurance plans and clinics.

Respectfully submitted,

NATHANIEL R. MENDELL
Acting United States Attorney

By:    */s/ Amanda P.M. Strachan*
AMANDA P.M. STRACHAN
CHRISTOPHER R. LOONEY
DAVID G. LAZARUS
ALEXANDRA W. AMRHEIN
Assistant United States Attorneys
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated:  April 30, 2021

<u>Certificate of Service</u>

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to counsel for the defendant, who are registered participants as identified on the Notice of Electronic Filing (NEF).

By:    */s/ Christopher Looney*
Christopher Looney
Assistant United States Attorney

Dated:  April 30, 2021